**ORAL ARGUMENT NOT YET SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

## No. 23-1075

───────

BROOKFIELD WHITE PINE HYDRO LLC,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

───────────────

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

───────────────

**INITIAL BRIEF FOR RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

───────────────

MATTHEW R. CHRISTIANSEN
GENERAL COUNSEL

ROBERT H. SOLOMON
SOLICITOR

ANGELA X. GAO
ATTORNEY

FOR RESPONDENT
FEDERAL ENERGY REGULATORY
COMMISSION
WASHINGTON, DC 20426

INITIAL BRIEF: NOVEMBER 2, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties

All parties and intervenors before the Court are listed in

Petitioner's Circuit Rule 28(a)(1) certificate.

### B.    Rulings Under Review

1.    Notice of Denial of Water Quality Certification (Nov. 22, 2022), R.245, JA ___; and

2.    Order Addressing Arguments Raised on Rehearing, *Brookfield White Pine Hydro LLC*, 182 FERC ¶ 61,169 (Mar. 17, 2023) ("Rehearing Order"), JA ___-___.

### C.    Related Cases

No other cases are pending regarding the subject of the

Commission rulings on review.  However, *Erie Boulevard Hydropower,*

*LP v. FERC* (D.C. Cir. No. 23-1184) (in abeyance), implicates the same

regulatory provisions at issue here and likewise challenges a

Commission order declining to find waiver of a State's certification

authority under Clean Water Act Section 401, 33 U.S.C. § 1341.

*/s/ Angela X. Gao*
Angela X. Gao

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................1

STATEMENT OF THE ISSUE ...............................................3

STATUTORY AND REGULATORY PROVISIONS ..................4

STATEMENT OF FACTS ....................................................5

I.    Statutory And Regulatory Background ..........................5

    A.    The Clean Water Act empowers States to block or add conditions to any federal hydroelectric license issued under the Federal Power Act .............................5

    B.    Denial without prejudice is permissible where federal environmental review remains ongoing for a project proposal that continues to evolve. .........................8

    C.    The 2020 Rule, which governs this case, has since been replaced by the 2023 Rule. ...................................12

II.   The Shawmut Hydroelectric Project ..........................17

    A.    The First Certification Request ...........................18

    B.    The Second Certification Request ........................19

SUMMARY OF ARGUMENT ..............................................23

ARGUMENT ...................................................................25

I.    Standard of Review ................................................25

II.   The Commission Properly Interpreted 40 C.F.R. § 121.7(e) .........27

    A.    Read in context, the regulation does not require denials due to insufficient information to make all three findings. ........28

ii

B.     The Commission's interpretation aligns with both regulatory and statutory purpose. ........................................................... 41

III.    The Commission's No-Waiver Determination Should Be Affirmed Under Either Interpretation of § 121.7(e)(1) ................................ 45

A.     Substantial evidence supports the Commission's determination that the Denial satisfies § 121.7(e)(1). ......... 45

B.     The Denial satisfies § 121.7(e)(1) even under an interpretation that requires all three findings.................... 47

C.     Any error as to the Commission's analysis was harmless and would not preclude affirmance. ........................................... 52

CONCLUSION ....................................................................... 55

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*Alcoa Power Generating Inc. v. FERC,*
    643 F.3d 963 (D.C. Cir. 2011)...............................................5, 7, 8, 26

*Am. Bankers Ins. Grp. v. United States,*
    408 F.3d 1328 (11th Cir. 2005) ................................................29, 30

*Apple Inc. v. United States,*
    964 F.3d 1087 (Fed. Cir. 2020)........................................................31

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...........................................................................9

*Cal. State Water Res. Control Bd. v. FERC,*
    43 F.4th 920 (9th Cir. 2022).................................................7, 43, 44

*City of Tacoma v. FERC,*
    460 F.3d 53 (D.C. Cir. 2006) .........................................................43

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ........................................................................25

*Hoopa Valley Tribe v. FERC,*
    913 F.3d 1099 (D.C. Cir. 2019).............................................7, 43, 44

*Jama v. Immigr. & Customs Enf't,*
    543 U.S. 335 (2005) ........................................................................31

*Keating v. FERC,*
    927 F.2d 616 (D.C. Cir. 1991).............................................10, 11, 43

*Ky. Mun. Energy Agency v. FERC,*
    45 F.4th 162 (D.C. Cir. 2022) .......................................................26

iv

# TABLE OF AUTHORITIES

## COURT CASES                                                    PAGE

*Kisor v. Wilkie,*
     139 S. Ct. 2400 (2019) ............................................................. 36, 37

*Millennium Pipeline Co. v. Seggos,*
     860 F.3d 696 (D.C. Cir. 2017)........................................................ 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus,*
     719 F.2d 1159 (D.C. Cir. 1983)...................................................... 41

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
     551 U.S. 644 (2007) ....................................................................53

*Nat'l R.R. Passenger Corp. v. United States,*
     431 F.3d 374 (D.C. Cir. 2005).............................................28-30, 33

*N.C. Dep't of Env't Quality v. FERC,*
     3 F.4th 655 (4th Cir. 2021)...................................................35, 36, 44

*N.Y. State Dep't of Env't Conservation v. FERC,*
     884 F.3d 450 (2d Cir. 2018).......................................................... 11

*N.Y. State Dep't of Env't Conservation v. FERC,*
     991 F.3d 39 (2d Cir. 2021)............................................................ 11

*OfficeMax, Inc. v. United States,*
     428 F.3d 583 (6th Cir. 2005) .............................................. 29, 33, 34

# TABLE OF AUTHORITIES

## COURT CASES                                                    PAGE

*Peacock v. Lubbock Compress Co.,*
     252 F.2d 892 (5th Cir. 1958) ...................................... 29, 30, 34, 42

*Prohibition Juice Co. v. FDA*,
   45 F.4th 8 (D.C. Cir. 2022) .................................................. 53, 54, 55

*PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*,
   511 U.S. 700 (1994) ................................................................ 5, 6, 7

*Reese Bros. v. United States*,
   447 F.3d 229 (3d Cir. 2006) .......................................................... 28

*Slodov v. United States*,
   436 U.S. 238 (1978) ...................................................................... 42

*S.D. Warren Co. v. Me. Bd. of Env't Prot.*,
   547 U.S. 370 (2006) ............................................................... 5, 6, 43

*Stand Up for California! v. Dep't of the Interior*,
   994 F.3d 616 (D.C. Cir. 2021) ................................................. 28, 41

*Tinoqui-Chalola Council of Kitanemuk & Yowlumne
   Tejon Indians v. Dep't of Energy*,
   232 F.3d 1300 (9th Cir. 2000) ......................................................... 9

*TNA Merchant Projects, Inc. v. FERC*,
   857 F.3d 354 (D.C. Cir. 2017) ........................................................ 26

*Turlock Irrigation Dist. v. FERC*,
   36 F.4th 1179 (D.C. Cir. 2022) .............. 10, 11, 18, 38, 39, 44, 45, 48

## TABLE OF AUTHORITIES

**COURT CASES**                                                    **PAGE**

*U.S. Dep't of Interior v. FERC*,
   952 F.2d 538 (D.C. Cir. 1992) ......................................................... 7

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
   141 S. Ct. 777 (2021) ..................................................................... 9

*Vazquez-Claudio v. Shinseki,*
    713 F.3d 112 (Fed. Cir. 2013).........................................................28

*Yates v. United States,*
    574 U.S. 528 (2015) .......................................................................28

**ADMINISTRATIVE CASE**

*Brookfield White Pine Hydro LLC,*
    182 FERC ¶ 61,169 (2023) ............................... 17, 18, 20, 21, 31-36,
                                                                        45, 46, 51, 53-54

**STATUTES**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A)..................................................................25, 53

Clean Water Act

    Section 101, 33 U.S.C. § 1251 ...................................................6, 12

    Section 401, 33 U.S.C. § 1341 .................. 1, 3, 5-8, 11-13, 15-18, 20,
                                                                        21, 24, 25, 35, 37, 42-43

**TABLE OF AUTHORITIES**

**STATUTES**                                                          **PAGE**

Endangered Species Act

    Section 7, 16 U.S.C. § 1536 ..............................................................9

Federal Power Act

Section 1, 16 U.S.C. § 792 ..................................................... 5

Section 4, 16 U.S.C. § 797(e) ................................................. 5

Section 6, 16 U.S.C. § 799 ..................................................... 5

Section 10(a)(1), 16 U.S.C. § 803(a)(1) ................................. 5

Section 23(b)(1), 16 U.S.C. § 817(1) ..................................... 5

National Environmental Policy Act

Section 102(2)(C), 42 U.S.C. § 4332(2)(C) ...................................... 10

**REGULATIONS**

Code of Federal Regulations (July 1, 2019 ed.)

40 C.F.R. Part 121 ............................................................ 13

40 C.F.R. § 121.16 ........................................................... 13

Code of Federal Regulations (July 1, 2021 ed.)

18 C.F.R. § 5.23(b)(2) ......................................................... 8

40 C.F.R. § 121.7(e)(1) ............... 3-4, 13-15, 21-25, 27, 30-32, 34-36,
                                           38, 40-41, 44-49, 51-54

40 C.F.R. § 121.9(a)(2) .............................. 14-16, 21, 25, 44, 46, 53

40 C.F.R. § 121.13 ........................................................... 37

**TABLE OF AUTHORITIES**

**RULEMAKING**                                                          **PAGE**

Clean Water Act Section 401 Certification Rule ("2020 Rule"),
      85 Fed. Reg. 42,210 (July 13, 2020) ...... 12-16, 21, 31, 32, 39, 40, 42

Clean Water Act Section 401 Water Quality Certification
    Improvement Rule ("2023 Rule"),
    88 Fed. Reg. 66,558 (Sept. 27, 2023) .................................... 13, 15-17

Notice of Intent to Reconsider and Revise the Clean Water Act
    Section 401 Certification Rule,
    87 Fed. Reg. 35,318 (June 9, 2022) ................................................ 15

**EXECUTIVE ORDERS**

Executive Order No. 13,868
    84 Fed. Reg. 15,495 (Apr. 10, 2019) ................................................ 12

Executive Order No. 13,990
    86 Fed. Reg. 7,037 (Jan. 20, 2021) ................................................ 12

**OTHER AUTHORITIES**

Bryan A. Garner, *A Dictionary of Modern Legal Usage*
    (3d ed. 2011) ...................................................................... 29

EPA, *Programmatic Clean Water Act Section 401 Certification Decisions
    on the Draft 2020 Nationwide Permits within Region 9*
    (Dec. 11, 2020) .................................................................. 37

EPA, *Programmatic Clean Water Act Section 401 Certification Decisions
    on the Draft 2020 Nationwide Permits within Region 10*
    (Dec. 11, 2020) .................................................................. 37

FERC, *Pre-Filing Environmental Review Process*
    (May 29, 2020) .................................................................. 10

# GLOSSARY

| | |
|---|---|
| 2020 Rule | Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13, 2020) |
| 2023 Rule | Clean Water Act Section 401 Water Quality Certification Improvement Rule, 88 Fed. Reg. 66,558 (Sept. 27, 2023) |
| Br. | Opening brief of Petitioner Brookfield White Pine Hydro LLC |
| Brookfield | Petitioner Brookfield White Pine Hydro LLC |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| Denial | R.227, Denial without prejudice in Shawmut Hydroelectric Project L-01975I-33-I-N (Oct. 12, 2022), JA ___-___ |
| EPA | Environmental Protection Agency |
| Fisheries Service | National Marine Fisheries Service |
| Maine | Maine Department of Environmental Protection |
| P | Internal paragraph number within a Commission order |
| Project | The Shawmut Hydroelectric Project (Project No. 2322) |

R.                                      Commission certified index to
                                        record number

Rehearing Order                         *Brookfield White Pine Hydro LLC*,
                                        182 FERC ¶ 61,169 (2023),
                                        JA ___-___ (order on review)

# In the United States Court of Appeals
# for the District of Columbia Circuit

### No. 23-1075
———————

BROOKFIELD WHITE PINE HYDRO LLC,
*Petitioner,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION
———————————————————————

## INTRODUCTION

Section 401 of the Clean Water Act, 33 U.S.C. § 1341, empowers States to protect their water resources in the federal licensing of hydroelectric facilities. Before the Federal Energy Regulatory Commission ("Commission" or "FERC") can grant a federal license to operate such facilities, Section 401 requires the applicant to first seek certification from the State that the proposed facility will comply with its water quality standards.

A State can deny certification if it determines the facility will not comply with water quality standards. But a State can also deny certification where there is insufficient information for it to make a compliance determination on the merits, as evaluation of the proposal remains ongoing. This case concerns the latter type of denial and what it must include.

Here, the Maine Department of Environmental Protection ("Maine") timely denied, without prejudice, a certification request by Brookfield White Pine Hydro ("Brookfield") for its hydroelectric project in Maine. The denial explained that Maine had insufficient information to determine compliance without the results from ongoing federal environmental reviews, which were necessary to its analysis. These federal agencies were still actively evaluating the project, and Brookfield, in response, had continued to modify its project proposal to address concerns. As this iterative process was still incomplete, Maine's denial was without prejudice to Brookfield reapplying once the results and proposal were both finalized.

Brookfield then sought a determination from the Commission that Maine had waived its certification authority. It argued that the denial

contravened a recent Clean Water Act regulation, 40 C.F.R.

§ 121.7(e)(1), governing the form of denials.  Brookfield interpreted this

regulation to require three specific findings in every denial, and claimed

that Maine's denial failed to make those findings.

The Commission rejected Brookfield's interpretation of the

regulation.  It determined that only one of the three findings was

required for the type of denial at issue, and Brookfield's contrary

interpretation would force States to make final compliance

determinations before having the results of federal environmental

review and a final proposal from the applicant.  Concluding that

Maine's denial here satisfied the regulation, the Commission declined to

find that Maine had waived its certification authority.

On review, Brookfield challenges both the Commission's

interpretation of 40 C.F.R. § 121.7(e)(1) and its determination that

Maine did not waive its Section 401 certification authority.

### STATEMENT OF THE ISSUE

Whether the Commission properly interpreted 40 C.F.R.

§ 121.7(e)(1) to conclude that Maine had not waived its Clean Water Act

section 401 certification authority by denying certification without

prejudice because it lacked information—including forthcoming federal analyses—necessary to evaluate the Project's compliance with water quality requirements.

## STATUTORY AND REGULATORY PROVISIONS

Section 121.7(e)(1) of Title 40 of the Code of Federal Regulations recites:

> (e)  Any denial of certification shall be in writing and shall include:
>
> > (1)  For denial of certification for an individual license or permit,
> >
> > > (i)      The specific water quality requirements with which the discharge will not comply;
> > >
> > > (ii)     A statement explaining why the discharge will not comply with the identified water quality requirements; and
> > >
> > > (iii)    If the denial is due to insufficient information, the denial must describe the specific water quality data or information, if any, that would be needed to assure that the discharge from the proposed project will comply with water quality requirements.

40 C.F.R. § 121.7(e)(1).[1] Additional pertinent statutes and regulations are reproduced in the Addendum to this brief.

---

[1]      Unless specifically noted otherwise, all citations are to the 2021 edition of the Code of Federal Regulations, which governs this case.

4

# STATEMENT OF FACTS

## I.     Statutory And Regulatory Background

### A.     The Clean Water Act empowers States to block or add conditions to any federal hydroelectric license issued under the Federal Power Act.

This matter involves the intersection of two federal statutes:  the Federal Power Act and the Clean Water Act.  The Commission issues federal licenses to construct and operate hydroelectric dams under the Federal Power Act, *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 373 (2006) (citing 16 U.S.C. §§ 792, 817(1)), and States issue water quality certifications that become mandatory conditions on those licenses under Section 401 of the Clean Water Act, *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 971 (D.C. Cir. 2011) (citing 33 U.S.C. § 1341(a)(1), (d)).

The Commission considers environmental issues and assesses public need for a hydroelectric project before deciding whether to grant a license.  16 U.S.C. §§ 797(e), 803(a)(1); *see also S.D. Warren*, 547 U.S. at 373; *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 722 (1994).  Licenses are granted for a default of 40 years and a maximum of 50 years.  16 U.S.C. § 799.

The Commission, however, does not have final say over every aspect of a license.  In the Clean Water Act, Congress sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution[.]"  33 U.S.C. § 1251(b).  States may, in exercising this responsibility, adopt and enforce water quality standards that are stricter than those provided under federal law.  *PUD No. 1*, 511 U.S. at 705.  One mechanism by which States can protect their water quality is the certification requirement in Section 401 of the Clean Water Act.  This provision mandates that a federal license may not issue unless the relevant State has granted or waived water quality certification.  33 U.S.C. § 1341(a)(1).  Such certification (or waiver) is required for a "Federal license or permit to conduct any activity . . . which may result in a[] discharge into the navigable waters."  33 U.S.C. § 1341(a)(1).  Operating a hydroelectric dam is one such activity that "may result in any discharge into the navigable waters."  *S.D. Warren*, 547 U.S. at 373.  A Commission-issued hydroelectric license is therefore subject to the state water quality certification process.  *See id*. at 374.

6

A State may respond to a certification request by granting
certification (including with conditions) or denying the request.  When
granting certification, a State may impose conditions to limit water
pollution and mandate compliance "with any other appropriate
requirement of State law set forth in such certification."  *PUD No. 1*,
511 U.S. at 712; 33 U.S.C. § 1341(d).  These conditions then become a
mandatory part of any federal license that issues.  33 U.S.C. § 1341(d);
*U.S. Dep't of Interior v. FERC*, 952 F.2d 538, 548 (D.C. Cir. 1992).  If, on
the other hand, a State denies a certification request, then "no federal
'license or permit shall be granted.'"  *Alcoa Power*, 643 F.3d at 971
(quoting 33 U.S.C. § 1341(a)(1)).

    But the States' certification power is not unlimited.  A State must
"act" on a request for certification within one year of receiving it, or else
its certification authority "shall be waived with respect to an . . .
application" for a "Federal license or permit."  33 U.S.C. § 1341(a)(1);
*Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1103-04 (D.C. Cir. 2019).
The consequences of waiver can be "significant."  *Cal. State Water Res.
Control Bd. v. FERC*, 43 F.4th 920, 924 (9th Cir. 2022).  Waiver means
that a State no longer has authority to impose any conditions on a

hydroelectric project's federal license under Section 401. *Id.* Given that federal licenses can last up to 50 years, "project[s] may be noncompliant with prevailing state water quality standards for decades" when waiver is triggered. *Id.*

The Commission, as the agency tasked with licensing hydroelectric projects, determines in the first instance whether a State has waived its certification power under Clean Water Act Section 401. *See Millennium Pipeline Co. v. Seggos*, 860 F.3d 696, 701 (D.C. Cir. 2017) (FERC makes Section 401 waiver determinations); *Alcoa Power*, 643 F.3d at 971-72 (compliance with Section 401's "requirements" "is a question of federal law[] [that is] properly put to the Commission"); *see also* 18 C.F.R. § 5.23(b)(2) (explaining Commission procedure).

**B.    Denial without prejudice is permissible where federal environmental review remains ongoing for a project proposal that continues to evolve.**

A State's certification decision often relies on detailed environmental reviews that provide critical information about the project's environmental impact. Under Section 7 of the Endangered Species Act, federal agencies undertaking actions that may have an impact on endangered species are required to formally consult with the

National Marine Fisheries Service ("Fisheries Service").  *See* 16 U.S.C. § 1536.  These consultations culminate in a Biological "Opinion" that explains how the proposed action will affect the species or its habitat. *Id.* § 1536(b)(3)(A).  "If the Service concludes that the proposed action will 'jeopardize the continued existence of any [listed] species or threatened species or result in the destruction or adverse modification of [critical habitat],' § 1536(a)(2), the Biological Opinion must outline any 'reasonable and prudent alternatives' that the Service believes will avoid that consequence, § 1536(b)(3)(A)."  *Bennett v. Spear*, 520 U.S. 154, 158 (1997).

Developing a Biological Opinion can be an "extremely lengthy and time-consuming" process, often exceeding a year.  *See Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. Dep't of Energy*, 232 F.3d 1300, 1308 (9th Cir. 2000).  Several drafts of the Biological Opinion and related documents are circulated intra-agency and inter-agency, so they may be commented upon by others, revised, and recirculated for further discussion.  *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 784 (2021).  Throughout this iterative

process, the proposed action may undergo modifications to address raised concerns.  *Id.*

An Environmental Impact Statement is yet another analysis States routinely need to determine compliance.  Under the National Environmental Policy Act, a federal agency must prepare this Statement for any "major Federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  As with a Biological Opinion, developing the Statement also involves multiple drafts that are circulated internally and externally for comment and revision before the final Statement is issued, and may call for modifications to the proposed project.  *See*, *e.g.*, FERC, *Pre-Filing Environmental Review Process* (May 29, 2020), https://www.ferc.gov/ media/pre-filing-environmental-review-process.

Because these environmental reviews can often take more than one year to complete, States may deny certification without prejudice where there is insufficient information to determine compliance.  *See, e.g.*, *Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179, 1181 (D.C. Cir. 2022) (denial without prejudice pending ongoing federal and state environmental reviews); *Keating v. FERC*, 927 F.2d 616, 620 (D.C. Cir.

1991) (denial without prejudice pending ongoing environmental reviews).  And because applicants often continue revising their project proposals while environmental review is ongoing, States may be left unable to determine whether, and to what extent, the proposed project is consistent with state water quality standards.

Rather than delay or inaction triggering waiver, courts have recognized that a State "act[s]" by denying without prejudice under these circumstances.  *Turlock*, 36 F.4th at 1183 ("Each time [the State] denied certification" because it awaited results from ongoing environmental review, it "act[ed] within the meaning of section 401(a)(1)."); *N.Y. State Dep't of Env't Conservation v. FERC*, 991 F.3d 439, 450 n.11 (2d Cir. 2021) ("states can deny an application without prejudice within the one-year deadline" if there is inadequate information for a merits determination); *N.Y. State Dep't of Env't Conservation v. FERC*, 884 F.3d 450, 456 (2d Cir. 2018) ("den[ial] . . . without prejudice" of "incomplete" application "constitute[s] 'acting' on [a certification] request under the language of Section 401").

**C.  The 2020 Rule, which governs this case, has since been replaced by the 2023 Rule.**

**1.**  The Environmental Protection Agency ("EPA") is charged with administering the Clean Water Act.  33 U.S.C. § 1251(d).  EPA, acting in response to an executive order,[2] promulgated the water quality certification regulations at issue here on July 13, 2020.  *See* Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13, 2020) ("2020 Rule").  The 2020 Rule subsequently took effect on September 11, 2020.

Prior to this rule, the regulations governing water quality certifications had remained substantively unchanged since originally promulgated in 1971.[3]  The 1971 regulations set out, among other things, the core essentials of a certification framework, but otherwise permitted flexibility for States to structure their own certification

---

[2]    Executive Order 13,868, "Promoting Energy Infrastructure and Economic Growth," directed EPA to review and revise the then-existing regulations governing water quality certifications.  *See* Exec. Order No. 13,868, 84 Fed. Reg. 15,495 (Apr. 10, 2019) (revoked by Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021)); *see also* 2020 Rule, 85 Fed. Reg. at 42,211.

[3]    *See* 36 Fed. Reg. 8,563 (May 8, 1971), last redesignated at 44 Fed. Reg. 32,899 (June 7, 1979).

programs.  *See generally* 40 C.F.R. Part 121 (2019); *see also* 2023 Rule, 88 Fed. Reg. at 66,562-64.  These prior regulations did not, for example, specify findings that must be made in denials, whether on the merits or not.  Nor did they impose any grounds for waiver beyond what Section 401 itself required.  *See* 40 C.F.R. § 121.16 (2019) (certification waived upon either "express[]" written notification or "failure of the State . . . to act on such request for certification within a reasonable period of time after receipt of such request").

The 2020 Rule intended to "moderniz[e]" this framework by "mak[ing] the Agency's regulations consistent with the current text of [Clean Water Act] section 401, increas[ing] efficiencies, and clarify[ing] aspects of [section 401] that have been unclear."  85 Fed. Reg. at 42,236.  In so doing, the 2020 Rule introduced "several new features" that departed from past practice (2023 Rule, 88 Fed. Reg. at 66,564), two of which are relevant here.

First, § 121.7 imposes new, agency-defined procedural requirements for certification decisions.  Section 121.7(e)(1) governs the content of State denials and recites specific findings they must include:

    (e)  Any denial of certification shall be in writing and shall include:

13

. . .

> (i)   The specific water quality requirements with which the discharge will not comply;
>
> (ii)  A statement explaining why the discharge will not comply with the identified water quality requirements; and
>
> (iii) If the denial is due to insufficient information, the denial must describe the specific water quality data or information, if any, that would be needed to assure that the discharge from the proposed project will comply with water quality requirements.

40 C.F.R. § 121.7(e)(1). Subsections (i) and (ii) recite findings for a denial on the merits, requiring a State to determine the "specific water quality requirements" the project "will not comply" with and explain "why." *Id.* § 121.7(e)(1)(i)-(ii). Subsection (iii), by contrast, governs denials "due to insufficient information"—where a merits determination cannot be made, *see supra* pp. 10-11—and requires a State to merely "describe the specific water quality data or information, if any," needed to determine compliance. *Id.* § 121.7(e)(1)(iii).

Second, § 121.9 introduces new waiver provisions purportedly triggered by violating certain procedural aspects of the 2020 Rule. Relevant here, § 121.9(a)(2)(iii) predicates "waive[r]" of a State's certification authority on its "failure or refusal to satisfy" the procedural

14

"requirements of § 121.7(e)." *See id.* § 121.9(a)(2)(iii). Accordingly, whether a State waived its certification authority under § 121.9(a)(2)(iii) turns on whether its denial satisfied "the requirements of § 121.7(e)." *Id.*

Notwithstanding these changes, the 2020 Rule also reaffirmed at least one established practice. Responding to concerns that the proposed rule would prohibit denying certification based on insufficient information (*see supra* pp. 10-11), EPA "reaffirm[ed] and clarif[ied] that insufficient information about the proposed project can be a basis for a certification denial," specifically citing § 121.7(e)(1)(iii) for support. 2020 Rule, 85 Fed. Reg. at 42,265.

**2.** On June 6, 2021, eight months after the 2020 Rule took effect, EPA announced that it intended to replace that rule with a new rulemaking effort. *See* Notice of Intent to Reconsider and Revise the Clean Water Act Section 401 Certification Rule, 87 Fed. Reg. 35,318 (June 9, 2022). These efforts culminated in the 2023 Rule that EPA promulgated on September 27, 2023, which will become effective on November 27, 2023. *See* Clean Water Act Section 401 Water Quality

Certification Improvement Rule, 88 Fed. Reg. 66,558 (Sept. 27, 2023) ("2023 Rule").

In the 2023 Rule, EPA explained that it "revised the 2020 Rule to better reflect the [Clean Water Act's] statutory text, the legislative history regarding section 401, and the broad water quality protection goals of the Act" and, additionally, to "clarif[y] certain aspects of section 401 implementation that have evolved in response to over 50 years of judicial interpretation and certifying authority practice." *Id.* at 66,565.

Notably, the 2023 Rule removed several waiver provisions the 2020 Rule introduced—including § 121.9(a)(2)(iii)—that EPA was concerned would be improperly used to trigger waiver. *Id.* at 66,610. EPA explained: "The mere failure of a certifying authority to include certain regulatorily defined elements in its certification decision . . . do[es] not qualify as the kind of [behavior] that Congress contemplated would result in a constructive waiver." *Id.* Instead, the 2023 Rule revised this regulation to be consistent with Section 401's statutory text, so that constructive waiver is triggered "only if a certifying authority fails or refuses to act on a request for certification within the reasonable period of time." *Id.* at 66,663.

Furthering the point, the 2023 Rule also added a new regulatory provision (§ 121.8, "Extent of federal agency review") to clarify the permissible scope of Federal agency review.  *Id.*  "To the extent a Federal agency verifies compliance with the requirements of Clean Water Act section 401, its review is limited to whether:  the appropriate certifying authority issued the certification decision; the certification authority confirmed it complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1); and the certifying authority acted on the request for certification within the reasonable period of time."  *Id.*

## II.    The Shawmut Hydroelectric Project

Brookfield owns and operates the Shawmut Hydroelectric Project ("Project"), which is located on the Kennebec River in Maine.  *Brookfield White Pine Hydro LLC*, 182 FERC ¶ 61,169, P 3 (2023); JA ___ ("Rehearing Order").  The Project's facilities comprise, among other things, a 23-foot-high and 1,135-foot-long concrete gravity dam, a 1,310-acre reservoir extending upstream for approximately 12.3 miles, and two powerhouses with a combined generating capacity of 8.65 MW. R.247, Maine Draft Denial (Aug. 11, 2021) at 2, JA ___.  The

Commission first licensed the Project in 1964.  Rehearing Order P 3; JA

___.  A new license was subsequently issued in 1981 and, after an

extension, only recently expired on January 31, 2022.[4]  *Id.*

## A.    The First Certification Request

On January 31, 2020, Brookfield filed an application for a new 40-

year federal license to continue operating and maintaining the Project.

It then filed a Section 401 certification application with Maine on

August 28, 2020.  Rehearing Order P 8, JA ___.

Less than a year later, on August 11, 2021, Maine provided

Brookfield with a draft order denying water quality certification.  *See*

Draft Denial at 1-54, JA ___-___.  The draft denial concluded that the

Project as proposed would not comply with several Maine water quality

requirements, especially with respect to fish passage of Atlantic salmon.

*Id.* at 53-54, JA ___ ("The proposed operation of the [Project], because of

the impact of the dam and its discharge on indigenous species of . . .

---

[4]    Since this date, and while the current licensing proceeding is still
ongoing, the Project has continued to operate under an annual license
that renews each year.  Rehearing Order P 3 n.5, JA ___.  Annual
licenses "allow for the continued operation of hydroelectric projects
under the terms of the existing, expired license."  *Turlock*, 36 F.4th at
1184 n.6.

Atlantic salmon, will result in" the waters being unsuitable as a "habitat for fish and other aquatic life" and "do not allow [fish] to pass upstream or downstream in a safe, timely, and effective manner.").

Based on "the issues and concerns raised in the draft order," Brookfield chose to withdraw its certification application on August 18, 2021. R.166, Brookfield Second Req. Ltr. to Maine (Oct. 15, 2021) at 1, JA ___; *see also* R.151, Brookfield Withdrawal Ltr. to Maine (Aug. 18, 2021) at 1-2, JA ___.

## B. The Second Certification Request

Two months later, on October 15, 2021, Brookfield filed its second certification request, this time reportedly providing "important updates [to its] proposal, including the preliminary Section 18 fishway prescriptions, fish passage measures from [its] Species Protection Plans, and additional measures from the Draft Environmental Assessment recommended by FERC staff." R.166, Brookfield Second Req. Ltr. to FERC (Oct. 15, 2021) at 1, JA ___. Brookfield "reiterated that the goal of [the second application was] . . . to respond to concerns/issues raised in the Draft Order." R.166, Brookfield Second Req. Ltr. to Maine (Oct. 15, 2021) at 2, JA ___.

19

On July 29, 2022, Maine issued a draft order denying certification without prejudice.  Denial at 5, JA ___.  Then, on September 22, 2022—less than a month before Section 401's one-year deadline—Brookfield filed "significant" modifications to its application, "including new information related to its proposed fish passage measures and additional proposed measures that it had not filed with [Maine] previously."  *Id.*

Maine timely issued a final denial without prejudice on October 12, 2022.  Rehearing Order P 9, JA ___; R.227, Denial at 1, JA ___.  The Denial explained there was insufficient information to determine the merits of Brookfield's application because:  (1) it did not yet have the benefit of the Fisheries Service's forthcoming Biological Opinion and the Commission's anticipated Environmental Impact Statement; (2) neither it nor any federal agency had reviewed the significant proposal modifications that Brookfield recently submitted; and (3) Brookfield's application, which had materially evolved throughout the proceeding, apparently would continue to do so to address additional fish passage concerns from the Fisheries Service.  Rehearing Order PP 9-10; JA ___-___; Denial at 1-5, JA___-___; R.227, Maine Denial Ltr. to Brookfield

20

(Oct. 12, 2022) at 2, JA ___.  Maine emphasized that the denial was without prejudice, and that Brookfield was free to refile with the necessary information once available.  Denial at 3-4, JA ___-___.

Brookfield then sought a determination from the Commission that Maine had waived its certification authority.  Rehearing Order P 11, JA ___.  In the intervening time between Brookfield's first and second certification requests, EPA had promulgated the 2020 Rule—a set of new regulations governing Section 401 certifications that were in effect when Brookfield reapplied for state certification.  *See supra* pp. 11-15.  Brookfield relied on two regulations in particular:  it claimed Maine did not make all three findings in § 121.7(e)(1) and, for that reason, had failed to "satisfy the requirements of § 121.7(e)," which triggered waiver under § 121.9(a)(2)(iii).  Rehearing Order PP 11, 14, JA ___-___.

The Commission, with one Commissioner dissenting, disagreed with Brookfield's conjunctive interpretation of § 121.7(e)(1) and declined to find that Maine had waived its certification authority.  *Id*. PP 15-20, JA___-___.  While acknowledging that this regulation recited "and" between subsections, it determined that only one of the three findings in § 121.7(e)(1) was necessary for denials due to insufficient

information, which the Denial readily satisfied. *Id.* PP 15-16, JA ___-
___. The remaining findings, the Commission concluded, would force
Maine to make compliance determinations without having critical
information from federal environmental reviews that were still ongoing.
*Id.* PP 16-18, JA ___-___. And Brookfield's ongoing and anticipated
modifications to its project proposal would only further frustrate
Maine's ability to make such determinations. *Id.* PP 17-18, JA ___-___.
Under these circumstances, the Commission reasoned that if the Denial
satisfies § 121.7(e)(1)(iii), then it must also satisfy these remaining
subsections. *Id.* PP 16-18, JA ___-___. In that same analysis, the
Commission also determined that the Denial nevertheless "incorporates
by reference" Maine's "August 11, 2021, draft denial of certification" to
provide "further details regarding the state's concerns related to the
project's effects on habitat characteristics and aquatic life criteria, and
its ability to meet state water quality standards." *Id.* P 17 & n.40,
JA ___.

        This petition for review followed.

22

## SUMMARY OF ARGUMENT

This case is about context, or rather, Brookfield's attempts to ignore it.  When Maine denied certification without prejudice, it was waiting on results from two ongoing federal environmental reviews of Brookfield's project.  Without those results, Maine could not determine whether the proposed project would comply with water quality requirements, or even which requirements would be implicated.  Nor did Maine know what final form the project would take, as Brookfield had continued to modify its proposal in response to the environmental reviews.  And this was all after Maine had already evaluated a prior iteration of Brookfield's proposal and issued a draft denial on the merits.  What Brookfield seeks to characterize as delay or indifference on Maine's part was, in fact, consistent effort to evaluate Brookfield's iterative changes to its project and reach a final merits determination.

Just as Maine's denial must be considered in the broader context of the ongoing licensing proceeding, so too must a single word be construed in the context of the regulation in which it appears.  Both sides agree that 40 C.F.R. § 121.7(e)(1) expressly authorizes "denials due to insufficient information."  The only dispute is whether, to "satisfy

the requirements of § 121.7(e)," such denials need only make the finding subsection (iii) requires, as the Commission concluded, or if they must also make the findings in subsections (i) and (ii), as Brookfield urges.

This Court should affirm the Commission's interpretation (and its no-waiver determination) because that reading fairly considers both the text and context of the regulation, as well as effectuates Section 401's statutory purpose. When read as a whole, § 121.7(e)(1) addresses two separate types of denials: denials where there is *in*sufficient information for States to make substantive findings, and denials where there *is* sufficient information to determine noncompliance on the merits. For the former type of denial at issue here, States cannot determine which "specific water quality requirements . . . will not [be] complied with," or "why," because they lack the "water quality data or information" necessary to make those kinds of findings.

Brookfield's interpretation relies on the fact that the regulation says "and" and not "or." But courts have often construed "and" disjunctively where context demands, as it does here. Brookfield's reading, moreover, would trigger the severe consequences of waiver for not complying with a procedural rule that is entirely a creature of

24

agency creation.  To so easily deprive States of their certification power

contravenes the very purpose of Section 401:  to ensure that States

remain able to protect their water resources.

In any event, even were the Court to adopt a conjunctive reading

of § 121.7(e)(1), it should still affirm the Commission's no-waiver

determination.  The Denial satisfies § 121.7(e)(1)'s requirements

regardless of how it is interpreted and, for that reason, cannot trigger

waiver under § 121.9(a)(2)(iii).  That is because the Denial expressly

references findings from a prior draft denial and, when read in context

of those prior findings, satisfies all three requirements in § 121.7(e)(1).

The Commission's determination that Maine did not waive its

certification authority should be affirmed.

## ARGUMENT

## I.    Standard of Review

Commission orders are reviewed under the Administrative

Procedure Act's deferential "arbitrary and capricious" standard.

5 U.S.C. § 706(2)(A).  Review under this standard is narrow.  *FERC v.*

*Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016).  "A court is not to

ask whether a regulatory decision is the best one possible or even

25

whether it is better than the alternatives." *Id.* "Rather, the court must uphold a [decision] if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up); *see also Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 174 (D.C. Cir. 2022) ("The question, though, is not whether, on this record, reasonable minds could have reached a different conclusion.  It is only whether substantial evidence supported the Commission's conclusion and whether it reasonably explained its decision.").

On questions of law, the Commission's interpretations of federal statutes and regulations are reviewed *de novo*.  The Commission enjoys deference for its interpretations of the Federal Power Act, a statute it administers in issuing hydroelectric licenses, *see TNA Merchant Projects, Inc. v. FERC*, 857 F.3d 354, 358 (D.C. Cir. 2017), whereas its interpretations of the Clean Water Act—a statute administered by EPA—receive no such deference, *Alcoa Power*, 643 F.3d at 972.

26

## II.     The Commission Properly Interpreted 40 C.F.R. § 121.7(e)

The regulatory interpretation issue is narrow where, as here, federal and state review remains ongoing.  Both sides agree that 40 C.F.R. § 121.7(e)(1) expressly authorizes denials "due to insufficient information."  Br. 7.  The only dispute is whether such a denial—at this interlocutory point in the certification process—need only identify the missing "water quality data or information" necessary to determine compliance (subsection (iii)), or if the denial must also determine the "specific water quality requirements" that will not be complied with and explain why that noncompliance will occur (subsections (i) and (ii)).

Brookfield contends States issuing this type of denial must make all three findings now, or else waive their certification authority entirely.  Its primary argument relies on the fact that "the regulation says 'and,' not 'or.'"  Br. 19.  "For this reason alone," Brookfield argues, the Commission's contrary interpretation should be rejected.  *Id.*

Brookfield's interpretation isolates a solitary word from the regulation and wrongly presumes that "and" has but a single, uniform meaning.  When read in the context of the entire regulation—along with the statute it seeks to implement—§ 121.7(e)(1) uses "and" to connote a

disjunctive, rather than conjunctive, meaning.  The Commission's interpretation should be upheld.

### A.  Read in context, the regulation does not require denials due to insufficient information to make all three findings.

**1.**  Regulations, as with statutes, "must be construed holistically." *Stand Up for California! v. Dep't of the Interior*, 994 F.3d 616, 623 (D.C. Cir. 2021).  A "fundamental principle" of this analysis is that "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."  *Yates v. United States*, 574 U.S. 528, 537 (2015) (citation omitted); *see also Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("In construing regulatory language, we must read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning.").

Several courts, including this one, have recognized that "the word 'and' can be either conjunctive or disjunctive" depending on the context. *Reese Bros. v. United States*, 447 F.3d 229, 235 (3d Cir. 2006).  *See Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374, 376 (D.C. Cir. 2005) ("To be sure, Congress does sometimes use the word 'and'

disjunctively" and "[i]ndeed, it did so in this very statute[.]"); *OfficeMax, Inc. v. United States*, 428 F.3d 583, 588 (6th Cir. 2005) ("Congress used 'and' in more than one sense when it enacted these provisions . . . giving it a conjunctive meaning (requiring all items) in some places and giving it a disjunctive or cumulative meaning (allowing any of the items) in other places."); *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958) ("[T]he word 'and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings."); *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* at 56 (3d ed. 2011) ("*and* is frequently misused for *or* where a single noun, or one of two nouns, is called for" and "[s]loppy drafting sometimes leads courts to recognize that *and* in a given context means *or*, much to the chagrin of some judges").

As these different usages reveal, the text here cannot be interpreted by simply assuming—as Brookfield does, Br. 17-19—that "'and' means 'and,' 'or' means 'or,' and never the twain shall meet." *OfficeMax*, 428 F.3d at 588. Instead, "and" must be read disjunctively if the context dictates deviating from this term's ordinary conjunctive meaning. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328,

1332 (11th Cir. 2005); *see also Peacock*, 252 F.2d at 893 ("Courts are often compelled to construe . . . 'and' as meaning 'or'.").

One such disjunctive context is the use of "and" to connect subsections that enumerate criteria for "separate" alternatives, rather than a "single," integrated list of criteria. *Nat'l R.R.*, 431 F.3d at 376 (construing "and" disjunctively in subsections defining "toll telephone service" because "the two subsections describe separate types of services, not criteria for a single service"). Under these circumstances, it "would be absurd" to apply a conjunctive reading of "and" that requires satisfying all subsections. *Id.*

That is precisely how "and" is used here. Section 121.7(e)(1) enumerates three findings for denials, with an "and" placed between the second and third finding. When read as a whole, this regulation addresses two separate types of denials: (1) The first two subsections govern denials where there is sufficient information to determine, on the merits, that "the discharge will not comply" with "specific water quality requirements," *see* § 121.7(e)(1)(i)-(ii); and (2) the third subsection governs denials where the information is "insufficient" to reach a determination either way, *see* § 121.7(e)(1)(iii). *See also*

30

Rehearing Order P 15 & n.36, JA ___-___ (explaining that "insufficient information" is an independent "basis for denial" under § 121.7(e)(1)).

Starting with the text, subsection (iii) is set apart from the others by its own conditional clause—"(iii) *If the denial is due to insufficient information*, the denial must describe the specific water quality data or information, if any, [needed to assure compliance]"—indicating that it governs a different category of denials than what came before it.  *See* § 121.7(e)(1)(iii) (emphasis added).  Subsection (iii) is also drafted as a standalone sentence that forms a complete thought by itself—unlike the first two subsections, which are dependent clauses that cannot be fully understood absent reference to one another.  *Cf. Apple Inc. v. United States*, 964 F.3d 1087, 1097 (Fed. Cir. 2020) (declining to read tariff provisions as a "single, integrated list" because their "varied syntax" and "dissimilar" nature signaled "two distinct exclusions" that "each may be understood completely without reading any further" (quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 344 (2005))).

The 2020 Rule itself confirms that insufficient information is an independent basis for denial under § 121.7(e)(1)(iii).  *See* 85 Fed. Reg. at 42,265 (quoting § 121.7(e)(1)(iii) and explaining that "the final rule

reaffirms and clarifies that *insufficient information about the proposed project can be a basis for a certification denial*" (emphasis added)), *cited in* Rehearing Order P 15 n.36, JA ___-___. The rule also explains that if "no specific data or information" "would allow the certifying authority to determine [compliance] with water quality requirements," then a State need only "*indicate as such and provide the basis for this determination in its written decision to deny certification.*" *Id.* (emphasis added). The rule does not go on to say that such denials must also make the findings in § 121.7(e)(1)(i)-(ii).

Here, Maine's denial was "without prejudice," rather than on the merits, because Brookfield's project awaits further federal and state review. As this record illustrates, the certification process can involve iterative rounds of back-and-forth where an applicant modifies its proposal and provides further information in response to the State's feedback and questions. *See* Rehearing Order PP 8-10, JA ___-___ (recounting cycles of Maine's analysis and Brookfield's proposal modifications). This is not a case of State inattentiveness or delay simply to restart the one-year clock. *See supra* pp. 10-11. After Maine issued a draft denial explaining why Brookfield's initial proposal would

32

not pass muster, Brookfield withdrew that proposal and later reapplied for certification with a new proposal. Brookfield then continued to revise that proposal in response to the developing Biological Opinion and Environmental Impact Statement. *See* Rehearing Order PP 9-10, JA ___. Once these federal environmental reviews are completed and Brookfield's proposal finalized, Brookfield can reapply and Maine can use these results to continue its ongoing evaluation and reach a final merits determination. It makes little sense to stop this process early and conclude that Maine—despite its efforts thus far—had somehow waived its certification power entirely. Yet by holding Maine's denial to a standard intended for a different type of denial (on the merits), that is what Brookfield seeks to do.

Because subsection (iii) speaks to a separate category of denials, it should be read disjunctively from subsections (i) and (ii), rather than conjunctively as a single, integrated list of three requirements. *See Nat'l R.R.*, 431 F.3d at 376.

**2.** A disjunctive reading is particularly warranted where, as here, the enumerated criteria cannot be "satisf[ied] all . . . at once" or are "generally mutually exclusive." *See OfficeMax*, 428 F.3d at 588

33

(construing "local telephone service, toll telephone service, *and* teletypewriter exchange service" disjunctively because "no service exists that can satisfy all three definitions at once"); *Peacock*, 252 F.2d at 893 (interpreting "and" disjunctively in statute requiring payment of overtime wages to employees engaged in "the ginning *and* compressing of cotton" because "compressing is an operation entirely removed from ginning and . . . the two are never carried on together" (emphasis added; citation omitted)).

Subsection (iii), by its own terms, governs denials "due to *insufficient* information," where the project proposals necessarily lack "the specific water quality data or information . . . that would be needed to assure" compliance with water quality requirements. § 121.7(e)(1)(iii) (emphasis added). But, as the Commission explained, "[o]nly when the state has *sufficient* information can it make the findings specified in sections 121.7(e)(1)(i) and (ii)." Rehearing Order P 18, JA ___-___ (emphasis added). That is because "[absent] information providing details about the project proposal, it would not be possible for [a State] agency to determine which, if any, water quality requirements the discharge will not comply with" under § 121.7(e)(1)(i),

34

or "provide an explanation of how the discharge will not comply" under

§ 121.7(e)(1)(ii).  *Id.*

So too here.  At the time of Maine's denial, the Fisheries Service
had yet to issue its Biological Opinion analyzing the Project's effects on
Atlantic Salmon.  *Id.* P 9, JA ___; Denial at 2, JA ___; R.227, Maine
Denial Ltr. to Brookfield (Oct. 12, 2022) at 2, JA ___.  Nor did Maine
have the benefit of the Commission's Environmental Impact Statement
considering the combined environmental effects of "relicensing the
Shawmut Project" and "amending the licenses for the Shawmut,
Weston, Hydro-Kennebec, and Lockwood Projects with respect to
fisheries resources."  Rehearing Order P 9, JA ___; Denial at 2, JA ___.
The information from these reports, as Maine explained, was "necessary
for the [State] to review and consider any Project" application pursuant
to its Section 401 certification process.  Denial at 2, JA ___; *see also N.C.
Dep't of Env't Quality v. FERC*, 3 F.4th 655, 674 (4th Cir. 2021) (FERC's
environmental assessment is "a critical part" of the information a State
needs to evaluate a certification request).

Such information not only shapes the State's "analysis of the
potential impacts on [its] waters," but can also "change" "the

35

configuration of a project." *See N.C. Dep't*, 3 F.4th at 663 n.2 (quoting

record).  In fact, the record here illustrates Brookfield had significantly

modified its proposal less than one month before the one-year deadline,

and also anticipated further modifications, to address concerns that the

forthcoming reports might raise.  Rehearing Order P 10, JA ___; Denial

at 2-3, JA ___-___.  The "added uncertainty" of not knowing how the

Project would change in response to these reports—which were

themselves unavailable yet "necessary" to Maine's analysis—placed the

State in "an untenable position" of processing Brookfield's application

"based on the evolving information currently before it."  Denial at 3-4,

JA __-___.  On this record, the Commission reasonably concluded there

was insufficient information for Maine to determine the "specific water

quality requirements" Brookfield's evolving proposal would not comply

with (§ 121.7(e)(1)(i)), or "explain[] why" compliance would not occur

(§ 121.7(e)(1)(ii)).  Rehearing Order PP 16-18, JA ___-___.

The Commission's interpretation also comports with how the

Environmental Protection Agency itself reads § 121.7(e)(1).  EPA, as the

agency that "wrote [this] regulation," has "direct insight into what that

rule was intended to mean" or "what it was supposed to include or

exclude." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) (citation

omitted).  In its own denials[5] due to "insufficient information," EPA

described the specific water quality data or information needed to

determine certification, but explained this missing "information would

also be necessary for [it] to identify specific water quality requirements

and evaluate whether the range of discharges from potential projects

will comply with such requirements."[6]  Without such information, EPA

could not—and did not—make those findings in its denials, consistent

with Maine's Denial here.

    **3.**  Brookfield nonetheless contends "there is nothing incoherent or

impossible" about requiring a denial due to insufficient information to

---

[5]    EPA serves as the certifying authority "where a State or interstate
agency has no authority to give such a certification."  33 U.S.C.
§ 1341(a).  When EPA takes on this role, it must comply with—and
interpret—the same "requirements of Clean Water Act section 401 and
40 C.F.R. part 121" that State agencies do.  *See* 40 C.F.R. § 121.13(b).

[6]    EPA, *Programmatic Section 401 Certification Decisions on the
Draft 2020 Nationwide Permits within Region 10* (Dec. 11, 2020), at
Enclosure 5-6, https://www.nwp.usace.army.mil/Portals/24/docs/
regulatory/nationwide/2021_Tribal_Water_Quality_EPA.pdf; *see also*
EPA, *Programmatic Section 401 Certification Decisions on the Draft
2020 Nationwide Permits within Region 9* (Dec. 11, 2020), at Enclosure
3-4, https://www.epa.gov/system/files/documents/2021-08/final-epa-r9-
tribal-401-cert.-2020-nwps.pdf.

"also specify which water quality requirements are not met based on the information that is currently available." Br. 20. It may be that, in some cases, a State is able to *speculate* about which water quality requirements will not be met, even in the absence of critical information about the proposal or its effects on the State's water resources. But neither the regulation nor the Clean Water Act requires States to engage in guesswork to avoid waiver. After all, § 121.71(e)(1)(i) requires identifying "specific water quality requirements with which the discharge *will not* comply"—not those requirements the State hypothesizes "*could potentially* not comply." *See also* § 121.7(e)(1)(ii) (requiring explanation of why discharge "*will not* comply"). Indeed, this Court has recognized that forcing States to make substantive findings on certification requests "without necessary information" and "lacking sufficient documentation" places them "in an untenable position." *Turlock*, 36 F.4th at 1184 (State's denial need not be "on the merits" where federal- and state-level environmental analyses necessary for its review were not yet complete). The Commission's interpretation of the regulation reasonably avoids this outcome.

38

Equally unavailing is Brookfield's argument that the Commission's interpretation disadvantages applicants in its "current predicament." Br. 21-22. Without these additional findings, it contends, applicants seeking to reapply are "left in the dark as to the basis for the denial of their application," while the State is allowed to "hold its objections in reserve." *Id*. This argument misses the mark. Where, as here, the proposal itself remains in flux, and information critical to the State's water quality certification analysis is unavailable, it is the *State* that is "left in the dark," Br. 22. *Cf. Turlock*, 36 F.4th at 1184 (rejecting applicant's gamesmanship concerns where State faced "the Hobson's choice" of either making substantive findings "without necessary information" or "waiving its power to decide"). If the State cannot determine—due to the evolving nature of the proposal and incomplete information available—which "specific water quality requirements" would not be met, or how noncompliance would occur, then it likewise cannot be expected to include those determinations in a denial.

Nor does Brookfield's reliance on the 2020 Rule's preamble help. Brookfield notes that this rule was promulgated to "increas[e]

39

transparency and reduc[e] regulatory uncertainty," and cites language

referring to § 121.7(e)'s "three elements."  Br. 20-21, 24-25; *see* 85 Fed.

Reg. at 42,265 ("The EPA is finalizing the requirement that a

certification denial be in writing and include three elements to support

the denial."); *id.* at 42,267 ("If certification denials do not include these

three elements, the certifying authority . . . has waived certification.").

But this language merely refers to § 121.7(e)'s three findings in the

collective, rather than mandates their complete inclusion in every

denial.  Indeed, it would make little sense to require all "three

elements" in every denial.  If, for example, a State has sufficient

information to determine noncompliance on the merits (and make the

findings in § 121.7(e)(1)(i)-(ii)), then there is no reason to require that

State to *also* identify additional "water quality data or information"

needed to assure compliance (§ 121.7(e)(1)(iii)), or else trigger waiver.

As a fallback, Brookfield avers that the Denial should at least

identify "which particular water quality requirements the State [was]

unable to evaluate without more information" from the Biological

Opinion and Environmental Impact Statement, and explain why those

requirements are not met "based on the information the State currently

has."  Br. 22.  But no part of § 121.7(e)(1) requires identifying the requirements a State was "*unable* to evaluate" due to insufficient information.  Instead, subsections (i) and (ii) merely require identifying the requirements the proposed project "*will not* comply" with—which necessarily presumes that the State was *able* to evaluate those requirements.  § 121.7(e)(1)(i)-(ii).  Subsection (iii) does not help Brookfield's position either, as it only requires describing "the specific water quality data or information" a State would need to determine compliance.  § 121.7(e)(1)(iii).  The Commission reasonably found that requirement satisfied here.  *See infra* pp. 45-47.

## B.    The Commission's interpretation aligns with both regulatory and statutory purpose.

Regulations, as with statutes, "should ordinarily be read to effectuate [their] purposes rather than frustrate them."  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1165 (D.C. Cir. 1983) (citations omitted); *Stand Up for California!*, 994 F.3d at 624 ("As with statutes, we may look to the purpose and drafting history of the regulation to confirm whether our interpretation of the text comports with the [agency's] intent in promulgating [the regulation].").

41

In this vein, courts have interpreted "and" disjunctively to avoid frustrating the purpose a statute or regulation was intended to achieve. *See*, *e.g.*, *Slodov v. United States*, 436 U.S. 238, 250 (1978) (construing "and" disjunctively in statute imposing a tax penalty on "[a]ny person required to collect, truthfully account for, *and* pay over any tax imposed by this title" because Congress did not intend to limit penalty to only "those persons in a position to perform all three of the enumerated duties"); *Peacock*, 252 F.2d at 893 ("For us to conclude that Congress meant 'and' in a literal conjunctive sense is to determine that Congress meant in fact to grant no relief.").

Here, the 2020 Rule was "intended to make the Agency's regulations consistent with the current text of [Clean Water Act] section 401, increase efficiencies, and clarify aspects of [section 401] that have been unclear or subject to differing legal interpretations in the past." 85 Fed. Reg. at 42,236. "In modernizing 40 CFR part 121," the 2020 Rule "recognizes and responds to significant changes to the [Clean Water Act] that occurred after the [prior] 1971 regulations were finalized." *Id.* The 2020 Rule should therefore be interpreted consistent with the statutory purpose of Section 401.

42

Under the Clean Water Act, "Congress enacted a scheme of cooperative federalism that gives states an important role in regulating water quality," in which they remain the "the prime bulwark in the effort to abate water pollution." *Cal. Water Bd.*, 43 F.4th at 923 (quoting *Keating*, 927 F.2d at 622). "One of the primary mechanisms through which the states may assert the broad authority reserved to them is the certification requirement set out in section 401 of the Act." *Keating*, 927 F.2d at 622; *see also S.D. Warren*, 547 U.S. at 386 ("State certifications under § 401 are essential in the scheme to preserve state authority to address the broad range of pollution."). Through Section 401, "Congress intended that the states would retain the power to block, for environmental reasons, local water projects that might otherwise win federal approval." *Keating*, 927 F.2d at 622; *see also City of Tacoma v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006) ("The Clean Water Act gives a primary role to states to block local water projects by imposing and enforcing water quality standards that are more stringent than applicable federal standards." (cleaned up)); *see also supra* pp. 6-7.

Although Section 401's waiver provision was intended to curb a State's "unreasonable delay" in acting on a request, *Hoopa Valley*, 913

43

F.3d at 1104, courts have emphasized that waiver is not to be triggered casually. That is because "[t]he States' rights and responsibilities to ensure compliance with their own water-quality standards are too important to be so easily stripped away." *N.C. Dep't*, 3 F.4th at 675; *Cal. Water Bd.*, 43 F.4th at 936 (waiver determinations "cannot rest on such thin evidence" given the consequences); *see also Turlock*, 36 F.4th at 1183-84.

Waiver also leads to "dramatic consequences." *Cal. Water Bd.*, 43 F.4th at 936. Because "the default term of a federal hydroelectric license is forty years," a State that waives its authority to impose conditions on a hydroelectric project's license could result in that project being "noncompliant with prevailing state water quality standards *for decades*." *Id.* at 924 (emphasis added). Given the weight of these consequences, a waiver determination is not to be taken lightly.

Yet Brookfield's interpretation would do just that. Under its conjunctive reading, "[i]f a denial does not satisfy *any one* of the three elements of Section 121.7(e)(1), then 'the certification requirement for a license or permit shall be waived.'" Br. 25 (quoting 40 C.F.R. § 121.9(a)(2)(iii)) (emphasis added). That means the severe

44

consequences of waiver would be triggered simply because a State

cannot, based on the insufficient information before it, identify the

specific water quality requirements that would not be met, despite

timely denying the request under § 121.7(e)(1)(iii).  *See* Rehearing

Order P 18, JA ___ (Maine would be placed in "[im]possible" situation of

making substantive findings without necessary information); *cf.*

*Turlock*, 36 F.4th at 1183 (declining to find waiver where State's

repeated denials were due to incomplete federal- and state-level

environmental analyses that rendered applicants' requests incomplete

and "not ready for review").

## III.  The Commission's No-Waiver Determination Should Be Affirmed Under Either Interpretation of § 121.7(e)(1)

### A.  Substantial evidence supports the Commission's determination that the Denial satisfies § 121.7(e)(1).

For the foregoing reasons, the Commission's interpretation of

§ 121.7(e)(1) should be affirmed because it comports with the text,

context, and purpose of the regulation.  Under this reading, when

further federal and state analysis remains ongoing, a denial due to

insufficient information need only comply with subsection (iii) in order

45

to "satisfy the requirements of § 121.7(e)" and avoid waiver.  *See supra*
pp. 27-41; *see also* § 121.9(a)(2)(iii).

Here, the Commission reasonably determined that the Denial
complies with § 121.7(e)(1)(iii), and thus satisfies the requirements of
§ 121.7(e), because it describes the specific "water quality data or
information needed to assure the project will comply with water quality
requirements."  *See* Rehearing Order PP 16-18, JA ___-___.  As the
Commission found, the Denial describes needing information from two
forthcoming reports for certification review:  the "Fisheries Service's . . .
Biological Opinion" containing new information on the Project's effects
on Atlantic salmon, and the Commission's Environmental Impact
Statement "analyz[ing] the combined effects" of four related
hydroelectric projects (including this one) "with respect to fisheries
resources."  *Id.* PP 9, 17; JA ___, ___.  The Denial also describes
additional information needed on the "significant material changes"
Brookfield planned to make to its proposal in response to the Fisheries
Service's "fish passage" concerns.  *Id.* PP 10, 17; JA ___, ___.  Section
121.7(e)(1)(iii) requires nothing more.

Brookfield concedes "FERC is correct in the sense that the Denial identifies additional information the State would like to have for its review," but argues that the Denial somehow falls short of "identify[ing] the specific water quality data or information [Brookfield] needs to include next time around to obtain certification." Br. 29-30. This argument is makeweight. The Denial specifically identifies information in the forthcoming Biological Opinion and Environmental Impact Statement—as well as the anticipated responsive comments—as "necessary for [it] to review and consider" certifying Brookfield's proposed project. Denial at 2, JA ___; Maine Denial Ltr. to Brookfield (Oct. 12, 2022) at 2, JA ___. It further states that these reports and comments must be included were Brookfield to "submit another subsequent and updated [water quality certification] application." Denial at 3, JA ___.

## B.   The Denial satisfies § 121.7(e)(1) even under an interpretation that requires all three findings.

Even under Brookfield's conjunctive interpretation of § 121.7(e)(1), Maine's Denial makes all three enumerated findings and does not trigger waiver. That is because, to the extent Maine was required to identify specific water quality requirements or provide explanations

47

that could be relevant under § 121.7(e)(1)(i) and (ii), it had already done so in an earlier draft denial that the Denial expressly references.

Brookfield faults the Denial for not identifying any specific water quality requirements that its Project proposal would not comply with. Br. 26. It notes that the Denial discusses "fish passage concerns," particularly with respect to "Atlantic salmon," but claims "there [was] no way for [it] to know" from these "general references" which of Maine's "numerous water quality requirements," if any, "the State found its proposal failed to meet." *Id.*

As an initial matter, Brookfield again ignores that Maine was unable to evaluate the merits of its application because it lacked necessary information for its review. That is why Maine denied the request "without prejudice" and explained that the denial "should not be interpreted as either a positive or negative judgment of the merits of Brookfield's proposal." Denial at 6, JA ___. *Cf. Turlock*, 36 F.4th at 1183-84.

But insofar as Brookfield claims Maine's Denial should have *speculated* which water quality requirements could potentially be relevant, or how those requirements might not be met, Brookfield

48

already had that information thanks to its first attempt at certifying

this Project.  Before filing the certification request at issue here,

Brookfield had previously requested certification for the Project on

August 28, 2020.  Maine issued a draft denial in response that

explained why the Project as proposed would fail to meet specific State

water quality standards.  *See*, *e.g.*, Draft Denial at 53-54, JA ___-___;

R.247, Maine Draft Denial Ltr. to FERC (Dec. 5, 2022) at 1, JA ___.

This draft denial makes the findings § 121.7(e)(1)(i) and (ii)

require.[7]  It describes, at length, Maine's "concerns relating to the

Project's effects on habitat characteristics and aquatic life criteria, and

its ability to meet State water quality standards described in 38 M.R.S.

§ 465."  Maine Draft Denial Ltr. to FERC (Dec. 5, 2022) at 1, JA ___.  It

identifies several "applicable state water quality standards" and

explains what applicants must demonstrate to comply with those

---

[7]     Because Brookfield modified its proposal in between the first and
second certification requests, the proposals considered in the draft
denial and Denial are not identical.  But as both proposals pertain to
the same Project, the findings discussed in the draft denial may also be
relevant to Brookfield's revised proposal—subject to, of course,
forthcoming information Maine did not have regarding anticipated
proposal modifications, the Biological Opinion, and the Environmental
Impact Statement.

standards. Draft Denial at 9-13, JA __-___. The draft denial also analyzes Brookfield's proposed project and explains, for each standard, why or why not the proposal will comply. *Id.* at 14-52, JA ___-___. Maine concluded that denial was warranted because the proposed project would violate several of applicable State water quality standards, especially those concerning fish passage of Atlantic salmon. *See id.* at 53-54, JA ___-___ (explaining Brookfield had not demonstrated that the Project would not adversely impact "aquatic life pursuant to the standards set forth in 38 M.R.S. § 465(3)(A) and 38 M.R.S. § 465(3)(C)").

The later Denial expressly references the draft denial's earlier findings. In Maine's letter accompanying the Denial, it explains that these findings had prompted Brookfield to withdraw its prior application and submit a revised application "with additional measures to improve fish passage":

> Maine's Water Quality Standards require riverine impoundments to meet the habitat characteristic and aquatic life criteria described in 38 M.R.S. § 465. *As you are aware, on August 11, 2021, the Department issued a draft denial of [Brookfield's] August 28, 2020 application for [water quality certification], finding that it did not adequately demonstrate that Brookfield's proposed operation*

> *of the Project would meet Maine's water quality standards.* Brookfield filed a revised application with the Department on October 18, 2021, *with additional measures to improve fish passage.*

R.227, Maine Denial Ltr. to Brookfield (Oct. 12, 2022) at 1, JA ___ (emphasis added). The Denial itself also references "background facts with respect to prior [water quality certification] efforts," noting that Brookfield had "previously filed an application for [certification] for the Project on August 28, 2020, but withdrew that request on August 18, 2021, following the Department's issuance of a draft denial of [water quality certification] on August 11, 2021." Denial at 1 n.1, JA ___.

Nothing in § 121.7(e)(1) prohibits a denial from referencing other documents in the administrative record to make all three findings. These findings need not all be initially presented at once and, instead, can be sourced from other documents. Indeed, in its § 121.7(e)(1) analysis, the Commission determined that the Denial "incorporates by reference" the earlier draft denial, which "provides further details regarding the state's concerns related to the project's effects on habitat characteristics and aquatic life criteria, and its ability to meet state water quality standards." Rehearing Order P 17 n.40, JA ___. Likewise, in a letter to the Commission on rehearing, Maine affirmed

its position "that the Denial and *all materials referenced in it*, including the October 12, 2022 letter to Brookfield, and *the 2021 Draft Denial, satisfy the requirements of 40 C.F.R. § 121.7(e)*."  Maine Draft Denial Ltr. to FERC (Dec. 5, 2022) at 1-2, JA ___-___ (emphases added).

When read in context of the earlier draft denial it references, the later Denial complies with all three requirements listed in § 121.7(e)(1). It satisfies § 121.7(e)(1)(iii) by describing the "specific water quality data and information" necessary to determine compliance, such as information Maine had yet to receive from the Biological Opinion and Environmental Impact Statement.  *See supra* pp. 45-47.  And to the extent any findings could be divined as to § 121.7(e)(1)(i) and (ii), the Denial also satisfies these requirements by expressly referencing the draft denial's earlier findings.  The Denial therefore satisfies § 121.7(e)(1)'s requirements under either interpretation of this regulation.

## C.    Any error as to the Commission's analysis was harmless and would not preclude affirmance.

Because the Denial "satisf[ies] the requirements of § 121.7(e)" under either reading of the regulation, *supra* pp. 47-52, Brookfield has no basis to assert that Maine had waived its certification authority

52

under § 121.9(a)(2)(iii).  This Court should therefore affirm the

Commission's no-waiver determination even if it disagrees with the

Commission's interpretation of § 121.7(e)(1).

As the Rehearing Order adopts a disjunctive reading of

§ 121.7(e)(1), it does not expressly consider whether the Denial complies

with § 121.7(e)(1)(i) and (ii).  *See* Rehearing Order PP 16-18, JA __-___.

Brookfield asserts it was error for the Commission to interpret the

regulation this way and not consider these requirements.  Br. 25-28.  To

the extent the Court perceives any error in that analysis, it was

harmless and would not preclude the Court from affirming the

Commission's no-waiver determination.

The Administrative Procedure Act obliges courts to give "'due

account . . . of the rule of prejudicial error.'"  *Nat'l Ass'n of Home*

*Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (quoting 5 U.S.C.

§ 706).  Under this rule, when the correct outcome of an agency

proceeding is evident, the reviewing court may affirm despite an

apparent error.  *Prohibition Juice Co. v.  FDA*, 45 F.4th 8, 24 (D.C. Cir.

2022).  And it may do so even on grounds not explicitly offered by the

agency.  *Id.*  Brookfield, as the "party attacking the agency's

53

determination," bears the burden of showing that an error is harmful. *Id.* (citation omitted).  It cannot do so here.

Had the Commission adopted a conjunctive interpretation and considered whether the Denial satisfies § 121.7(e)(1)(i) and (ii), it would have reached the same conclusion:  the Denial complies with § 121.7(e)(1) and does not trigger waiver.  This is evident from the Rehearing Order itself, which concludes that Maine's Denial "incorporates by reference" the earlier draft denial to "provide[] further details" about the Project's "ability to meet state water quality standards" and adverse effects on aquatic wildlife.  Rehearing Order P 17 n.40, JA ___.  The Commission, then, would have found § 121.7(e)(1)(i) and (ii) satisfied because the Denial expressly references the draft denial's earlier findings that identify specific state water quality requirements and explain why those requirements would not be met.  *See supra* pp. 47-52.  Any error the Commission might have made in not considering § 121.7(e)(1)(i) and (ii) would not have changed the outcome.  *See Prohibition Juice*, 45 F.4th at 24-25 (FDA's failure to review marketing plans was harmless error where consideration of the plans would "not have changed the agency's decision" and remand

would merely "convert judicial review of agency action into a ping-pong game, lobbing the matter from agency to court and back.").

Accordingly, this Court should affirm the Commission's determination that Maine did not waive its certification power regardless of which regulatory interpretation it applies.

## CONCLUSION

For the foregoing reasons, the Court should deny the petition for review.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Angela X. Gao*
Angela X. Gao
Attorney

Federal Energy Regulatory
    Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6790
*angela.gao@ferc.gov*

November 2, 2023

55

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), because this brief contains 10,268 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Angela X. Gao*
Angela X. Gao
Attorney

Federal Energy Regulatory
    Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6790
*angela.gao@ferc.gov*

November 2, 2023

# ADDENDUM

# TABLE OF CONTENTS

**STATUTES:**                                                          **PAGE**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) .................................................................... A-1

Clean Water Act

    Section 101, 33 U.S.C. § 1251 ...................................................... A-2

    Section 401, 33 U.S.C. § 1341 ...................................................... A-8

Endangered Species Act

    Section 7, 16 U.S.C. § 1536 .......................................................... A-10

Federal Power Act

    Section 1, 16 U.S.C. § 792 ............................................................ A-19

    Section 4, 16 U.S.C. § 797(e) ....................................................... A-22

    Section 6, 16 U.S.C. § 799 ............................................................ A-27

    Section 10, 16 U.S.C. § 803(a)(1)................................................. A-28

    Section 23(b), 16 U.S.C. § 817(1)................................................. A-33

National Environmental Policy Act,

    Section 102, 42 U.S.C. § 4332(2)(C) ........................................... A-34

**REGULATIONS:**

Code of Federal Regulations (July 1, 2019 ed.)

    40 C.F.R. Part 121 ...................................................................... A-37

Code of Federal Regulations (July 1, 2021 ed.)

    18 C.F.R. § 5.23(b)(2) .............................................................. A-43

    40 C.F.R. § 121.7(e) ................................................................ A-44

    40 C.F.R. § 121.9(a)(2) ........................................................... A-45

    40 C.F.R. § 121.13 .................................................................. A-47

**RULEMAKING:**

Clean Water Act Section 401 Certification Rule ("2020 Rule"),
    85 Fed. Reg. 42,210 (July 13, 2020)
    *excerpted at* 42,210-11, 42,236, 42,265 ..................................... A-48

Notice of Intent to Reconsider and Revise the Clean Water Act
    Section 401 Certification Rule, 87 Fed. Reg. 35,318 (June 9, 2022),
    *excerpted at* 35,318 ................................................................ A-52

Clean Water Act Section 401 Water Quality Certification Improvement
    Rule ("2023 Rule"), 88 Fed. Reg. 66,558 (Sept. 27, 2023),
    *excerpted at* 66,558-65, 66,609-11, 66,661-66 ........................... A-53

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

| Sec. | |
|---|---|
| 801. | Congressional review. |
| 802. | Congressional disapproval procedure. |
| 803. | Special rule on statutory, regulatory, and judicial deadlines. |
| 804. | Definitions. |
| 805. | Judicial review. |
| 806. | Applicability; severability. |
| 807. | Exemption for monetary policy. |
| 808. | Effective date of certain rules. |

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of



Sec.
1287.    Authorization of appropriations.
1288.    Areawide waste treatment management.
1289.    Basin planning.
1290.    Annual survey.
1291.    Sewage collection systems.
1292.    Definitions.
1293.    Loan guarantees.
1293a.   Contained spoil disposal facilities.
1294.    Public information and education on recy-
         cling and reuse of wastewater, use of land
         treatment, and reduction of wastewater vol-
         ume.
1295.    Requirements for American materials.
1296.    Determination of priority of projects.
1297.    Guidelines for cost-effectiveness analysis.
1298.    Cost effectiveness.
1299.    State certification of projects.
1300.    Pilot program for alternative water source
         projects.
1301.    Sewer overflow and stormwater reuse munic-
         ipal grants.
1302.    Wastewater efficiency grant pilot program.
1302a.   Clean water infrastructure resiliency and sus-
         tainability program.
1302b.   Small and medium publicly owned treatment
         works circuit rider program.
1302c.   Small publicly owned treatment works effi-
         ciency grant program.
1302d.   Grants for construction and refurbishing of
         individual household decentralized waste-
         water systems for individuals with low or
         moderate income.
1302e.   Connection to publicly owned treatment
         works.
1302f.   Stormwater infrastructure technology.

SUBCHAPTER III—STANDARDS AND
ENFORCEMENT

1311.    Effluent limitations.
1312.    Water quality related effluent limitations.
1313.    Water quality standards and implementation
         plans.
1313a.   Revised water quality standards.
1314.    Information and guidelines.
1314a.   Wastewater technology clearinghouse.
1315.    State reports on water quality.
1316.    National standards of performance.
1317.    Toxic and pretreatment effluent standards.
1318.    Records and reports; inspections.
1319.    Enforcement.
1320.    International pollution abatement.
1321.    Oil and hazardous substance liability.
1321a.   Prevention of small oil spills.
1321b.   Improved coordination with tribal govern-
         ments.
1321c.   International efforts on enforcement.
1322.    Marine sanitation devices; discharges inci-
         dental to the normal operation of vessels.
1323.    Federal facilities pollution control.
1324.    Clean lakes.
1325.    National Study Commission.
1326.    Thermal discharges.
1327.    Omitted.
1328.    Aquaculture.
1329.    Nonpoint source management programs.
1330.    National estuary program.

SUBCHAPTER IV—PERMITS AND LICENSES

1341.    Certification.
1342.    National pollutant discharge elimination sys-
         tem.
1343.    Ocean discharge criteria.
1344.    Permits for dredged or fill material.
1345.    Disposal or use of sewage sludge.
1346.    Coastal recreation water quality monitoring
         and notification.

SUBCHAPTER V—GENERAL PROVISIONS

1361.    Administration.

Sec.
1362.    Definitions.
1363.    Water Pollution Control Advisory Board.
1364.    Emergency powers.
1365.    Citizen suits.
1366.    Appearance.
1367.    Employee protection.
1368.    Federal procurement.
1369.    Administrative procedure and judicial review.
1370.    State authority.
1371.    Authority under other laws and regulations.
1372.    Labor standards.
1373.    Public health agency coordination.
1374.    Effluent Standards and Water Quality Infor-
         mation Advisory Committee.
1375.    Reports to Congress; detailed estimates and
         comprehensive study on costs; State esti-
         mates.
1375a.   Report on coastal recreation waters.
1376.    Authorization of appropriations.
1377.    Indian tribes.
1377a.   Green infrastructure promotion.

SUBCHAPTER VI—STATE WATER POLLUTION
CONTROL REVOLVING FUNDS

1381.    Grants to States for establishment of revolv-
         ing funds.
1382.    Capitalization grant agreements.
1383.    Water pollution control revolving loan funds.
1384.    Allotment of funds.
1385.    Corrective action.
1386.    Audits, reports, and fiscal controls; intended
         use plan.
1387.    Authorization of appropriations.
1388.    Requirements.
1389.    Clean watersheds needs survey.

## Editorial Notes

### CODIFICATION

The Federal Water Pollution Control Act, comprising this chapter, was originally enacted by act June 30, 1948, ch. 758, 62 Stat. 1155, and amended by acts July 17, 1952, ch. 927, 66 Stat. 755; July 9, 1956, ch. 518, §§1, 2, 70 Stat. 498–507; June 25, 1959, Pub. L. 86–70, 73 Stat. 141; July 12, 1960, Pub. L. 86–624, 74 Stat. 411; July 20, 1961, Pub. L. 87–88, 75 Stat. 204; Oct. 2, 1965, Pub. L. 89–234, 79 Stat. 903; Nov. 3, 1966, Pub. L. 89–753, 80 Stat. 1246; Apr. 3, 1970, Pub. L. 91–224, 84 Stat. 91; Dec. 31, 1970, Pub. L. 91–611, 84 Stat. 1818; July 9, 1971, Pub. L. 92–50, 85 Stat. 124; Oct. 13, 1971, Pub. L. 92–137, 85 Stat. 379; Mar. 1, 1972, Pub. L. 92–240, 86 Stat. 47, and was formerly classi-fied first to section 466 et seq. of this title and later to section 1151 et seq. of this title. The act is shown here-in, however, as having been added by Pub. L. 92–500 without reference to such intervening amendments be-cause of the extensive amendment, reorganization, and expansion of the act's provisions by Pub. L. 92–500.

## SUBCHAPTER I—RESEARCH AND RELATED PROGRAMS

### § 1251. Congressional declaration of goals and policy

**(a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective**

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever at-tainable, an interim goal of water quality

which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

(7) it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

(b) **Congressional recognition, preservation, and protection of primary responsibilities and rights of States**

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

(c) **Congressional policy toward Presidential activities with foreign countries**

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

(d) **Administrator of Environmental Protection Agency to administer chapter**

Except as otherwise expressly provided in this chapter, the Administrator of the Environ-

mental Protection Agency (hereinafter in this chapter called ''Administrator'') shall administer this chapter.

(e) **Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

(f) **Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

(g) **Authority of States over water**

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

(June 30, 1948, ch. 758, title I, § 101, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816; amended Pub. L. 95–217, §§ 5(a), 26(b), Dec. 27, 1977, 91 Stat. 1567, 1575; Pub. L. 100–4, title III, § 316(b), Feb. 4, 1987, 101 Stat. 60.)

### EDITORIAL NOTES

#### AMENDMENTS

1987—Subsec. (a)(7). Pub. L. 100–4 added par. (7).

1977—Subsec. (b). Pub. L. 95–217, § 26(b), inserted provisions expressing Congressional policy that the States manage the construction grant program under this chapter and implement the permit program under sections 1342 and 1344 of this title.

Subsec. (g). Pub. L. 95–217, § 5(a), added subsec. (g).

### STATUTORY NOTES AND RELATED SUBSIDIARIES

#### SHORT TITLE OF 2021 AMENDMENT

Pub. L. 117–58, div. E, § 50001, Nov. 15, 2021, 135 Stat. 1135, provided that: ''This division [see Tables for classification] may be cited as the 'Drinking Water and Wastewater Infrastructure Act of 2021'.''

Pub. L. 116–337, § 1, Jan. 13, 2021, 134 Stat. 5120, provided that: ''This Act [amending section 1330 of this title] may be cited as the 'Protect and Restore America's Estuaries Act'.''

Pub. L. 116–294, § 1, Jan. 5, 2021, 134 Stat. 4899, provided that: ''This Act [amending section 1268 of this title] may be cited as the 'Great Lakes Restoration Initiative Act of 2019' or the 'GLRI Act of 2019'.''

A-3

SHORT TITLE OF 2019 AMENDMENT

Pub. L. 115–436, §1, Jan. 14, 2019, 132 Stat. 5558, provided that: "This Act [enacting section 1377a of this title and section 4370j of Title 42, The Public Health and Welfare, amending sections 1319, 1342, and 1362 of this title, enacting provisions set out as a note under section 4370j of Title 42, and renumbering provisions set out as a note under this section] may be cited as the 'Water Infrastructure Improvement Act'."

SHORT TITLE OF 2018 AMENDMENT

Pub. L. 115–282, title IX, §901, Dec. 4, 2018, 132 Stat. 4322, provided that: "This title [enacting sections 4729 and 4730 of Title 16, Conservation, amending sections 1319, 1322, 1365, and 1369 of this title, sections 4712 and 4725 of Title 16, section 42 of Title 18, Crimes and Criminal Procedure, and section 11301 of Title 46, Shipping, repealing section 4711 of Title 16, enacting provisions set out as a note under section 1322 of this title and section 4711 of Title 16, and repealing provisions set out as a note under section 1342 of this title] may be cited as the 'Vessel Incidental Discharge Act of 2018'."

SHORT TITLE OF 2017 AMENDMENT

Pub. L. 115–91, div. C, title XXXV, §3508(a), Dec. 12, 2017, 131 Stat. 1915, provided that: "This section [amending sections 1321, 2701, and 2715 of this title] may be cited as the 'Foreign Spill Protection Act of 2017'."

SHORT TITLE OF 2008 AMENDMENT

Pub. L. 110–365, §1, Oct. 8, 2008, 122 Stat. 4021, provided that: "This Act [amending sections 1268 and 1271a of this title] may be cited as the 'Great Lakes Legacy Reauthorization Act of 2008'."

Pub. L. 110–288, §1, July 29, 2008, 122 Stat. 2650, provided that: "This Act [amending sections 1322, 1342, and 1362 of this title] may be cited as the 'Clean Boating Act of 2008'."

SHORT TITLE OF 2002 AMENDMENT

Pub. L. 107–303, §1(a), Nov. 27, 2002, 116 Stat. 2355, provided that: "This Act [enacting section 1271a of this title, amending sections 1254, 1266, 1268, 1270, 1285, 1290, 1324, 1329, 1330, and 1375 of this title, enacting provisions set out as notes under this section, section 1254 of this title, and section 1113 of Title 31, Money and Finance, and repealing provisions set out as a note under section 50 of Title 20, Education] may be cited as the 'Great Lakes and Lake Champlain Act of 2002'."

Pub. L. 107–303, title I, §101, Nov. 27, 2002, 116 Stat. 2355, provided that: "This title [enacting section 1271a of this title and amending section 1268 of this title] may be cited as the 'Great Lakes Legacy Act of 2002'."

Pub. L. 107–303, title II, §201, Nov. 27, 2002, 116 Stat. 2358, provided that: "This title [amending section 1270 of this title] may be cited as the 'Daniel Patrick Moynihan Lake Champlain Basin Program Act of 2002'."

SHORT TITLE OF 2000 AMENDMENTS

Pub. L. 106–457, title II, §201, Nov. 7, 2000, 114 Stat. 1967, provided that: "This title [amending section 1267 of this title and enacting provisions set out as a note under section 1267 of this title] may be cited as the 'Chesapeake Bay Restoration Act of 2000'."

Pub. L. 106–457, title IV, §401, Nov. 7, 2000, 114 Stat. 1973, provided that: "This title [amending section 1269 of this title] may be cited as the 'Long Island Sound Restoration Act'."

Pub. L. 106–457, title V, §501, Nov. 7, 2000, 114 Stat. 1973, provided that: "This title [enacting section 1273 of this title] may be cited as the 'Lake Pontchartrain Basin Restoration Act of 2000'."

Pub. L. 106–457, title VI, §601, Nov. 7, 2000, 114 Stat. 1975, provided that: "This title [enacting section 1300 of this title] may be cited as the 'Alternative Water Sources Act of 2000'."

Pub. L. 106–284, §1, Oct. 10, 2000, 114 Stat. 870, provided that: "This Act [enacting sections 1346 and 1375a of this title and amending sections 1254, 1313, 1314, 1362, and 1377 of this title] may be cited as the 'Beaches Environmental Assessment and Coastal Health Act of 2000'."

SHORT TITLE OF 1994 AMENDMENT

Pub. L. 103–431, §1, Oct. 31, 1994, 108 Stat. 4396, provided that: "This Act [amending section 1311 of this title] may be cited as the 'Ocean Pollution Reduction Act'."

SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–596, §1, Nov. 16, 1990, 104 Stat. 3000, provided that: "This Act [enacting sections 1269 and 1270 of this title, amending sections 1268, 1324, and 1416 of this title, and enacting provisions set out as notes under this section and section 1270 of this title] may be cited as the 'Great Lakes Critical Programs Act of 1990'."

Pub. L. 101–596, title II, §201, Nov. 16, 1990, 104 Stat. 3004, provided that: "This part [probably means title, enacting section 1269 of this title and amending section 1416 of this title] may be cited as the 'Long Island Sound Improvement Act of 1990'."

Pub. L. 101–596, title III, §301, Nov. 16, 1990, 104 Stat. 3006, provided that: "This title [enacting section 1270 of this title, amending section 1324 of this title, and enacting provisions set out as a note under section 1270 of this title] may be cited as the 'Lake Champlain Special Designation Act of 1990'."

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–653, title X, §1001, Nov. 14, 1988, 102 Stat. 3835, provided that: "This title [amending section 1330 of this title and enacting provisions set out as notes under section 1330 of this title] may be cited as the 'Massachusetts Bay Protection Act of 1988'."

SHORT TITLE OF 1987 AMENDMENT

Pub. L. 100–4, §1(a), Feb. 4, 1987, 101 Stat. 7, provided that: "This Act [enacting sections 1254a, 1267, 1268, 1281b, 1329, 1377, 1381 to 1387, and 1414a of this title, amending this section and sections 1254, 1256, 1262, 1281, 1282 to 1285, 1287, 1288, 1291, 1311 to 1313, 1314, 1317 to 1322, 1324, 1342, 1344, 1345, 1361, 1362, 1365, 1369, 1375, and 1376 of this title, and enacting provisions set out as notes under this section, sections 1284, 1311, 1317, 1319, 1330, 1342, 1345, 1362, 1375, and 1414a of this title, and section 1962d–20 of Title 42, The Public Health and Welfare] may be cited as the 'Water Quality Act of 1987'."

SHORT TITLE OF 1981 AMENDMENT

Pub. L. 97–117, §1, Dec. 29, 1981, 95 Stat. 1623, provided that: "This Act [enacting sections 1298, 1299, and 1313a of this title, amending sections 1281 to 1285, 1287, 1291, 1292, 1296, 1311, and 1314 of this title, and enacting provisions set out as notes under sections 1311 and 1375 of this title] may be cited as the 'Municipal Wastewater Treatment Construction Grant Amendments of 1981'."

SHORT TITLE OF 1977 AMENDMENT

Pub. L. 95–217, §1, Dec. 27, 1977, 91 Stat. 1566, provided: "That this Act [enacting sections 1281a, 1294 to 1296, and 1297 of this title, amending this section and sections 1252, 1254 to 1256, 1259, 1262, 1263, 1281, 1282 to 1288, 1291, 1292, 1311, 1314, 1315, 1317 to 1319, 1321 to 1324, 1328, 1341, 1342, 1344, 1345, 1362, 1364, 1375, and 1376 of this title, enacting provisions set out as notes under this section and sections 1284, 1286, 1314, 1321, 1342, 1344, and 1376 of this title, and amending provisions set out as a note under this section] may be cited as the 'Clean Water Act of 1977'."

SHORT TITLE

Pub. L. 92–500, §1, Oct. 18, 1972, 86 Stat. 816, provided that: "That this Act [enacting this chapter, amending section 24 of Title 12, Banks and Banking, sections 633 and 636 of Title 15, Commerce and Trade, and section 711 of former Title 31, Money and Finance, and enacting provisions set out as notes under this section and sec-

tions 1281 and 1361 of this title] may be cited as the 'Federal Water Pollution Control Act Amendments of 1972'.''

Act June 30, 1948, ch. 758, title V, § 520, formerly § 518, as added by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 896, amended Pub. L. 95–217, § 2, Dec. 27, 1977, 91 Stat. 1566, renumbered § 519, Pub. L. 100–4, title V, § 506, Feb. 4, 1987, 101 Stat. 76, renumbered § 520, Pub. L. 115–436, § 5(b)(1), Jan. 14, 2019, 132 Stat. 5561, provided that: ''This Act [this chapter] may be cited as the 'Federal Water Pollution Control Act' (commonly referred to as the Clean Water Act).''

### SAVINGS PROVISION

Pub. L. 92–500, § 4, Oct. 18, 1972, 86 Stat. 896, provided that:

''(a) No suit, action, or other proceeding lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall abate by reason of the taking effect of the amendment made by section 2 of this Act [which enacted this chapter]. The court may, on its own motion or that of any party made at any time within twelve months after such taking effect, allow the same to be maintained by or against the Administrator or such officer or employee.

''(b) All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972], and pertaining to any functions, powers, requirements, and duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall continue in full force and effect after the date of enactment of this Act [Oct. 18, 1972] until modified or rescinded in accordance with the Federal Water Pollution Control Act as amended by this Act [this chapter].

''(c) The Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall remain applicable to all grants made from funds authorized for the fiscal year ending June 30, 1972, and prior fiscal years, including any increases in the monetary amount of any such grant which may be paid from authorizations for fiscal years beginning after June 30, 1972, except as specifically otherwise provided in section 202 of the Federal Water Pollution Control Act as amended by this Act [section 1282 of this title] and in subsection (c) of section 3 of this Act.''

### SEPARABILITY

Act June 30, 1948, ch. 758, title V, § 512, as added by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 894, provided that: ''If any provision of this Act [this chapter], or the application of any provision of this Act [this chapter] to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the remainder of this Act [this chapter], shall not be affected thereby.''

### NATIONAL SHELLFISH INDICATOR PROGRAM

Pub. L. 102–567, title III, § 308, Oct. 29, 1992, 106 Stat. 4286; as amended by Pub. L. 105–362, title II, § 201(b), Nov. 10, 1998, 112 Stat. 3282, provided that:

''(a) ESTABLISHMENT OF A RESEARCH PROGRAM.—The Secretary of Commerce, in cooperation with the Secretary of Health and Human Services and the Administrator of the Environmental Protection Agency, shall establish and administer a 5-year national shellfish research program (hereafter in this section referred to as the 'Program') for the purpose of improving existing classification systems for shellfish growing waters using the latest technological advancements in microbiology and epidemiological methods. Within 12 months after the date of enactment of this Act [Oct. 29, 1992], the Secretary of Commerce, in cooperation with the advisory committee established under subsection (b) and the Consortium, shall develop a comprehensive 5-year plan for the Program which shall at a minimum provide for—

''(1) an environmental assessment of commercial shellfish growing areas in the United States, including an evaluation of the relationships between indicators of fecal contamination and human enteric pathogens;

''(2) the evaluation of such relationships with respect to potential health hazards associated with human consumption of shellfish;

''(3) a comparison of the current microbiological methods used for evaluating indicator bacteria and human enteric pathogens in shellfish and shellfish growing waters with new technological methods designed for this purpose;

''(4) the evaluation of current and projected systems for human sewage treatment in eliminating viruses and other human enteric pathogens which accumulate in shellfish;

''(5) the design of epidemiological studies to relate microbiological data, sanitary survey data, and human shellfish consumption data to actual hazards to health associated with such consumption; and

''(6) recommendations for revising Federal shellfish standards and improving the capabilities of Federal and State agencies to effectively manage shellfish and ensure the safety of shellfish intended for human consumption.

''(b) ADVISORY COMMITTEE.—(1) For the purpose of providing oversight of the Program on a continuing basis, an advisory committee (hereafter in this section referred to as the 'Committee') shall be established under a memorandum of understanding between the Interstate Shellfish Sanitation Conference and the National Marine Fisheries Service.

''(2) The Committee shall—

''(A) identify priorities for achieving the purpose of the Program;

''(B) review and recommend approval or disapproval of Program work plans and plans of operation;

''(C) review and comment on all subcontracts and grants to be awarded under the Program;

''(D) receive and review progress reports from the Consortium and program subcontractors and grantees; and

''(E) provide such other advice on the Program as is appropriate.

''(3) The Committee shall consist of at least ten members and shall include—

''(A) three members representing agencies having authority under State law to regulate the shellfish industry, of whom one shall represent each of the Atlantic, Pacific, and Gulf of Mexico shellfish growing regions;

''(B) three members representing persons engaged in the shellfish industry in the Atlantic, Pacific, and Gulf of Mexico shellfish growing regions (who shall be appointed from among at least six recommendations by the industry members of the Interstate Shellfish Sanitation Conference Executive Board), of whom one shall represent the shellfish industry in each region;

''(C) three members, of whom one shall represent each of the following Federal agencies: the National Oceanic and Atmospheric Administration, the Environmental Protection Agency, and the Food and Drug Administration; and

''(D) one member representing the Shellfish Institute of North America.

''(4) The Chairman of the Committee shall be selected from among the Committee members described in paragraph (3)(A).

''(5) The Committee shall establish and maintain a subcommittee of scientific experts to provide advice, assistance, and information relevant to research funded under the Program, except that no individual who is

awarded, or whose application is being considered for, a grant or subcontract under the Program may serve on such subcommittee. The membership of the subcommittee shall, to the extent practicable, be regionally balanced with experts who have scientific knowledge concerning each of the Atlantic, Pacific, and Gulf of Mexico shellfish growing regions. Scientists from the National Academy of Sciences and appropriate Federal agencies (including the National Oceanic and Atmospheric Administration, Food and Drug Administration, Centers for Disease Control, National Institutes of Health, Environmental Protection Agency, and National Science Foundation) shall be considered for membership on the subcommittee.

''(6) Members of the Committee and its scientific subcommittee established under this subsection shall not be paid for serving on the Committee or subcommittee, but shall receive travel expenses as authorized by section 5703 of title 5, United States Code.

''(c) CONTRACT WITH CONSORTIUM.—Within 30 days after the date of enactment of this Act [Oct. 29, 1992], the Secretary of Commerce shall seek to enter into a cooperative agreement or contract with the Consortium under which the Consortium will—

''(1) be the academic administrative organization and fiscal agent for the Program;

''(2) award and administer such grants and subcontracts as are approved by the Committee under subsection (b);

''(3) develop and implement a scientific peer review process for evaluating grant and subcontractor applications prior to review by the Committee;

''(4) in cooperation with the Secretary of Commerce and the Committee, procure the services of a scientific project director;

''(5) develop and submit budgets, progress reports, work plans, and plans of operation for the Program to the Secretary of Commerce and the Committee; and

''(6) make available to the Committee such staff, information, and assistance as the Committee may reasonably require to carry out its activities.

''(d) AUTHORIZATION OF APPROPRIATIONS.—(1) Of the sums authorized under section 4(a) of the National Oceanic and Atmospheric Administration Marine Fisheries Program Authorization Act (Public Law 98–210; 97 Stat. 1409), there are authorized to be appropriated to the Secretary of Commerce $5,200,000 for each of the fiscal years 1993 through 1997 for carrying out the Program. Of the amounts appropriated pursuant to this authorization, not more than 5 percent of such appropriation may be used for administrative purposes by the National Oceanic and Atmospheric Administration. The remaining 95 percent of such appropriation shall be used to meet the administrative and scientific objectives of the Program.

''(2) The Interstate Shellfish Sanitation Conference shall not administer appropriations authorized under this section, but may be reimbursed from such appropriations for its expenses in arranging for travel, meetings, workshops, or conferences necessary to carry out the Program.

''(e) DEFINITIONS.—As used in this section, the term—

''(1) 'Consortium' means the Louisiana Universities Marine Consortium; and

''(2) 'shellfish' means any species of oyster, clam, or mussel that is harvested for human consumption.''

LIMITATION ON PAYMENTS

Pub. L. 100–4, §2, Feb. 4, 1987, 101 Stat. 8, provided that: ''No payments may be made under this Act [see Short Title of 1987 Amendment note above] except to the extent provided in advance in appropriation Acts.''

SEAFOOD PROCESSING STUDY; SUBMITTAL OF RESULTS TO CONGRESS NOT LATER THAN JANUARY 1, 1979

Pub. L. 95–217, §74, Dec. 27, 1977, 91 Stat. 1609, provided that the Administrator of the Environmental Protection Agency conduct a study to examine the geographical, hydrological, and biological characteristics of marine waters to determine the effects of seafood processes which dispose of untreated natural wastes into such waters and to include in this study an examination of technologies which may be used in such processes to facilitate the use of the nutrients in these wastes or to reduce the discharge of such wastes into the marine environment and to submit the result of this study to Congress not later than Jan. 1, 1979.

OVERSIGHT STUDY

Pub. L. 92–500, §5, Oct. 18, 1972, 86 Stat. 897, authorized the Comptroller General of the United States to conduct a study and review of the research, pilot, and demonstration programs related to prevention and control of water pollution conducted, supported, or assisted by any Federal agency pursuant to any Federal law or regulation and assess conflicts between these programs and their coordination and efficacy, and to report to Congress thereon by Oct. 1, 1973.

INTERNATIONAL TRADE STUDY

Pub. L. 92–500, §6, Oct. 18, 1972, 86 Stat. 897, provided that:

''(a) The Secretary of Commerce, in cooperation with other interested Federal agencies and with representatives of industry and the public, shall undertake immediately an investigation and study to determine—

''(1) the extent to which pollution abatement and control programs will be imposed on, or voluntarily undertaken by, United States manufacturers in the near future and the probable short- and long-range effects of the costs of such programs (computed to the greatest extent practicable on an industry-by-industry basis) on (A) the production costs of such domestic manufacturers, and (B) the market prices of the goods produced by them;

''(2) the probable extent to which pollution abatement and control programs will be implemented in foreign industrial nations in the near future and the extent to which the production costs (computed to the greatest extent practicable on an industry-by-industry basis) of foreign manufacturers will be affected by the costs of such programs;

''(3) the probable competitive advantage which any article manufactured in a foreign nation will likely have in relation to a comparable article made in the United States if that foreign nation—

''(A) does not require its manufacturers to implement pollution abatement and control programs.

''(B) requires a lesser degree of pollution abatement and control in its programs, or

''(C) in any way reimburses or otherwise subsidizes its manufacturers for the costs of such program;

''(4) alternative means by which any competitive advantage accruing to the products of any foreign nation as a result of any factor described in paragraph (3) may be (A) accurately and quickly determined, and (B) equalized, for example, by the imposition of a surcharge or duty, on a foreign product in an amount necessary to compensate for such advantage; and

''(5) the impact, if any, which the imposition of a compensating tariff of other equalizing measure may have in encouraging foreign nations to implement pollution and abatement control programs.

''(b) The Secretary shall make an initial report to the President and Congress within six months after the date of enactment of this section [Oct. 18, 1972] of the results of the study and investigation carried out pursuant to this section and shall make additional reports thereafter at such times as he deems appropriate taking into account the development of relevant data, but not less than once every twelve months.''

INTERNATIONAL AGREEMENTS

Pub. L. 92–500, §7, Oct. 18, 1972, 86 Stat. 898, provided that: ''The President shall undertake to enter into international agreement to apply uniform standards of

performance for the control of the discharge and emission of pollutants from new sources, uniform controls over the discharge and emission of toxic pollutants, and uniform controls over the discharge of pollutants into the ocean. For this purpose the President shall negotiate multilateral treaties, conventions, resolutions, or other agreements, and formulate, present, or support proposals at the United Nations and other appropriate international forums.''

#### NATIONAL POLICIES AND GOAL STUDY

Pub. L. 92–500, §10, Oct. 18, 1972, 86 Stat. 899, directed President to make a full and complete investigation and study of all national policies and goals established by law to determine what the relationship should be between these policies and goals, taking into account the resources of the Nation, and to report results of his investigation and study together with his recommendations to Congress not later than two years after Oct. 18, 1972.

#### EFFICIENCY STUDY

Pub. L. 92–500, §11, Oct. 18, 1972, 86 Stat. 899, directed President, by utilization of the General Accounting Office, to conduct a full and complete investigation and study of ways and means of most effectively using all of the various resources, facilities, and personnel of the Federal Government in order to most efficiently carry out the provisions of this chapter and to report results of his investigation and study together with his recommendations to Congress not later than two hundred and seventy days after Oct. 18, 1972.

#### SEX DISCRIMINATION

Pub. L. 92–500, §13, Oct. 18, 1972, 86 Stat. 903, provided that: ''No person in the United States shall on the ground of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance under this Act [see Short Title note above] the Federal Water Pollution Control Act [this chapter], or the Environmental Financing Act [set out as a note under section 1281 of this title]. This section shall be enforced through agency provisions and rules similar to those already established, with respect to racial and other discrimination, under title VI of the Civil Rights Act of 1964 [section 2000d et seq. of Title 42, The Public Health and Welfare]. However, this remedy is not exclusive and will not prejudice or cut off any other legal remedies available to a discriminate.''

#### DEFINITION OF ''ADMINISTRATOR''

Pub. L. 100–4, §1(d), Feb. 4, 1987, 101 Stat. 8, provided that: ''For purposes of this Act [see Short Title of 1987 Amendment note above], the term 'Administrator' means the Administrator of the Environmental Protection Agency.''

#### Executive Documents

##### STANDARDS

For provisions relating to the responsibility of the head of each Executive agency for compliance with applicable pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

##### CONTIGUOUS ZONE OF UNITED STATES

For extension of contiguous zone of United States, see Proc. No. 7219, set out as a note under section 1331 of Title 43, Public Lands.

##### PREVENTION, CONTROL, AND ABATEMENT OF ENVIRONMENTAL POLLUTION AT FEDERAL FACILITIES

Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare, provides for the prevention, control, and abatement of environmental pollution at federal facilities.

##### EXECUTIVE ORDER NO. 11548

Ex. Ord. No. 11548, July 20, 1970, 35 F.R. 11677, which related to the delegation of Presidential functions, was superseded by Ex. Ord. No. 11735, Aug. 3, 1973, 38 F.R. 21243, formerly set out as a note under section 1321 of this title.

##### EX. ORD. NO. 11742. DELEGATION OF FUNCTIONS TO SECRETARY OF STATE RESPECTING THE NEGOTIATION OF INTERNATIONAL AGREEMENTS RELATING TO THE ENHANCEMENT OF THE ENVIRONMENT

Ex. Ord. No. 11742, Oct. 23, 1973, 38 F.R. 29457, provided:

Under and by virtue of the authority vested in me by section 301 of title 3 of the United States Code and as President of the United States, I hereby authorize and empower the Secretary of State, in coordination with the Council on Environmental Quality, the Environmental Protection Agency, and other appropriate Federal agencies, to perform, without the approval, ratification, or other action of the President, the functions vested in the President by Section 7 of the Federal Water Pollution Control Act Amendments of 1972 (Public Law 92–500; 86 Stat. 898) with respect to international agreements relating to the enhancement of the environment.

RICHARD NIXON.

### § 1252. Comprehensive programs for water pollution control

#### (a) Preparation and development

The Administrator shall, after careful investigation, and in cooperation with other Federal agencies, State water pollution control agencies, interstate agencies, and the municipalities and industries involved, prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters. In the development of such comprehensive programs due regard shall be given to the improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife, recreational purposes, and the withdrawal of such waters for public water supply, agricultural, industrial, and other purposes. For the purpose of this section, the Administrator is authorized to make joint investigations with any such agencies of the condition of any waters in any State or States, and of the discharges of any sewage, industrial wastes, or substance which may adversely affect such waters.

#### (b) Planning for reservoirs; storage for regulation of streamflow

(1) In the survey or planning of any reservoir by the Corps of Engineers, Bureau of Reclamation, or other Federal agency, consideration shall be given to inclusion of storage for regulation of streamflow, except that any such storage and water releases shall not be provided as a substitute for adequate treatment or other methods of controlling waste at the source.

(2) The need for and the value of storage for regulation of streamflow (other than for water quality) including but not limited to navigation, salt water intrusion, recreation, esthetics, and fish and wildlife, shall be determined by the Corps of Engineers, Bureau of Reclamation, or other Federal agencies.

(3) The need for, the value of, and the impact of, storage for water quality control shall be de-

"SEC. 1005. FUNDING SOURCES.

"Within one year of enactment [Nov. 14, 1988], the Administrator of the United States Environmental Protection Agency and the Governor of Massachusetts shall undertake to identify and make available sources of funding to support activities pertaining to Massachusetts Bay undertaken pursuant to or authorized by section 320 of the Clean Water Act [33 U.S.C. 1330], and shall make every effort to coordinate existing research, monitoring or control efforts with such activities."

PURPOSES AND POLICIES OF NATIONAL ESTUARY PROGRAM

Pub. L. 100–4, title III, §317(a), Feb. 4, 1987, 101 Stat. 61, provided that:

"(1) FINDINGS.—Congress finds and declares that—

"(A) the Nation's estuaries are of great importance for fish and wildlife resources and recreation and economic opportunity;

"(B) maintaining the health and ecological integrity of these estuaries is in the national interest;

"(C) increasing coastal population, development, and other direct and indirect uses of these estuaries threaten their health and ecological integrity;

"(D) long-term planning and management will contribute to the continued productivity of these areas, and will maximize their utility to the Nation; and

"(E) better coordination among Federal and State programs affecting estuaries will increase the effectiveness and efficiency of the national effort to protect, preserve, and restore these areas.

"(2) PURPOSES.—The purposes of this section [enacting this section] are to—

"(A) identify nationally significant estuaries that are threatened by pollution, development, or overuse;

"(B) promote comprehensive planning for, and conservation and management of, nationally significant estuaries;

"(C) encourage the preparation of management plans for estuaries of national significance; and

"(D) enhance the coordination of estuarine research."

SUBCHAPTER IV—PERMITS AND LICENSES

§ 1341. Certification

(a) Compliance with applicable requirements; application; procedures; license suspension

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which

such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(6) Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

(June 30, 1948, ch. 758, title IV, § 401, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 877; amended Pub. L. 95–217, §§ 61(b), 64, Dec. 27, 1977, 91 Stat. 1598, 1599.)

### Editorial Notes

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–217 inserted reference to section 1313 of this title in pars. (1), (3), (4), and (5), struck out par. (6) which provided that no Federal agency be deemed an applicant for purposes of this subsection, and redesignated par. (7) as (6).

## § 1342. National pollutant discharge elimination system

**(a) Permits for discharge of pollutants**

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343

''(E) the relative urgency to initiate a program to restore and protect an endangered species or threatened species in terms of survival of the species.

So much of any appropriated funds allocated for obligation to any State for any fiscal year as remains unobligated at the close thereof is authorized to be made available to that State until the close of the succeeding fiscal year. Any amount allocated to any State which is unobligated at the end of the period during which it is available for expenditure is authorized to be made available for expenditure by the Secretary in conducting programs under this section.''

Subsec. (i). Pub. L. 100–478, §1005(b), added subsec. (i).

1982—Subsec. (d)(2)(i). Pub. L. 97–304, §3(1), substituted ''75 percent'' for ''66⅔ per centum''.

Subsec. (d)(2)(ii). Pub. L. 97–304, §3(2), substituted ''90 percent'' for ''75 per centum''.

Subsec. (i). Pub. L. 97–304, §8(b), struck out subsec. (i) which authorized appropriations to carry out this section of $10,000,000 through the period ending Sept. 30, 1977, $12,000,000 for the period Oct. 1, 1977, through Sept. 30, 1980, and $12,000,000 for the period Oct. 1, 1980, through Sept. 30, 1982. See section 1542(b) of this title.

1980—Subsec. (i). Pub. L. 96–246 in par. (2) substituted ''$12,000,000'' for ''$16,000,000'' and ''1980'' for ''1981'', and added par. (3).

1978—Subsec. (c). Pub. L. 95–632 designated existing provision as par. (1), and in par. (1) as so designated, redesignated pars. (1) to (5) as subpars. (A) to (E), respectively, and subpars. (A) and (B) of subpar. (E), as so redesignated, as cls. (i) and (ii), respectively, substituted ''paragraph'' for ''subsection'' in provision preceding subpar. (A), as so redesignated, ''endangered or threatened species of fish or wildlife'' for ''endangered species or threatened species'' in subpar. (D), as so redesignated, ''subparagraphs (C), (D), and (E) of this paragraph'' for ''paragraphs (3), (4), and (5) of this subsection'' in cl. (i) of subpar. (E), as so redesignated, ''clause (i) and this clause'' for ''subparagraph (A) and this subparagraph'' in cl. (ii) of subpar. (E), as so redesignated, and added par. (2).

1977—Subsec. (c). Pub. L. 95–212, §1(1), inserted provisions that States in which the State fish and wildlife agencies do not possess the broad authority to conserve all resident species of fish and wildlife which the Secretary determines to be threatened or endangered may nevertheless qualify for cooperative agreement funds if they satisfy all other requirements and have plans to devote immediate attention to those species most urgently in need of conservation programs.

Subsec. (i). Pub. L. 95–212, §1(2), substituted provisions authorizing appropriations of $10,000,000 to cover the period ending Sept. 30, 1977, and $16,000,000 to cover the period beginning Oct. 1, 1977, and ending Sept. 30, 1981, for provisions authorizing appropriations of not to exceed $10,000,000 through the fiscal year ending June 30, 1977.

**Statutory Notes and Related Subsidiaries**

COOPERATIVE AGREEMENTS WITH STATES UNAFFECTED BY 1981 AMENDMENT OF MARINE MAMMAL PROTECTION ACT

Nothing in the amendment of section 1379 of this title by section 4(a) of Pub. L. 97–58 to be construed as affecting in any manner any cooperative agreement entered into by a State under subsec. (c) of this section before, on, or after Oct. 9, 1981, see section 4(b) of Pub. L. 97–58, set out as a note under section 1379 of this title.

### § 1536. Interagency cooperation

#### (a) Federal agency actions and consultations

(1) The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an ''agency action'') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

(3) Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

(4) Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

#### (b) Opinion of Secretary

(1)(A) Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

(B) In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)—

(i) if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth—

(I) the reasons why a longer period is required,

(II) the information that is required to complete the consultation, and

(III) the estimated date on which consultation will be completed; or

(ii) if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

(2) Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

(3)(A) Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

(B) Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

(4) If after consultation under subsection (a)(2), the Secretary concludes that—

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

**(c) Biological assessment**

(1) To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

(2) Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

**(d) Limitation on commitment of resources**

After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

**(e) Endangered Species Committee**

(1) There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

(2) The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

(3) The Committee shall be composed of seven members as follows:

(A) The Secretary of Agriculture.

(B) The Secretary of the Army.

(C) The Chairman of the Council of Economic Advisors.

(D) The Administrator of the Environmental Protection Agency.

(E) The Secretary of the Interior.

(F) The Administrator of the National Oceanic and Atmospheric Administration.

(G) The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

(4)(A) Members of the Committee shall receive no additional pay on account of their service on the Committee.

(B) While away from their homes or regular places of business in the performance of services for the Committee, members of the Committee shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under section 5703 of title 5.

(5)(A) Five members of the Committee or their representatives shall constitute a quorum for the transaction of any function of the Committee, except that, in no case shall any representative be considered in determining the existence of a quorum for the transaction of any function of the Committee if that function involves a vote by the Committee on any matter before the Committee.

(B) The Secretary of the Interior shall be the Chairman of the Committee.

(C) The Committee shall meet at the call of the Chairman or five of its members.

(D) All meetings and records of the Committee shall be open to the public.

(6) Upon request of the Committee, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Committee to assist it in carrying out its duties under this section.

(7)(A) The Committee may for the purpose of carrying out its duties under this section hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee deems advisable.

(B) When so authorized by the Committee, any member or agent of the Committee may take any action which the Committee is authorized to take by this paragraph.

(C) Subject to the Privacy Act [5 U.S.C. 552a], the Committee may secure directly from any Federal agency information necessary to enable it to carry out its duties under this section. Upon request of the Chairman of the Committee, the head of such Federal agency shall furnish such information to the Committee.

(D) The Committee may use the United States mails in the same manner and upon the same conditions as a Federal agency.

(E) The Administrator of General Services shall provide to the Committee on a reimbursable basis such administrative support services as the Committee may request.

(8) In carrying out its duties under this section, the Committee may promulgate and amend such rules, regulations, and procedures, and issue and amend such orders as it deems necessary.

(9) For the purpose of obtaining information necessary for the consideration of an application for an exemption under this section the Committee may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents.

(10) In no case shall any representative, including a representative of a member designated pursuant to paragraph (3)(G) of this subsection, be eligible to cast a vote on behalf of any member.

**(f) Promulgation of regulations; form and contents of exemption application**

Not later than 90 days after November 10, 1978, the Secretary shall promulgate regulations which set forth the form and manner in which applications for exemption shall be submitted to the Secretary and the information to be contained in such applications. Such regulations shall require that information submitted in an application by the head of any Federal agency with respect to any agency action include, but not be limited to—

(1) a description of the consultation process carried out pursuant to subsection (a)(2) of this section between the head of the Federal agency and the Secretary; and

(2) a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2) of this section.

**(g) Application for exemption; report to Committee**

(1) A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

(2)(A) An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

(B) Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

(3) The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary—

(A) determine that the Federal agency concerned and the exemption applicant have—

(i) carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

(ii) conducted any biological assessment required by subsection (c); and

(iii) to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

(B) deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of title 5.

(4) If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of title 5 and prepare the report to be submitted pursuant to paragraph (5).

(5) Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing—

(A) the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

(B) a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

(C) appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

(D) whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

(6) To the extent practicable within the time required for action under subsection (g) of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of title 5.

(7) Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section.

(8) All meetings and records resulting from activities pursuant to this subsection shall be open to the public.

**(h) Grant of exemption**

(1) The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

(A) it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

(i) there are no reasonable and prudent alternatives to the agency action;

(ii) the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

(iii) the action is of regional or national significance; and

(iv) neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

(B) it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of title 5.

(2)(A) Except as provided in subparagraph (B), an exemption for an agency action granted under paragraph (1) shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action—

(i) regardless whether the species was identified in the biological assessment; and

(ii) only if a biological assessment has been conducted under subsection (c) with respect to such agency action.

(B) An exemption shall be permanent under subparagraph (A) unless—

(i) the Secretary finds, based on the best scientific and commercial data available, that such exemption would result in the extinction of a species that was not the subject of consultation under subsection (a)(2) or was not identified in any biological assessment conducted under subsection (c), and

(ii) the Committee determines within 60 days after the date of the Secretary's finding that the exemption should not be permanent.

If the Secretary makes a finding described in clause (i), the Committee shall meet with respect to the matter within 30 days after the date of the finding.

**(i) Review by Secretary of State; violation of international treaty or other international obligation of United States**

Notwithstanding any other provision of this chapter, the Committee shall be prohibited from considering for exemption any application made to it, if the Secretary of State, after a review of the proposed agency action and its potential implications, and after hearing, certifies, in writing, to the Committee within 60 days of any application made under this section that the granting of any such exemption and the carrying out of such action would be in violation of an international treaty obligation or other international obligation of the United States. The Secretary of State shall, at the time of such certification, publish a copy thereof in the Federal Register.

**(j) Exemption for national security reasons**

Notwithstanding any other provision of this chapter, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.

**(k) Exemption decision not considered major Federal action; environmental impact statement**

An exemption decision by the Committee under this section shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.]: *Provided*, That an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats shall have been previously prepared with respect to any agency action exempted by such order.

**(*l*) Committee order granting exemption; cost of mitigation and enhancement measures; report by applicant to Council on Environmental Quality**

(1) If the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid

for by the exemption applicant in implementing the agency action. All necessary mitigation and enhancement measures shall be authorized prior to the implementing of the agency action and funded concurrently with all other project features.

(2) The applicant receiving such exemption shall include the costs of such mitigation and enhancement measures within the overall costs of continuing the proposed action. Notwithstanding the preceding sentence the costs of such measures shall not be treated as project costs for the purpose of computing benefit-cost or other ratios for the proposed action. Any applicant may request the Secretary to carry out such mitigation and enhancement measures. The costs incurred by the Secretary in carrying out any such measures shall be paid by the applicant receiving the exemption. No later than one year after the granting of an exemption, the exemption applicant shall submit to the Council on Environmental Quality a report describing its compliance with the mitigation and enhancement measures prescribed by this section. Such a report shall be submitted annually until all such mitigation and enhancement measures have been completed. Notice of the public availability of such reports shall be published in the Federal Register by the Council on Environmental Quality.

**(m) Notice requirement for citizen suits not applicable**

The 60-day notice requirement of section 1540(g) of this title shall not apply with respect to review of any final determination of the Committee under subsection (h) of this section granting an exemption from the requirements of subsection (a)(2) of this section.

**(n) Judicial review**

Any person, as defined by section 1532(13) of this title, may obtain judicial review, under chapter 7 of title 5, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for (1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia, by filing in such court within 90 days after the date of issuance of the decision, a written petition for review. A copy of such petition shall be transmitted by the clerk of the court to the Committee and the Committee shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Attorneys designated by the Endangered Species Committee may appear for, and represent the Committee in any action for review under this subsection.

**(o) Exemption as providing exception on taking of endangered species**

Notwithstanding sections 1533(d) and 1538(a)(1)(B) and (C) of this title, sections 1371 and 1372 of this title, or any regulation promulgated to implement any such section—

(1) any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

(2) any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

**(p) Exemptions in Presidentially declared disaster areas**

In any area which has been declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act [42 U.S.C. 5121 et seq.], the President is authorized to make the determinations required by subsections (g) and (h) of this section for any project for the repair or replacement of a public facility substantially as it existed prior to the disaster under section 405 or 406 of the Disaster Relief and Emergency Assistance Act [42 U.S.C. 5171 or 5172] and which the President determines (1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of this section to be followed. Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.

(Pub. L. 93–205, §7, Dec. 28, 1973, 87 Stat. 892; Pub. L. 95–632, §3, Nov. 10, 1978, 92 Stat. 3752; Pub. L. 96–159, §4, Dec. 28, 1979, 93 Stat. 1226; Pub. L. 97–304, §§4(a), 8(b), Oct. 13, 1982, 96 Stat. 1417, 1426; Pub. L. 99–659, title IV, §411(b), (c), Nov. 14, 1986, 100 Stat. 3741, 3742; Pub. L. 100–707, title I, §109(g), Nov. 23, 1988, 102 Stat. 4709.)

### Editorial Notes

#### References in Text

This chapter, referred to in subsecs. (a)(1), (i), and (j), was in the original ''this Act'', meaning Pub. L. 93–205, Dec. 28, 1973, 81 Stat. 884, known as the Endangered Species Act of 1973, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

The Privacy Act, referred to in subsec. (e)(7)(C), is probably a reference to section 552a of Title 5, Government Organization and Employees. See Short Title note set out under section 552a of Title 5.

The National Environmental Policy Act of 1969, referred to in subsec. (k), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Disaster Relief and Emergency Assistance Act, referred to in subsec. (p), is Pub. L. 93–288, May 22, 1974, 88 Stat. 143, as amended, known as the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which is classified to chapter 68 (§5121 et seq.) of Title 42. For complete classification of this Act to the Code, see Short Title note set out under section 5121 of Title 42 and Tables.

#### Amendments

1988—Subsec. (p). Pub. L. 100–707 substituted ''the Disaster Relief and Emergency Assistance Act'' for ''the Disaster Relief Act of 1974'' and ''section 405 or 406 of the Disaster Relief and Emergency Assistance Act'' for ''section 401 or 402 of the Disaster Relief Act of 1974''.

1986—Subsec. (b)(4)(C). Pub. L. 99–659, §411(b)(1)–(3), added subpar. (C).

Subsec. (b)(4)(iii), (iv). Pub. L. 99–659, §411(b)(4)–(6), added cl. (iii), redesignated former cl. (iii) as (iv), and in cl. (iv), as so redesignated, inserted reference to cl. (iii).

Subsec. (o). Pub. L. 99–659, §411(c)(1), in introductory provisions, inserted '', sections 1371 and 1372 of this title,'', and substituted ''any'' for ''either'' after ''implement''.

Subsec. (o)(2). Pub. L. 99–659, §411(c)(2), substituted ''subsection (b)(4)(iv)'' for ''subsection (b)(4)(iii)'' and inserted ''prohibited'' before ''taking of the species''.

1982—Subsec. (a)(3), (4). Pub. L. 97–304, §4(a)(1), added par. (3) and redesignated former par. (3) as (4).

Subsec. (b). Pub. L. 97–304, §4(a)(2), incorporated existing provisions into pars. (1)(A) and (3)(A) and added pars. (1)(B), (2), (3)(B), and (4).

Subsec. (c)(1). Pub. L. 97–304, §4(a)(3), inserted '', except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor'' after ''agency'' in parenthetical provision.

Subsec. (e)(10). Pub. L. 97–304, §4(a)(4), struck out provision that, except in the case of a member designated pursuant to paragraph (3)(G) of this subsection, no member could designate any person to serve as his or her representative unless that person was, at the time of such designation, holding a Federal office the appointment to which was subject to the advice and consent of the United States Senate.

Subsec. (g)(1). Pub. L. 97–304, §4(a)(5)(B), substituted ''An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5)'' for ''An application for an exemption shall be considered initially by a review board in the manner provided in this subsection, and shall be considered by the Endangered Species Committee for a final determination under subsection (h) after a report is made by the review board''.

Subsec. (g)(2)(A). Pub. L. 97–304, §4(a)(5)(C)(i), substituted ''An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license'' for ''An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f) of this section, not later than 90 days after the completion of the consultation process; or, in the case of any agency action involving a permit or license applicant, not later than 90 days after the date on which the Federal agency concerned takes final agency action, for purposes of chapter 7 of title 5, with respect to the issuance of the permit or license'' and inserted provision that, ''For purposes of the preceding sentence, the term 'final agency action' means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review.''

Subsec. (g)(2)(B). Pub. L. 97–304, §4(a)(5)(C)(ii), inserted ''(i)'' after ''the Secretary shall promptly'', struck out ''to the review board to be established under paragraph (3) and'' after ''individuals to be appointed'' in cl. (i) as so designated, and added cl. (ii).

Subsec. (g)(3). Pub. L. 97–304, §4(a)(5)(D), (E), redesignated par. (5) as (3) and substituted provisions directing the Secretary, within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, to (A) determine that the Fed-

eral agency concerned and the exemption applicant have (i) carried out the consultation responsibilities described in subsection (a) of this section in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2) of this section, (ii) conducted any biological assessment required by subsection (c) of this section, and (iii) to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d) of this section, or (B) deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii), and providing that the denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of title 5, for provisions placing upon the review board appointed under former par. (3) the duty to make a full review of the consultation carried out under subsection (a)(2) of this section, and within 60 days after its appointment or within such longer time as was mutually agreed upon between the exemption applicant and the Secretary, to make a determination, by a majority vote, (A) whether an irresolvable conflict existed and (B) whether the Federal agency concerned and such exemption applicant had (i) carried out consultation responsibilities as described in subsection (a) of this section in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2) of this section, (ii) conducted any biological assessment required of it by subsection (c) of this section, and (iii) refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d) of this section, and providing that any determination by the review board that an irresolvable conflict did not exist or that the Federal agency concerned or the exemption applicant had not met its respective requirements under subclause (i), (ii), or (iii) was to be considered final agency action for purposes of chapter 7 of title 5. Former par. (3), providing for the establishment and functions of a review board to consider applications for exemptions and to submit reports to the Endangered Species Committee, was struck out.

Subsec. (g)(4). Pub. L. 97–304, §4(a)(5)(D), (F), redesignated par. (6) as (4) and substituted "If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of title 5 and prepare the report to be submitted pursuant to paragraph (5)" for "If the review board determines that an irresolvable conflict exists and makes positive determinations under subclauses (i), (ii), and (iii) of paragraph (5), it shall proceed to prepare the report to be submitted under paragraph (7)". Former par. (4), directing the Secretary to submit the application to the review board immediately after its appointment under paragraph (3), and to submit to the review board, in writing, his views and recommendations with respect to the application within 60 days after receiving a copy of any application under paragraph (2), was struck out.

Subsec. (g)(5). Pub. L. 97–304, §4(a)(5)(G), redesignated par. (7) as (5) and substituted "Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit" for "Within 180 days after making the determinations under paragraph (6), the review board shall submit" in the provisions preceding subpar. (A), and added subpar. (D). Former par. (5) redesignated (3) and amended.

Subsec. (g)(6). Pub. L. 97–304, §4(a)(5)(H), redesignated par. (8) as (6). Former par. (6) redesignated (4) and amended.

Subsec. (g)(7). Pub. L. 97–304, §4(a)(5)(I), redesignated par. (10) as (7) and substituted "Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section" for "Upon request of a review board, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the review board to assist it in carry out its duties under this section". Former par. (7) redesignated (5) and amended.

Subsec. (g)(8). Pub. L. 97–304, §4(a)(5)(J), redesignated par. (12) as (8) and substituted "records resulting from activities pursuant to this subsection" for "records of review boards". Former par. (8) redesignated (6).

Subsec. (g)(9). Pub. L. 97–304, §4(a)(5)(D), struck out par. (9) which had provided that the review board, in carrying out its duties, could (A) sit and act at such times and places, take such testimony, and receive such evidence, as the review board deemed advisable, (B) subject to the Privacy Act of 1974 [5 U.S.C. 552a], request of any Federal agency or applicant information necessary to enable it to carry out such duties, and upon such request the head of such Federal agency would furnish such information to the review board, and (C) use the United States mails in the same manner and upon the same conditions as a Federal agency.

Subsec. (g)(10). Pub. L. 97–304, §4(a)(5)(I), redesignated par. (10) as (7).

Subsec. (g)(11). Pub. L. 97–304, §4(a)(5)(D), struck out par. (11) which had provided that the Administrator of the General Services Administration provide to a review board, on a reimbursable basis, such administrative support services as the review board requested.

Subsec. (g)(12). Pub. L. 97–304, §4(a)(5)(J), redesignated par. (12) as (8).

Subsec. (h)(1). Pub. L. 97–304, §4(a)(6), substituted "within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5)" for "within 90 days of receiving the report of the review board under subsection (g)(7)" in provisions preceding subpar. (A), substituted "report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony" for "report of the review board and on such other testimony" in subpar. (A) preceding cl. (i), and added cl. (i).

Subsec. (o). Pub. L. 97–304, §4(a)(7), substituted "Notwithstanding sections 1533(d) and 1538(a)(1)(B) and (C) of this title or any regulation promulgated to implement either such section (1) any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and (2) any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iii) shall not be considered to be a taking of the species concerned" for "Notwithstanding sections 1533(d) and 1538(a) of this title or any regulations promulgated pursuant to such sections, any action for which an exemption is granted under subsection (h) of this section shall not be considered a taking of any endangered or threatened species with respect to any activity which is necessary to carry out such action".

Subsec. (q). Pub. L. 97–304, §8(b), struck out subsec. (q) which authorized appropriations of $600,000 for each of fiscal years 1979, 1980, 1981, and 1982 in carrying out functions under subsecs. (e), (f), (g), and (h) of this section. See section 1542(c) of this title.

1979—Subsec. (a). Pub. L. 96–159, §4(1), designated existing provisions as par. (1); struck out third sentence requirement that each Federal agency, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (referred to as "agency action") did not jeopardize the continued existence of any endangered species or threatened species or result in the destruc-

tion or adverse modification of habitat of such species which was determined by the Secretary, after consultation as appropriate with the affected States, to be critical, unless the agency was granted an exemption for such action by the Committee pursuant to subsec. (h) of this section; and added pars. (2) and (3), incorporating former third sentence provisions.

Subsec. (b). Pub. L. 96–159, §4(2), (3), substituted "he believes would not violate subsection (a)(2) of this section and" for "he believes would avoid jeopardizing the continued existence of any endangered or threatened species or adversely modifying the critical habitat of such species, and which" before "can be taken" and introductory "subsection (a)(2) of this section" for "subsection (a) of this section".

Subsec. (c). Pub. L. 96–159, §4(3), (4), substituted "subsection (a)(2)" for "subsec. (a)" of this section, designated existing provisions as so amended par. (1), and added par. (2).

Subsec. (d). Pub. L. 96–159, §4(3), (5), substituted introductory words "subsection (a)(2)" for "subsection (a)" of this section and "alternative measures which would not violate subsection (a)(2)" for "alternative measures which would avoid jeopardizing the continued existence of any endangered or threatened species or adversely modifying or destroying the critical habitat of any such species".

Subsecs. (e)(2), (f). Pub. L. 96–159, §4(3) substituted "subsection (a)(2)" for "subsection (a)".

Subsec. (g)(1). Pub. L. 96–159, §4(3), (6), substituted in first sentence "subsection (a)(2)" for "subsection (a)" of this section and "agency action would violate subsection (a)(2)" for "agency action may jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify the critical habitat of such species".

Subsec. (g)(2)(A). Pub. L. 96–159, §4(7), required exemption applicant, to submit a written application, in the case of any agency action involving a permit or license applicant, not later than 90 days after the date on which the Federal agency concerned takes final agency action, for purposes of chapter 7 of Title 5, with respect to the issuance of the permit or license.

Subsec. (g)(3). Pub. L. 96–159, §4(8), added subpar. (B), and redesignated former subpar. (B) as (C).

Subsec. (g)(5). Pub. L. 96–159, §4(3), (9), substituted in introductory text and cl. (i) "subsection (a)(2)" for "subsection (a)" of this section; redesignated as cls. (A) and (B) former cls. (i) and (ii); inserted in cl. (B) "the Federal agency concerned and" before "such exemption applicant"; redesignated as subcls. (i) to (iii) former subcls. (A) to (C); substituted in subcl. (i) "agency action which would not violate subsection (a)(2) of this section" for "agency action which will avoid jeopardizing the continued existence of an endangered or threatened species or result in the adverse modification or destruction of a critical habitat"; and substituted in last sentence "the Federal agency concerned or the exemption applicant has not met its respective requirements under subclause (i), (ii), or (iii)" for "the exemption applicant has not met the requirements of subparagraph (A), (B), or (C)" preceding "shall be considered final agency action".

Subsec. (g)(6). Pub. L. 96–159, §4(10), substituted "subclauses (i), (ii), and (iii)" for "subparagraphs (A), (B), and (C)" of paragraph (5).

Subsec. (h)(1). Pub. L. 96–159, §4(3), substituted "subsection (a)(2)" for "subsection (a)" of this section.

Subsec. (h)(2). Pub. L. 96–159, §4(11), in subpar. (A), substituted "paragraph (1)" for "subsection (h) of this section", inserted cl. (i), incorporated existing provisions in text designated cl. (ii), inserting thereto "with respect to such agency action"; in subpar. (B), incorporated existing provision in cl. (i), inserted findings provision respecting the extinction of a species that was not: the subject of consultation or identified in any biological assessment under subsec. (a)(2) or (c) of this section, added cl. (ii), deleted prior requirement for a Committee determination within 30 days of the Secretary's finding that an exemption would result in ex-

tinction of the species whether to grant an exemption for the agency notwithstanding such finding, and superseded the same with requirement that the Committee meet with respect to the matter within 30 days after the date of such a finding.

Subsec. (m). Pub. L. 96–159, §4(3), substituted "subsection (a)(2)" for "subsection (a)" of this section.

Subsec. (q). Pub. L. 96–159, §4(12), authorized appropriations of $600,000 for fiscal years 1980 through 1982, and deleted appropriations authorization of $300,000 for period beginning Oct. 1, 1979, and ending Mar. 3, 1980, and requirement that the Chairman of the Committee report to the Congress before end of fiscal year 1979 with respect to adequacy of the budget authority.

1978—Subsec. (a). Pub. L. 95–632 designated existing provision as subsec. (a), inserted reference to agency action, substituted "adverse modification" for "modification", and provided for the grant of an exemption for agency action by the Endangered Species Committee pursuant to subsec. (h) of this section.

Subsecs. (b) to (q). Pub. L. 95–632 added subsecs. (b) to (q).

## Statutory Notes and Related Subsidiaries

OBJECTIVES, PERFORMANCE STANDARDS, AND CRITERIA FOR USE OF WILDLIFE CONSERVATION BANKING PROGRAMS

Pub. L. 116–283, div. A, title III, §329, Jan. 1, 2021, 134 Stat. 3527, provided that:

"(a) IN GENERAL.—To ensure opportunities for Department of Defense participation in wildlife conservation banking programs pursuant to section 2694c of title 10, United States Code, the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall issue regulations of general applicability establishing objectives, measurable performance standards, and criteria for use, consistent with the Endangered Species Act [of 1973] (16 U.S.C. 1531 et seq.), for mitigation banking offsetting effects on a species, or habitat of such species, that is endangered, threatened, a candidate for listing, or otherwise at risk under such Act. To the maximum extent practicable, the regulatory standards and criteria shall maximize available credits and opportunities for mitigation, provide flexibility for characteristics of various species, and apply equivalent standards and criteria to all mitigation banks.

"(b) DEADLINE FOR REGULATIONS.—The Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall publish an advance notice of proposed rulemaking for the regulations required by subsection (a) by not later than 1 year after the date of the enactment of this Act [Jan. 1, 2021]."

DEFERRAL OF AGENCY ACTION

Pub. L. 105–18, title II, §3003, June 12, 1997, 111 Stat. 176, provided that:

"(a) CONSULTATION AND CONFERENCING.—As provided by regulations issued under the Endangered Species Act (16 U.S.C. 1531 et seq.) for emergency situations, formal consultation or conferencing under section 7(a)(2) or section 7(a)(4) of the Act [16 U.S.C. 1536(a)(2), (4)] for any action authorized, funded or carried out by any Federal agency to repair a Federal or non-Federal flood control project, facility or structure may be deferred by the Federal agency authorizing, funding or carrying out the action, if the agency determines that the repair is needed to respond to an emergency causing an imminent threat to human lives and property in 1996 or 1997. Formal consultation or conferencing shall be deferred until the imminent threat to human lives and property has been abated. For purposes of this section, the term repair shall include preventive and remedial measures to restore the project, facility or structure to remove an imminent threat to human lives and property.

"(b) REASONABLE AND PRUDENT MEASURES.—Any reasonable and prudent measures specified under section 7

of the Endangered Species Act (16 U.S.C. 1536) to minimize the impact of an action taken under this section shall be related both in nature and extent to the effect of the action taken to repair the flood control project, facility or structure.''

TRANSLOCATION OF CALIFORNIA SEA OTTERS

Pub. L. 99–625, §1, Nov. 7, 1986, 100 Stat. 3500, provided that:

"(a) DEFINITIONS.—For purposes of this section—

"(1) The term 'Act' means the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

"(2) The term 'agency action' has the meaning given that term in section 7(a)(2) of the Act [16 U.S.C. 1536(a)(2)].

"(3) The term 'experimental population' means the population of sea otters provided for under a plan developed under subsection (b).

"(4) The phrase 'parent population' means the population of sea otters existing in California on the date on which proposed regulations setting forth a proposed plan under subsection (b) are issued.

"(5) The phrase 'prospective action' refers to any prospective agency action that—

"(A) may affect either the experimental population or the parent population; and

"(B) has evolved to the point where meaningful consultation under section 7(a)(2) or (3) of the Act [16 U.S.C. 1536(a)(2), (3)] can take place.

"(6) The term 'Secretary' means the Secretary of the Interior.

"(7) The term 'Service' means the United States Fish and Wildlife Service.

"(b) PLAN SPECIFICATIONS.—The Secretary may develop and implement, in accordance with this section, a plan for the relocation and management of a population of California sea otters from the existing range of the parent population to another location. The plan, which must be developed by regulation and administered by the Service in cooperation with the appropriate State agency, shall include the following:

"(1) The number, age, and sex of sea otters proposed to be relocated.

"(2) The manner in which the sea otters will be captured, translocated, released, monitored, and protected.

"(3) The specification of a zone (hereinafter referred to as the 'translocation zone') to which the experimental population will be relocated. The zone must have appropriate characteristics for furthering the conservation of the species.

"(4) The specification of a zone (hereinafter referred to as the 'management zone') that—

"(A) surrounds the translocation zone; and

"(B) does not include the existing range of the parent population or adjacent range where expansion is necessary for the recovery of the species.

The purpose of the management zone is to (i) facilitate the management of sea otters and the containment of the experimental population within the translocation zone, and (ii) to prevent, to the maximum extent feasible, conflict with other fishery resources within the management zone by the experimental population. Any sea otter found within the management zone shall be treated as a member of the experimental population. The Service shall use all feasible non-lethal means and measures to capture any sea otter found within the management zone and return it to either the translocation zone or to the range of the parent population.

"(5) Measures, including an adequate funding mechanism, to isolate and contain the experimental population.

"(6) A description of the relationship of the implementation of the plan to the status of the species under the Act and to determinations of the Secretary under section 7 of the Act [16 U.S.C. 1536].

"(c) STATUS OF MEMBERS OF THE EXPERIMENTAL POPULATION.—(1) Any member of the experimental population shall be treated while within the translocation zone as a threatened species for purposes of the Act, except that—

"(A) section 7 of the Act [16 U.S.C. 1536] shall only apply to agency actions that—

"(i) are undertaken within the translocation zone,

"(ii) are not defense-related agency actions, and

"(iii) are initiated after the date of the enactment of this section [Nov. 7, 1986]; and

"(B) with respect to defense-related actions within the translocation zone, members of the experimental population shall be treated as members of a species that is proposed to be listed under section 4 of the Act [16 U.S.C. 1533].

For purposes of this paragraph, the term 'defense-related agency action' means an agency action proposed to be carried out directly by a military department.

"(2) For purposes of section 7 of the Act [16 U.S.C. 1536], any member of the experimental population shall be treated while within the management zone as a member of a species that is proposed to be listed under section 4 of the Act [16 U.S.C. 1533]. Section 9 of the Act [16 U.S.C. 1538] applies to members of the experimental population; except that any incidental taking of such a member during the course of an otherwise lawful activity within the management zone, may not be treated as a violation of the Act or the Marine Mammal Protection Act of 1972 [16 U.S.C. 1361 et seq.].

"(d) IMPLEMENTATION OF PLAN.—The Secretary shall implement the plan developed under subsection (b)—

"(1) after the Secretary provides an opinion under section 7(b) of the Act [16 U.S.C. 1536(b)] regarding each prospective action for which consultation was initiated by a Federal agency or requested by a prospective permit or license applicant before April 1, 1986; or

"(2) if no consultation under section 7(a)(2) or (3) regarding any prospective action is initiated or requested by April 1, 1986, at any time after that date.

"(e) CONSULTATION AND EFFECT OF OPINION.—A Federal agency shall promptly consult with the Secretary, under section 7(a)(3) of the Act [16 U.S.C. 1536(a)(3)], at the request of, and in cooperation with, any permit or license applicant regarding any prospective action. The time limitations applicable to consultations under section 7(a)(2) of the Act apply to consultations under the preceding sentence. In applying section 7(b)(3)(B) with respect to an opinion on a prospective action that is provided after consultation under section 7(a)(3), that opinion shall be treated as the opinion issued after consultation under section 7(a)(2) unless the Secretary finds, after notice and opportunity for comment in accordance with section 553 of title 5, United States Code, that a significant change has been made with respect to the action or that a significant change has occurred regarding the information used during the initial consultation. The interested party may petition the Secretary to make a finding under the preceding sentence. The Secretary may implement any reasonable and prudent alternatives specified in any opinion referred to in this subsection through appropriate agreements with any such Federal agency, prospective permit or license applicant, or other interested party.

"(f) CONSTRUCTION.—For purposes of implementing the plan, no act by the Service, an authorized State agency, or an authorized agent of the Service or such an agency with respect to a sea otter that is necessary to effect the relocation or management of any sea otter under the plan may be treated as a violation of any provision of the Act or the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361 et seq.)."

## § 1537. International cooperation

### (a) Financial assistance

As a demonstration of the commitment of the United States to the worldwide protection of endangered species and threatened species, the President may, subject to the provisions of sec-



Sec.
825s–7.    Southwestern Power Administration; deposit and availability of discretionary offsetting collections.
825s–8.    Southeastern Power Administration: rates of basic and premium pay.
825t.      Utilization of power revenues.
825u.      Interest rate on power bonds held by Administrator of General Services.

SUBCHAPTER IV—STATE AND MUNICIPAL WATER CONSERVATION FACILITIES

828.       Facilitation of development and construction of water conservation facilities; exemption from certain Federal requirements.
828a.      Definitions.
828b.      Exemption from formula, books and records, and project cost statement requirements; annual charges.
828c.      Applicability of this subchapter.

#### Statutory Notes and Related Subsidiaries

FINDINGS

Pub. L. 113–23, §2, Aug. 9, 2013, 127 Stat. 493, provided that: ''Congress finds that—

''(1) the hydropower industry currently employs approximately 300,000 workers across the United States;

''(2) hydropower is the largest source of clean, renewable electricity in the United States;

''(3) as of the date of enactment of this Act [Aug. 9, 2013], hydropower resources, including pumped storage facilities, provide—

''(A) nearly 7 percent of the electricity generated in the United States; and

''(B) approximately 100,000 megawatts of electric capacity in the United States;

''(4) only 3 percent of the 80,000 dams in the United States generate electricity, so there is substantial potential for adding hydropower generation to non-powered dams; and

''(5) according to one study, by utilizing currently untapped resources, the United States could add approximately 60,000 megawatts of new hydropower capacity by 2025, which could create 700,000 new jobs over the next 13 years.''

## SUBCHAPTER I—REGULATION OF THE DEVELOPMENT OF WATER POWER AND RESOURCES

#### Statutory Notes and Related Subsidiaries

CODIFICATION; CONSTRUCTION

Act Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847, provided that sections 1 to 29 of the Federal Water Power Act, as amended (sections 792, 793, 794 to 797, 798 to 818, 819, and 820 to 823 of this title) shall constitute part I of the act. Said section 212 also repealed sections 25 and 30 of the act (sections 819, 791 of this title). It also contained a proviso as follows: ''That nothing in that Act, as amended, shall be construed to repeal or amend the provisions of the amendment to the Federal Water Power Act approved March 3, 1921 (41 Stat. 1353 [section 797a of this title]), or the provisions of any other Act relating to national parks and national monuments.''

### § 791. Repealed. Aug. 26, 1935, ch. 687, title II, § 212, 49 Stat. 847

Section, act June 10, 1920, ch. 285, §30, 41 Stat. 1077, designated the act as The Federal Water Power Act.

### § 791a. Short title

This chapter may be cited as the ''Federal Power Act''.

(June 10, 1920, ch. 285, pt. III, §321, formerly §320, as added Aug. 26, 1935, ch. 687, title II, §213, 49

Stat. 863; renumbered Pub. L. 95–617, title II, §212, Nov. 9, 1978, 92 Stat. 3148.)

#### Editorial Notes

CODIFICATION

Section was enacted as part of part III of the Federal Power Act, and not as part of part I of that Act which comprises this subchapter.

#### Statutory Notes and Related Subsidiaries

SHORT TITLE OF 2013 AMENDMENT

Pub. L. 113–23, §1(a), Aug. 9, 2013, 127 Stat. 493, provided that: ''This Act [amending sections 798, 823a, and 2705 of this title and enacting provisions set out as notes preceding section 791 and under section 797 of this title] may be cited as the 'Hydropower Regulatory Efficiency Act of 2013'.''

SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–575, §1, Nov. 15, 1990, 104 Stat. 2834, provided that: ''This Act [enacting section 2243 of Title 42, The Public Health and Welfare, amending sections 796 and 824a–3 of this title and sections 2014, 2061, 2201, and 2284 of Title 42, and enacting provisions set out as a note under section 796 of this title] may be cited as the 'Solar, Wind, Waste, and Geothermal Power Production Incentives Act of 1990'.''

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–473, §1, Oct. 6, 1988, 102 Stat. 2299, provided that: ''This Act [amending section 824e of this title and enacting provisions set out as notes under section 824e of this title] may be cited as the 'Regulatory Fairness Act'.''

SHORT TITLE OF 1986 AMENDMENT

Pub. L. 99–495, §1(a), Oct. 16, 1986, 100 Stat. 1243, provided that: ''This Act [enacting sections 797b and 823b of this title, amending sections 797, 800, 802, 803, 807, 808, 817, 823a, 824a–3, and 824j of this title, and enacting provisions set out as notes under sections 797, 803, 823a, 824a–3, and 825h of this title] may be cited as the 'Electric Consumers Protection Act of 1986'.''

### § 792. Federal Power Commission; creation; number; appointment; term; qualifications; vacancies; quorum; chairman; salary; place of holding sessions

A commission is created and established to be known as the Federal Power Commission (hereinafter referred to as the ''commission'') which shall be composed of five commissioners who shall be appointed by the President, by and with the advice and consent of the Senate, one of whom shall be designated by the President as chairman and shall be the principal executive officer of the commission. Each chairman, when so designated, shall act as such until the expiration of his term of office.

The commissioners first appointed under this section, as amended, shall continue in office for terms of one, two, three, four, and five years, respectively, from June 23, 1930, the term of each to be designated by the President at the time of nomination. Their successors shall be appointed each for a term of five years from the date of the expiration of the term for which his predecessor was appointed and until his successor is appointed and has qualified, except that he shall not so continue to serve beyond the expiration of the next session of Congress subsequent to the expiration of said fixed term of office, and ex-

cept that any person appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the unexpired term. Not more than three of the commissioners shall be appointed from the same political party. No person in the employ of or holding any official relation to any licensee or to any person, firm, association, or corporation engaged in the generation, transmission, distribution, or sale of power, or owning stock or bonds thereof, or who is in any manner pecuniarily interested therein, shall enter upon the duties of or hold the office of commissioners. Said commissioners shall not engage in any other business, vocation, or employment. No vacancy in the commission shall impair the right of the remaining commissioners to exercise all the powers of the commission. Three members of the commission shall constitute a quorum for the transaction of business, and the commission shall have an official seal of which judicial notice shall be taken. The commission shall annually elect a vice chairman to act in case of the absence or disability of the chairman or in case of a vacancy in the office of chairman.

Each commissioner shall receive necessary traveling and subsistence expenses, or per diem allowance in lieu thereof, within the limitation prescribed by law, while away from the seat of government upon official business.

The principal office of the commission shall be in the District of Columbia, where its general sessions shall be held; but whenever the convenience of the public or of the parties may be promoted or delay or expense prevented thereby, the commission may hold special sessions in any part of the United States.

(June 10, 1920, ch. 285, pt. I, § 1, 41 Stat. 1063; June 23, 1930, ch. 572, § 1, 46 Stat. 797; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, § 212, 49 Stat. 847; 1950 Reorg. Plan No. 9, § 3, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265; Pub. L. 86–619, § 1, July 12, 1960, 74 Stat. 407.)

### Editorial Notes

#### CODIFICATION

Provisions which prescribed the compensation of commissioners were omitted as obsolete. Compensation of the Chairman and members of the Commission was prescribed by sections 5314 and 5315 of Title 5, Government Organization and Employees, prior to termination of the Commission. See Termination of Federal Power Commission; Transfer of Functions note below.

#### AMENDMENTS

1960—Pub. L. 86–619 provided for continuation in office of a commissioner upon termination of his term until a successor is appointed and has qualified, not beyond expiration of next session of Congress subsequent to the expiration of said fixed term of office.

1930—Act June 23, 1938, amended section generally. Prior to amendment section read as follows: "A commission is hereby created and established, to be known as the Federal Power Commission (hereinafter referred to as the commission), which shall be composed of the Secretary of War, the Secretary of the Interior, and the Secretary of Agriculture. Two members of the commission shall constitute a quorum for the transaction of business, and the commission shall have an official seal, which shall be judicially noticed. The President shall designate the chairman of the commission."

### Statutory Notes and Related Subsidiaries

#### REPEALS

Act Oct. 15, 1949, ch. 695, § 5(a), 63 Stat. 880, formerly cited as a credit to this section, was repealed by Pub. L. 89–554, § 8(a), Sept. 6, 1966, 80 Stat. 655.

#### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

### Executive Documents

#### TRANSFER OF FUNCTIONS

Executive and administrative functions of Federal Power Commission, with certain reservations, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 9 of 1950, set out below.

### REORGANIZATION PLAN NO. 9 OF 1950

Eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, March 13, 1950, pursuant to the provisions of the Reorganization Act of 1949, approved June 20, 1949 [see 5 U.S.C. 901 et seq.].

#### FEDERAL POWER COMMISSION

SECTION 1. TRANSFER OF FUNCTIONS TO THE CHAIRMAN

(a) Subject to the provisions of subsection (b) of this section, there are hereby transferred from the Federal Power Commission, hereinafter referred to as the Commission, to the Chairman of the Commission, hereinafter referred to as the Chairman, the executive and administrative functions of the Commission, including functions of the Commission with respect to (1) the appointment and supervision of personnel employed under the Commission, (2) the distribution of business among such personnel and among administrative units of the Commission, and (3) the use and expenditure of funds.

(b)(1) In carrying out any of his functions under the provisions of this section the Chairman shall be governed by general policies of the Commission and by such regulatory decisions, findings, and determinations as the Commission may by law be authorized to make.

(2) The appointment by the Chairman of the heads of major administrative units under the Commission shall be subject to the approval of the Commission.

(3) Personnel employed regularly and full time in the immediate offices of Commissioners other than the Chairman shall not be affected by the provisions of this reorganization plan.

(4) There are hereby reserved to the Commission its functions with respect to revising budget estimates and with respect to determining upon the distribution of appropriated funds according to major programs and purposes.

SEC. 2. PERFORMANCE OF TRANSFERRED FUNCTIONS

The Chairman may from time to time make such provisions as he shall deem appropriate authorizing the performance by any officer, employee, or administrative unit under his jurisdiction of any functions transferred to the Chairman by the provisions of this reorganization plan.

SEC. 3. DESIGNATION OF CHAIRMAN

The functions of the Commission with respect to choosing a chairman from among the commissioners

composing the Commission are hereby transferred to the President.

## § 793. Appointment of officers and employees of Commission; duties, duties, and salaries; detail of officers and employees from other departments; expenditures authorized

The commission shall have authority to appoint, prescribe the duties, and fix the salaries of, a secretary, a chief engineer, a general counsel, a solicitor, and a chief accountant; and may, subject to the civil service laws, appoint such other officers and employees as are necessary in the execution of its functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5. The commission may request the President to detail an officer or officers from the Corps of Engineers, or other branches of the United States Army, to serve the commission as engineer officer or officers, or in any other capacity, in field work outside the seat of government, their duties to be prescribed by the commission; and such detail is authorized. The President may also, at the request of the commission, detail, assign, or transfer to the commission, engineers in or under the Departments of the Interior or Agriculture for field work outside the seat of government under the direction of the commission.

The commission may make such expenditures (including expenditures for rent and personal services at the seat of government and elsewhere, for law books, periodicals, and books of reference, and for printing and binding) as are necessary to execute its functions. Expenditures by the commission shall be allowed and paid upon the presentation of itemized vouchers therefor, approved by the chairman of the commission or by such other member or officer as may be authorized by the commission for that purpose subject to applicable regulations under chapters 1 to 11 of title 40 and division C (except sections 3302, 3306(f), 3307(e), 3501(b), 3509, 3906, 4104, 4710, and 4711) of subtitle I of title 41.

(June 10, 1920, ch. 285, pt. I, §2, 41 Stat. 1063; June 23, 1930, ch. 572, §1, 46 Stat. 798; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847; Oct. 28, 1949, ch. 782, title XI, §1106(a), 63 Stat. 972; Oct. 31, 1951, ch. 654, §2(14), 65 Stat. 707.)

### Editorial Notes

#### Codification

All appointments referred to in the first sentence are subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, §1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5, Government Organization and Employees.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed Pub. L. 89–554, Sept. 6, 1966, §8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 author-

izes the Office of Personnel Management to determine the applicability to specific positions and employees.

In text, "chapter 51 and subchapter III of chapter 53 of title 5" substituted for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

In text, "chapters 1 to 11 of title 40 and division C (except sections 3302, 3306(f), 3307(e), 3501(b), 3509, 3906, 4104, 4710, and 4711) of subtitle I of title 41" substituted for "the Federal Property and Administrative Services Act of 1949, as amended" on authority of Pub. L. 107–217, §5(c), Aug. 21, 2002, 116 Stat. 1303, which Act enacted Title 40, Public Buildings, Property, and Works, and Pub. L. 111–350, §6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

#### Amendments

1951—Act Oct. 31, 1951, inserted reference to applicable regulations of the Federal Property and Administrative Services Act of 1949, as amended, at end of section.

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

1930—Act June 23, 1930, substituted provisions permitting the commission to appoint, prescribe the duties, and fix the salaries of, a secretary, a chief engineer, a general counsel, a solicitor, and a chief accountant, and to appoint such other officers and employees as are necessary in the execution of its functions and fix their salaries, and authorizing the detail of officers from the Corps of Engineers, or other branches of the United States Army, to serve the commission as engineer officers, or in any other capacity, in field work outside the seat of government, and the detail, assignment or transfer to the commission of engineers in or under the Departments of the Interior or Agriculture for work outside the seat of government for provisions which required the commission to appoint an executive secretary at a salary of $5,000 per year and prescribe his duties, and which permitted the detail of an officer from the United States Engineer Corps to serve the commission as engineer officer; and inserted provisions permitting the commission to make certain expenditures necessary in the execution of its functions, and allowing the payment of expenditures upon the presentation of itemized vouchers approved by authorized persons.

#### Statutory Notes and Related Subsidiaries

##### Repeals

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, §8, 80 Stat. 632, 655.

## § 793a. Repealed. Pub. L. 87–367, title I, § 103(5), Oct. 4, 1961, 75 Stat. 787

Section, Pub. L. 86–626, title I, §101, July 12, 1960, 74 Stat. 430, authorized the Federal Power Commission to place four additional positions in grade 18, one in grade 17 and one in grade 16 of the General Schedule of the Classification Act of 1949.

## §§ 794, 795. Omitted

### Editorial Notes

#### Codification

Section 794, which required the work of the commission to be performed by and through the Departments of War, Interior, and Agriculture and their personnel, consisted of the second paragraph of section 2 of act June 10, 1920, ch. 285, 41 Stat. 1063, which was omitted in the revision of said section 2 by act June 23, 1930, ch. 572, §1, 46 Stat. 798. The first and third paragraphs of said section 2 were formerly classified to sections 793 and 795 of this title.

687, title II, §§ 201, 212, 49 Stat. 838, 847; Pub. L. 95–617, title II, § 201, Nov. 9, 1978, 92 Stat. 3134; Pub. L. 96–294, title VI, § 643(a)(1), June 30, 1980, 94 Stat. 770; Pub. L. 101–575, § 3, Nov. 15, 1990, 104 Stat. 2834; Pub. L. 102–46, May 17, 1991, 105 Stat. 249; Pub. L. 102–486, title VII, § 726, Oct. 24, 1992, 106 Stat. 2921; Pub. L. 109–58, title XII, §§ 1253(b), 1291(b), Aug. 8, 2005, 119 Stat. 970, 984.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 79z–5a of title 15, referred to in par. (25), was repealed by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974.

#### AMENDMENTS

2005—Par. (17)(C). Pub. L. 109–58, § 1253(b)(1), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: '' 'qualifying small power production facility' means a small power production facility—

''(i) which the Commission determines, by rule, meets such requirements (including requirements respecting fuel use, fuel efficiency, and reliability) as the Commission may, by rule, prescribe; and

''(ii) which is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities);''.

Par. (18)(B). Pub. L. 109–58, § 1253(b)(2), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: '' 'qualifying cogeneration facility' means a cogeneration facility which—

''(i) the Commission determines, by rule, meets such requirements (including requirements respecting minimum size, fuel use, and fuel efficiency) as the Commission may, by rule, prescribe; and

''(ii) is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities).''

Pars. (22), (23). Pub. L. 109–58, § 1291(b)(1), added pars. (22) and (23) and struck out former pars. (22) and (23) which read as follows:

''(22) 'electric utility' means any person or State agency (including any municipality) which sells electric energy; such term includes the Tennessee Valley Authority, but does not include any Federal power marketing agency.

''(23) TRANSMITTING UTILITY.—The term 'transmitting utility' means any electric utility, qualifying cogeneration facility, qualifying small power production facility, or Federal power marketing agency which owns or operates electric power transmission facilities which are used for the sale of electric energy at wholesale.''

Pars. (26) to (29). Pub. L. 109–58, § 1291(b)(2), added pars. (26) to (29).

1992—Par. (22). Pub. L. 102–486, § 726(b), inserted ''(including any municipality)'' after ''State agency''.

Pars. (23) to (25). Pub. L. 102–486, § 726(a), added pars. (23) to (25).

1991—Par. (17)(E). Pub. L. 102–46 struck out '', and which would otherwise not qualify as a small power production facility because of the power production capacity limitation contained in subparagraph (A)(ii)'' after ''geothermal resources'' in introductory provisions.

1990—Par. (17)(A). Pub. L. 101–575, § 3(a), inserted ''a facility which is an eligible solar, wind, waste, or geothermal facility, or''.

Par. (17)(E). Pub. L. 101–575, § 3(b), added subpar. (E).

1980—Par. (17)(A)(i). Pub. L. 96–294 added applicability to geothermal resources.

1978—Pars. (17) to (22). Pub. L. 95–617 added pars. (17) to (22).

1935—Act Aug. 26, 1935, § 201, amended definitions of ''reservations'' and ''corporations'', and inserted definitions of ''person'', ''licensee'', ''commission'', ''commissioner'', ''State commission'' and ''security''.

### Statutory Notes and Related Subsidiaries

#### FERC REGULATIONS

Pub. L. 101–575, § 4, Nov. 15, 1990, 104 Stat. 2834, provided that: ''Unless the Federal Energy Regulatory Commission otherwise specifies, by rule after enactment of this Act [Nov. 15, 1990], any eligible solar, wind, waste, or geothermal facility (as defined in section 3(17)(E) of the Federal Power Act as amended by this Act [16 U.S.C. 796(17)(E)]), which is a qualifying small power production facility as defined in subparagraph (C) of section 3(17) of the Federal Power Act as amended by this Act)—

''(1) shall be considered a qualifying small power production facility for purposes of part 292 of title 18, Code of Federal Regulations, notwithstanding any size limitations contained in such part, and

''(2) shall not be subject to the size limitation contained in section 292.601(b) of such part.''

#### STATE AUTHORITIES; CONSTRUCTION

Pub. L. 102–486, title VII, § 731, Oct. 24, 1992, 106 Stat. 2921, provided that: ''Nothing in this title [enacting sections 824l, 824m, and 825o–1 of this title and former sections 79z–5a and 79z–5b of Title 15, Commerce and Trade, and amending this section, sections 824, 824j, 824k, 825n, 825o, and 2621 of this title, and provisions formerly set out as a note under former section 79k of Title 15] or in any amendment made by this title shall be construed as affecting or intending to affect, or in any way to interfere with, the authority of any State or local government relating to environmental protection or the siting of facilities.''

#### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

#### ABOLITION OF INTERSTATE COMMERCE COMMISSION AND TRANSFER OF FUNCTIONS

Interstate Commerce Commission abolished and functions of Commission transferred, except as otherwise provided in Pub. L. 104–88, to Surface Transportation Board effective Jan. 1, 1996, by section 1302 of Title 49, Transportation, and section 101 of Pub. L. 104–88, set out as a note under section 1301 of Title 49. References to Interstate Commerce Commission deemed to refer to Surface Transportation Board, a member or employee of the Board, or Secretary of Transportation, as appropriate, see section 205 of Pub. L. 104–88, set out as a note under section 1301 of Title 49.

## § 797. General powers of Commission

The Commission is authorized and empowered—

### (a) Investigations and data

To make investigations and to collect and record data concerning the utilization of the water resources of any region to be developed, the water-power industry and its relation to other industries and to interstate or foreign commerce, and concerning the location, capacity, development costs, and relation to markets of power sites, and whether the power from Government dams can be advantageously used by the United States for its public purposes, and what is a fair value of such power, to the extent the Commission may deem necessary or useful for the purposes of this chapter.

**(b) Statements as to investment of licensees in projects; access to projects, maps, etc.**

To determine the actual legitimate original cost of and the net investment in a licensed project, and to aid the Commission in such determinations, each licensee shall, upon oath, within a reasonable period of time to be fixed by the Commission, after the construction of the original project or any addition thereto or betterment thereof, file with the Commission in such detail as the Commission may require, a statement in duplicate showing the actual legitimate original cost of construction of such project addition, or betterment, and of the price paid for water rights, rights-of-way, lands, or interest in lands. The licensee shall grant to the Commission or to its duly authorized agent or agents, at all reasonable times, free access to such project, addition, or betterment, and to all maps, profiles, contracts, reports of engineers, accounts, books, records, and all other papers and documents relating thereto. The statement of actual legitimate original cost of said project, and revisions thereof as determined by the Commission, shall be filed with the Secretary of the Treasury.

**(c) Cooperation with executive departments; information and aid furnished Commission**

To cooperate with the executive departments and other agencies of State or National Governments in such investigations; and for such purpose the several departments and agencies of the National Government are authorized and directed upon the request of the Commission, to furnish such records, papers, and information in their possession as may be requested by the Commission, and temporarily to detail to the Commission such officers or experts as may be necessary in such investigations.

**(d) Publication of information, etc.; reports to Congress**

To make public from time to time the information secured hereunder, and to provide for the publication of its reports and investigations in such form and manner as may be best adapted for public information and use. The Commission, on or before the 3d day of January of each year, shall submit to Congress for the fiscal year preceding a classified report showing the permits and licenses issued under this subchapter, and in each case the parties thereto, the terms prescribed, and the moneys received if any, or account thereof.

**(e) Issue of licenses for construction, etc., of dams, conduits, reservoirs, etc.**

To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate com-

merce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: *Provided*, That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation:[1] The license applicant and any party to the proceeding shall be entitled to a determination on the record, after opportunity for an agency trial-type hearing of no more than 90 days, on any disputed issues of material fact with respect to such conditions. All disputed issues of material fact raised by any party shall be determined in a single trial-type hearing to be conducted by the relevant resource agency in accordance with the regulations promulgated under this subsection and within the time frame established by the Commission for each license proceeding. Within 90 days of August 8, 2005, the Secretaries of the Interior, Commerce, and Agriculture shall establish jointly, by rule, the procedures for such expedited trial-type hearing, including the opportunity to undertake discovery and cross-examine witnesses, in consultation with the Federal Energy Regulatory Commission.[2] *Provided further*, That no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting the navigation have been approved by the Chief of Engineers and the Secretary of the Army. Whenever the contemplated improvement is, in the judgment of the Commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the Commission and shall become a part of the records of the Commission: *Provided further*, That in case the Commission shall find that any Government dam may be advantageously used by the United States for public purposes in addition to navigation, no license therefor shall be issued until two years after it shall have reported to Congress the facts and conditions relating thereto, except that this provision shall not apply to any Government dam constructed prior to June 10, 1920: *And provided further*, That upon the filing of any application for a license which has not been preceded by a preliminary permit under subsection (f) of this section, notice shall be given and published as required by the proviso of said subsection. In deciding whether to issue any license under this subchapter for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the pro-

---

[1] So in original. The colon probably should be a period.

[2] So in original. The period probably should be a colon.

tection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

**(f) Preliminary permits; notice of application**

To issue preliminary permits for the purpose of enabling applicants for a license hereunder to secure the data and to perform the acts required by section 802 of this title: *Provided, however*, That upon the filing of any application for a preliminary permit by any person, association, or corporation the Commission, before granting such application, shall at once give notice of such application in writing to any State or municipality likely to be interested in or affected by such application; and shall also publish notice of such application once each week for four weeks in a daily or weekly newspaper published in the county or counties in which the project or any part hereof or the lands affected thereby are situated.

**(g) Investigation of occupancy for developing power; orders**

Upon its own motion to order an investigation of any occupancy of, or evidenced intention to occupy, for the purpose of developing electric power, public lands, reservations, or streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States by any person, corporation, State, or municipality and to issue such order as it may find appropriate, expedient, and in the public interest to conserve and utilize the navigation and water-power resources of the region.

(June 10, 1920, ch. 285, pt. I, §4, 41 Stat. 1065; June 23, 1930, ch. 572, §2, 46 Stat. 798; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§202, 212, 49 Stat. 839, 847; July 26, 1947, ch. 343, title II, §205(a), 61 Stat. 501; Pub. L. 97–375, title II, §212, Dec. 21, 1982, 96 Stat. 1826; Pub. L. 99–495, §3(a), Oct. 16, 1986, 100 Stat. 1243; Pub. L. 109–58, title II, §241(a), Aug. 8, 2005, 119 Stat. 674.)

**Editorial Notes**

AMENDMENTS

2005—Subsec. (e). Pub. L. 109–58, which directed amendment of subsec. (e) by inserting after "adequate protection and utilization of such reservation." at end of first proviso "The license applicant and any party to the proceeding shall be entitled to a determination on the record, after opportunity for an agency trial-type hearing of no more than 90 days, on any disputed issues of material fact with respect to such conditions. All disputed issues of material fact raised by any party shall be determined in a single trial-type hearing to be conducted by the relevant resource agency in accordance with the regulations promulgated under this subsection and within the time frame established by the Commission for each license proceeding. Within 90 days of August 8, 2005, the Secretaries of the Interior, Commerce, and Agriculture shall establish jointly, by rule, the procedures for such expedited trial-type hearing, including the opportunity to undertake discovery and cross-examine witnesses, in consultation with the Federal Energy Regulatory Commission.", was executed by making the insertion after "adequate protection and utilization of such reservation:" at end of first proviso, to reflect the probable intent of Congress.

1986—Subsec. (e). Pub. L. 99–495 inserted provisions that in deciding whether to issue any license under this

subchapter, the Commission, in addition to power and development purposes, is required to give equal consideration to purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife, the protection of recreational opportunities, and the preservation of environmental quality.

1982—Subsec. (d). Pub. L. 97–375 struck out provision that the report contain the names and show the compensation of the persons employed by the Commission.

1935—Subsec. (a). Act Aug. 26, 1935, §202, struck out last paragraph of subsec. (a) which related to statements of cost of construction, etc., and free access to projects, maps, etc., and is now covered by subsec. (b).

Subsecs. (b), (c). Act Aug. 26, 1935, §202, added subsec. (b) and redesignated former subsecs. (b) and (c) as (c) and (d), respectively.

Subsec. (d). Act Aug. 26, 1935, §202, redesignated subsec. (c) as (d) and substituted "3d day of January" for "first Monday in December" in second sentence. Former subsec. (d) redesignated (e).

Subsec. (e). Act Aug. 26, 1935, §202, redesignated subsec. (d) as (e) and substituted "streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States" for "navigable waters of the United States" and "subsection (f)" for "subsection (e)". Former subsec. (e) redesignated (f).

Subsec. (f). Act Aug. 26, 1935, §202, redesignated subsec. (e) as (f) and substituted "once each week for four weeks" for "for eight weeks". Former section (f), which related to the power of the Commission to prescribe regulations for the establishment of a system of accounts and the maintenance thereof, was struck out by act Aug. 26, 1935.

Subsec. (g). Act Aug. 26, 1935, §202, added subsec. (g). Former subsec. (g), which related to the power of the Commission to hold hearings and take testimony by deposition, was struck out.

Subsec. (h). Act Aug. 26, 1935, §202, struck out subsec. (h) which related to the power of the Commission to perform any and all acts necessary and proper for the purpose of carrying out the provisions of this chapter.

1930—Subsec. (d). Act June 23, 1930, inserted sentence respecting contents of report.

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Department of War designated Department of the Army and title of Secretary of War changed to Secretary of the Army by section 205(a) of act July 26, 1947, ch. 343, title II, 61 Stat. 501. Section 205(a) of act July 26, 1947, was repealed by section 53 of act Aug. 10, 1956, ch. 1041, 70A Stat. 641. Section 1 of act Aug. 10, 1956, enacted "Title 10, Armed Forces" which in sections 3010 to 3013 continued military Department of the Army under administrative supervision of Secretary of the Army.

EFFECTIVE DATE OF 1986 AMENDMENT

Pub. L. 99–495, §18, Oct. 16, 1986, 100 Stat. 1259, provided that: "Except as otherwise provided in this Act, the amendments made by this Act [enacting section 823b of this title and amending this section and sections 800, 802, 803, 807, 808, 817, 823a, 824a–3, and 824j of this title] shall take effect with respect to each license, permit, or exemption issued under the Federal Power Act after the enactment of this Act [Oct. 16, 1986]. The amendments made by sections 6 and 12 of this Act [enacting section 823b of this title and amending section 817 of this title] shall apply to licenses, permits, and exemptions without regard to when issued."

SAVINGS PROVISION

Pub. L. 99–495, §17(a), Oct. 16, 1986, 100 Stat. 1259, provided that: "Nothing in this Act [see Short Title of 1986 Amendment note set out under section 791a of this title] shall be construed as authorizing the appropriation of water by any Federal, State, or local agency, In-

dian tribe, or any other entity or individual. Nor shall any provision of this Act—

"(1) affect the rights or jurisdiction of the United States, the States, Indian tribes, or other entities over waters of any river or stream or over any ground water resource;

"(2) alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by the States;

"(3) alter or establish the respective rights of States, the United States, Indian tribes, or any person with respect to any water or water-related right;

"(4) affect, expand, or create rights to use transmission facilities owned by the Federal Government;

"(5) alter, amend, repeal, interpret, modify, or be in conflict with, the Treaty rights or other rights of any Indian tribe;

"(6) permit the filing of any competing application in any relicensing proceeding where the time for filing a competing application expired before the enactment of this Act [Oct. 16, 1986]; or

"(7) modify, supersede, or affect the Pacific Northwest Electric Power Planning and Conservation Act [16 U.S.C. 839 et seq.]."

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions in subsec. (d) of this section relating to submitting a classified annual report to Congress showing permits and licenses issued under this subchapter, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 91 of House Document No. 103–7.

PROMOTING HYDROPOWER DEVELOPMENT AT NONPOWERED DAMS AND CLOSED LOOP PUMPED STORAGE PROJECTS

Pub. L. 113–23, § 6, Aug. 9, 2013, 127 Stat. 495, provided that:

"(a) IN GENERAL.—To improve the regulatory process and reduce delays and costs for hydropower development at nonpowered dams and closed loop pumped storage projects, the Federal Energy Regulatory Commission (referred to in this section as the 'Commission') shall investigate the feasibility of the issuance of a license for hydropower development at nonpowered dams and closed loop pumped storage projects in a 2-year period (referred to in this section as a '2-year process'). Such a 2-year process shall include any prefiling licensing process of the Commission.

"(b) WORKSHOPS AND PILOTS.—The Commission shall—

"(1) not later than 60 days after the date of enactment of this Act [Aug. 9, 2013], hold an initial workshop to solicit public comment and recommendations on how to implement a 2-year process;

"(2) develop criteria for identifying projects featuring hydropower development at nonpowered dams and closed loop pumped storage projects that may be appropriate for licensing within a 2-year process;

"(3) not later than 180 days after the date of enactment of this Act, develop and implement pilot projects to test a 2-year process, if practicable; and

"(4) not later than 3 years after the date of implementation of the final pilot project testing a 2-year process, hold a final workshop to solicit public comment on the effectiveness of each tested 2-year process.

"(c) MEMORANDUM OF UNDERSTANDING.—The Commission shall, to the extent practicable, enter into a memorandum of understanding with any applicable Federal or State agency to implement a pilot project described in subsection (b).

"(d) REPORTS.—

"(1) PILOT PROJECTS NOT IMPLEMENTED.—If the Commission determines that no pilot project described in subsection (b) is practicable because no 2-year process is practicable, not later than 240 days after the date of enactment of this Act [Aug. 9, 2013], the Com-

mission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a report that—

"(A) describes the public comments received as part of the initial workshop held under subsection (b)(1); and

"(B) identifies the process, legal, environmental, economic, and other issues that justify the determination of the Commission that no 2-year process is practicable, with recommendations on how Congress may address or remedy the identified issues.

"(2) PILOT PROJECTS IMPLEMENTED.—If the Commission develops and implements pilot projects involving a 2-year process, not later than 60 days after the date of completion of the final workshop held under subsection (b)(4), the Commission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a report that—

"(A) describes the outcomes of the pilot projects;

"(B) describes the public comments from the final workshop on the effectiveness of each tested 2-year process; and

"(C)(i) outlines how the Commission will adopt policies under existing law (including regulations) that result in a 2-year process for appropriate projects;

"(ii) outlines how the Commission will issue new regulations to adopt a 2-year process for appropriate projects; or

"(iii) identifies the process, legal, environmental, economic, and other issues that justify a determination of the Commission that no 2-year process is practicable, with recommendations on how Congress may address or remedy the identified issues."

IMPROVEMENT AT EXISTING FEDERAL FACILITIES

Pub. L. 102–486, title XXIV, § 2404, Oct. 24, 1992, 106 Stat. 3097, as amended by Pub. L. 103–437, § 6(d)(37), Nov. 2, 1994, 108 Stat. 4585; Pub. L. 104–66, title I, § 1052(h), Dec. 21, 1995, 109 Stat. 718, directed Secretary of the Interior and Secretary of the Army, in consultation with Secretary of Energy, to perform reconnaissance level studies, for each of the Nation's principal river basins, of cost effective opportunities to increase hydropower production at existing federally-owned or operated water regulation, storage, and conveyance facilities, with such studies to be completed within 2 years after Oct. 24, 1992, and transmitted to Congress, further provided that in cases where such studies had been prepared by any agency of the United States and published within ten years prior to Oct. 24, 1992, Secretary of the Interior, or Secretary of the Army, could choose to rely on information developed by prior studies rather than conduct new studies, and further provided for appropriations for fiscal years 1993 to 1995.

WATER CONSERVATION AND ENERGY PRODUCTION

Pub. L. 102–486, title XXIV, § 2405, Oct. 24, 1992, 106 Stat. 3098, provided that:

"(a) STUDIES.—The Secretary of the Interior, acting pursuant to the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388) [see Short Title note under section 371 of Title 43, Public Lands], and Acts supplementary thereto and amendatory thereof, is authorized and directed to conduct feasibility investigations of opportunities to increase the amount of hydroelectric energy available for marketing by the Secretary from Federal hydroelectric power generation facilities resulting from a reduction in the consumptive use of such power for Federal reclamation project purposes or as a result of an increase in the amount of water available for such generation because of water conservation efforts on Federal reclamation projects or a combination thereof. The Secretary of the Interior is further authorized and directed to conduct feasibility investigations of opportunities to mitigate damages to or enhance fish and wildlife as a result of increasing the amount of water

available for such purposes because of water conservation efforts on Federal reclamation projects. Such feasibility investigations shall include, but not be limited to—

"(1) an analysis of the technical, environmental, and economic feasibility of reducing the amount of water diverted upstream of such Federal hydroelectric power generation facilities by Federal reclamation projects;

"(2) an estimate of the reduction, if any, of project power consumed as a result of the decreased amount of diversion;

"(3) an estimate of the increase in the amount of electrical energy and related revenues which would result from the marketing of such power by the Secretary;

"(4) an estimate of the fish and wildlife benefits which would result from the decreased or modified diversions;

"(5) a finding by the Secretary of the Interior that the activities proposed in the feasibility study can be carried out in accordance with applicable Federal and State law, interstate compacts and the contractual obligations of the Secretary; and

"(6) a finding by the affected Federal Power Marketing Administrator that the hydroelectric component of the proposed water conservation feature is cost-effective and that the affected Administrator is able to market the hydro-electric power expected to be generated.

"(b) CONSULTATION.—In preparing feasibility studies pursuant to this section, the Secretary of the Interior shall consult with, and seek the recommendations of, affected State, local and Indian tribal interests, and shall provide for appropriate public comment.

"(c) AUTHORIZATION.—There is hereby authorized to be appropriated to the Secretary of the Interior such sums as may be necessary to carry out this section."

PROJECTS ON FRESH WATERS IN STATE OF HAWAII

Pub. L. 102–486, title XXIV, §2408, Oct. 24, 1992, 106 Stat. 3100, directed Federal Energy Regulatory Commission, in consultation with State of Hawaii, to carry out study of hydroelectric licensing in State of Hawaii for purposes of considering whether such licensing should be transferred to State, and directed Commission to complete study and submit report containing results of study to Congress within 18 months after Oct. 24, 1992.

## § 797a. Congressional authorization for permits, licenses, leases, or authorizations for dams, conduits, reservoirs, etc., within national parks or monuments

On and after March 3, 1921, no permit, license, lease, or authorization for dams, conduits, reservoirs, power houses, transmission lines, or other works for storage or carriage of water, or for the development, transmission, or utilization of power within the limits as constituted, March 3, 1921, of any national park or national monument shall be granted or made without specific authority of Congress.

(Mar. 3, 1921, ch. 129, 41 Stat. 1353.)

**Editorial Notes**

CODIFICATION

Provisions repealing so much of this chapter "as authorizes licensing such uses of existing national parks and national monuments by the Federal Power Commission" have been omitted.

Section was not enacted as part of the Federal Power Act which generally comprises this chapter.

**Statutory Notes and Related Subsidiaries**

CONSTRUCTION

Act Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847, provided that nothing in this chapter should be construed to repeal or amend the provisions of the act approved Mar. 3, 1921 (41 Stat. 1353) [16 U.S.C. 797a] or the provisions of any other Act relating to national parks and national monuments. See note preceding section 791 of this title.

## § 797b. Duty to keep Congress fully and currently informed

The Federal Energy Regulatory Commission shall keep the Committee on Energy and Commerce of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate fully and currently informed regarding actions of the Commission with respect to the provisions of Part I of the Federal Power Act [16 U.S.C. 791a et seq.].

(Pub. L. 99–495, §16, Oct. 16, 1986, 100 Stat. 1259.)

**Editorial Notes**

REFERENCES IN TEXT

The Federal Power Act, referred to in text, is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended. Part I of the Federal Power Act is classified generally to this subchapter (§791a et seq.). For complete classification of this Act to the Code, see section 791a of this title and Tables.

CODIFICATION

Section was enacted as part of the Electric Consumers Protection Act of 1986, and not as part of the Federal Power Act which generally comprises this chapter.

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Committee on Energy and Commerce of House of Representatives treated as referring to Committee on Commerce of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Commerce of House of Representatives changed to Committee on Energy and Commerce of House of Representatives, and jurisdiction over matters relating to securities and exchanges and insurance generally transferred to Committee on Financial Services of House of Representatives by House Resolution No. 5, One Hundred Seventh Congress, Jan. 3, 2001.

## § 797c. Dams in National Park System units

After October 24, 1992, the Federal Energy Regulatory Commission may not issue an original license under Part I of the Federal Power Act [16 U.S.C. 791a et seq.] (nor an exemption from such Part) for any new hydroelectric power project located within the boundaries of any unit of the National Park System that would have a direct adverse effect on Federal lands within any such unit. Nothing in this section shall be construed as repealing any existing provision of law (or affecting any treaty) explicitly authorizing a hydroelectric power project.

(Pub. L. 102–486, title XXIV, §2402, Oct. 24, 1992, 106 Stat. 3097.)

2013—Pub. L. 113–23 designated existing first, second, and third sentences as subsecs. (a), (c), and (d), respectively, and added subsec. (b).

1935—Act Aug. 26, 1935, §203, amended section generally, striking out "and a license issued" at end of second sentence and inserting "or for other good cause shown after notice and opportunity for hearing" in last sentence.

## § 799. License; duration, conditions, revocation, alteration, or surrender

Licenses under this subchapter shall be issued for a period not exceeding fifty years. Each such license shall be conditioned upon acceptance by the licensee of all of the terms and conditions of this chapter and such further conditions, if any, as the Commission shall prescribe in conformity with this chapter, which said terms and conditions and the acceptance thereof shall be expressed in said license. Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice.

(June 10, 1920, ch. 285, pt. I, §6, 41 Stat. 1067; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§204, 212, 49 Stat. 841, 847; Pub. L. 104–106, div. D, title XLIII, §4321(i)(6), Feb. 10, 1996, 110 Stat. 676; Pub. L. 104–316, title I, §108(a), Oct. 19, 1996, 110 Stat. 833; Pub. L. 105–192, §2, July 14, 1998, 112 Stat. 625.)

### Editorial Notes

#### Amendments

1998—Pub. L. 105–192 inserted at end "Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice."

1996—Pub. L. 104–316 struck out at end "Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice."

Pub. L. 104–106 struck out at end "Copies of all licenses issued under the provisions of this subchapter and calling for the payment of annual charges shall be deposited with the General Accounting Office, in compliance with section 20 of title 41."

1935—Act Aug. 26, 1935, §204, amended section generally, substituting "thirty days" for "ninety days" in third sentence and inserting last sentence.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1996 Amendment

For effective date and applicability of amendment by Pub. L. 104–106, see section 4401 of Pub. L. 104–106, set out as a note under section 2220 of Title 10, Armed Forces.

## § 800. Issuance of preliminary permits or licenses

### (a) Preference

In issuing preliminary permits hereunder or original licenses where no preliminary permit has been issued, the Commission shall give preference to applications therefor by States, Indian tribes, and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region; and as between other applicants, the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water resources of the region, if it be satisfied as to the ability of the applicant to carry out such plans.

### (b) Development of water resources by United States; reports

Whenever, in the judgment of the Commission, the development of any water resources for public purposes should be undertaken by the United States itself, the Commission shall not approve any application for any project affecting such development, but shall cause to be made such examinations, surveys, reports, plans, and estimates of the cost of the proposed development as it may find necessary, and shall submit its findings to Congress with such recommendations as it may find appropriate concerning such development.

### (c) Assumption of project by United States after expiration of license

Whenever, after notice and opportunity for hearing, the Commission determines that the United States should exercise its right upon or after the expiration of any license to take over any project or projects for public purposes, the Commission shall not issue a new license to the original licensee or to a new licensee but shall submit its recommendation to Congress together with such information as it may consider appropriate.

(June 10, 1920, ch. 285, pt. I, §7, 41 Stat. 1067; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§205, 212, 49 Stat. 842, 847; Pub. L. 90–451, §1, Aug. 3, 1968, 82 Stat. 616; Pub. L. 99–495, §2, Oct. 16, 1986, 100 Stat. 1243; Pub. L. 115–325, title II, §201(a), Dec. 18, 2018, 132 Stat. 4459.)

### Editorial Notes

#### Codification

Additional provisions in the section as enacted by act June 10, 1920, directing the commission to investigate the cost and economic value of the power plant outlined in project numbered 3, House Document numbered 1400, Sixty-second Congress, third session, and also in connection with such project to submit plans and estimates of cost necessary to secure an increased water supply for the District of Columbia, have been omitted as temporary and executed.

#### Amendments

2018—Subsec. (a). Pub. L. 115–325 substituted "States, Indian tribes, and municipalities" for "States and municipalities".

1986—Subsec. (a). Pub. L. 99–495 inserted "original" after "hereunder or" and substituted "issued," for "issued and in issuing licenses to new licensees under section 808 of this title".

1968—Subsec. (c). Pub. L. 90–451 added subsec. (c).

1935—Act Aug. 26, 1935, §205, amended section generally, striking out "navigation and" before "water resources" wherever appearing, and designating paragraphs as subsecs. (a) and (b).

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–495 effective with respect to each license, permit, or exemption issued under this chapter after Oct. 16, 1986, see section 18 of Pub. L. 99–495, set out as a note under section 797 of this title.

APPLICABILITY OF 2018 AMENDMENT

Pub. L. 115–325, title II, §201(b), Dec. 18, 2018, 132 Stat. 4459, provided that: ''The amendment made by subsection (a) [amending this section] shall not affect—

''(1) any preliminary permit or original license issued before the date of enactment of the Indian Tribal Energy Development and Self-Determination Act Amendments of 2017 [Dec. 18, 2018]; or

''(2) an application for an original license, if the Commission has issued a notice accepting that application for filing pursuant to section 4.32(d) of title 18, Code of Federal Regulations (or successor regulations), before the date of enactment of the Indian Tribal Energy Development and Self-Determination Act Amendments of 2017.''

DEFINITION OF INDIAN TRIBE

Pub. L. 115–325, title II, §201(c), Dec. 18, 2018, 132 Stat. 4459, provided that: ''For purposes of section 7(a) of the Federal Power Act (16 U.S.C. 800(a)) (as amended by subsection (a)), the term 'Indian tribe' has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).''

## § 801. Transfer of license; obligations of transferee

No voluntary transfer of any license, or of the rights thereunder granted, shall be made without the written approval of the commission; and any successor or assign of the rights of such licensee, whether by voluntary transfer, judicial sale, foreclosure sale, or otherwise, shall be subject to all the conditions of the license under which such rights are held by such licensee and also subject to all the provisions and conditions of this chapter to the same extent as though such successor or assign were the original licensee under this chapter: *Provided*, That a mortgage or trust deed or judicial sales made thereunder or under tax sales shall not be deemed voluntary transfers within the meaning of this section.

(June 10, 1920, ch. 285, pt. I, §8, 41 Stat. 1068; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847.)

## § 802. Information to accompany application for license; landowner notification

(a) Each applicant for a license under this chapter shall submit to the commission—

(1) Such maps, plans, specifications, and estimates of cost as may be required for a full understanding of the proposed project. Such maps, plans, and specifications when approved by the commission shall be made a part of the license; and thereafter no change shall be made in said maps, plans, or specifications until such changes shall have been approved and made a part of such license by the commission.

(2) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting and distributing power, and in any other business necessary to effect the purposes of a license under this chapter.

(3)[1] Such additional information as the commission may require.

(b) Upon the filing of any application for a license (other than a license under section 808 of this title) the applicant shall make a good faith effort to notify each of the following by certified mail:

(1) Any person who is an owner of record of any interest in the property within the bounds of the project.

(2) Any Federal, State, municipal or other local governmental agency likely to be interested in or affected by such application.

(June 10, 1920, ch. 285, pt. I, §9, 41 Stat. 1068; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847; Pub. L. 99–495, §14, Oct. 16, 1986, 100 Stat. 1257.)

### Editorial Notes

CODIFICATION

Former subsec. (c), included in the provisions designated as subsec. (a) by Pub. L. 99–495, has been editorially redesignated as par. (3) of subsec. (a) as the probable intent of Congress.

AMENDMENTS

1986—Pub. L. 99–495 designated existing provisions as subsec. (a), redesignated former subsecs. (a) and (b) as pars. (1) and (2) of subsec. (a), and added subsec. (b).

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–495 effective with respect to each license, permit, or exemption issued under this chapter after Oct. 16, 1986, see section 18 of Pub. L. 99–495, set out as a note under section 797 of this title.

## § 803. Conditions of license generally

All licenses issued under this subchapter shall be on the following conditions:

### (a) Modification of plans; factors considered to secure adaptability of project; recommendations for proposed terms and conditions

(1) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in section 797(e) of this title[1] if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.

(2) In order to ensure that the project adopted will be best adapted to the comprehensive plan

[1] See Codification note below.

[1] So in original. Probably should be followed by ''; and''.

described in paragraph (1), the Commission shall consider each of the following:

(A) The extent to which the project is consistent with a comprehensive plan (where one exists) for improving, developing, or conserving a waterway or waterways affected by the project that is prepared by—

(i) an agency established pursuant to Federal law that has the authority to prepare such a plan; or

(ii) the State in which the facility is or will be located.

(B) The recommendations of Federal and State agencies exercising administration over flood control, navigation, irrigation, recreation, cultural and other relevant resources of the State in which the project is located, and the recommendations (including fish and wildlife recommendations) of Indian tribes affected by the project.

(C) In the case of a State or municipal applicant, or an applicant which is primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities), the electricity consumption efficiency improvement program of the applicant, including its plans, performance and capabilities for encouraging or assisting its customers to conserve electricity cost-effectively, taking into account the published policies, restrictions, and requirements of relevant State regulatory authorities applicable to such applicant.

(3) Upon receipt of an application for a license, the Commission shall solicit recommendations from the agencies and Indian tribes identified in subparagraphs (A) and (B) of paragraph (2) for proposed terms and conditions for the Commission's consideration for inclusion in the license.

**(b) Alterations in project works**

That except when emergency shall require for the protection of navigation, life, health, or property, no substantial alteration or addition not in conformity with the approved plans shall be made to any dam or other project works constructed hereunder of an installed capacity in excess of two thousand horsepower without the prior approval of the Commission; and any emergency alteration or addition so made shall thereafter be subject to such modification and change as the Commission may direct.

**(c) Maintenance and repair of project works; liability of licensee for damages**

That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain, and operate said works as not to impair navigation, and shall conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property. Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or op-

eration of the project works or of the works appurtenant or accessory thereto, constructed under the license and in no event shall the United States be liable therefor.

**(d) Amortization reserves**

That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the net investment of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license. For any new license issued under section 808 of this title, the amortization reserves under this subsection shall be maintained on and after the effective date of such new license.

**(e) Annual charges payable by licensees; maximum rates; application; review and report to Congress**

(1) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of this subchapter, including any reasonable and necessary costs incurred by Federal and State fish and wildlife agencies and other natural and cultural resource agencies in connection with studies or other reviews carried out by such agencies for purposes of administering their responsibilities under this subchapter; for recompensing it for the use, occupancy, and enjoyment of its lands or other property; and for the expropriation to the Government of excessive profits until the respective States shall make provision for preventing excessive profits or for the expropriation thereof to themselves, or until the period of amortization as herein provided is reached, and in fixing such charges the Commission shall seek to avoid increasing the price to the consumers of power by such charges, and any such charges may be adjusted from time to time by the Commission as conditions may require: *Provided*, That, subject to annual appropriations Acts, the portion of such annual charges imposed by the Commission under this subsection to cover the reasonable and necessary costs of such agencies shall be available to such agencies (in addition to other funds appropriated for such purposes) solely for carrying out such studies and reviews and shall remain available until expended: *Provided*, That when licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations the Commission shall, subject to the approval of the Secretary of the Interior in the case of such dams or structures in reclamation projects and, in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 5123 of title 25, fix a reasonable annual charge for the use thereof, and such charges may with like approval be readjusted by the Commission at the end of twenty years after

the project is available for service and at periods of not less than ten years thereafter upon notice and opportunity for hearing: *Provided further,* That licenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit or is used by such State or municipality for State or municipal purposes, except that as to projects constructed or to be constructed by States or municipalities primarily designed to provide or improve navigation, licenses therefor shall be issued without charge; and that licenses for the development, transmission, or distribution of power for domestic, mining, or other beneficial use in projects of not more than two thousand horsepower installed capacity may be issued without charge, except on tribal lands within Indian reservations; but in no case shall a license be issued free of charge for the development and utilization of power created by any Government dam and that the amount charged therefor in any license shall be such as determined by the Commission: *Provided however,* That no charge shall be assessed for the use of any Government dam or structure by any licensee if, before January 1, 1985, the Secretary of the Interior has entered into a contract with such licensee that meets each of the following requirements:

(A) The contract covers one or more projects for which a license was issued by the Commission before January 1, 1985.

(B) The contract contains provisions specifically providing each of the following:

(i) A powerplant may be built by the licensee utilizing irrigation facilities constructed by the United States.

(ii) The powerplant shall remain in the exclusive control, possession, and ownership of the licensee concerned.

(iii) All revenue from the powerplant and from the use, sale, or disposal of electric energy from the powerplant shall be, and remain, the property of such licensee.

(C) The contract is an amendatory, supplemental and replacement contract between the United States and: (i) the Quincy-Columbia Basin Irrigation District (Contract No. 14–06–100–6418); (ii) the East Columbia Basin Irrigation District (Contract No. 14–06–100–6419); or, (iii) the South Columbia Basin Irrigation District (Contract No. 14–06–100–6420).

This paragraph shall apply to any project covered by a contract referred to in this paragraph only during the term of such contract unless otherwise provided by subsequent Act of Congress. In the event an overpayment of any charge due under this section shall be made by a licensee, the Commission is authorized to allow a credit for such overpayment when charges are due for any subsequent period.

(2) In the case of licenses involving the use of Government dams or other structures owned by the United States, the charges fixed (or readjusted) by the Commission under paragraph (1) for the use of such dams or structures shall not exceed 1 mill per kilowatt-hour for the first 40 gigawatt-hours of energy a project produces in any year, 1½ mills per kilowatt-hour for over 40

up to and including 80 gigawatt-hours in any year, and 2 mills per kilowatt-hour for any energy the project produces over 80 gigawatt-hours in any year. Except as provided in subsection (f), such charge shall be the only charge assessed by any agency of the United States for the use of such dams or structures.

(3) The provisions of paragraph (2) shall apply with respect to—

(A) all licenses issued after October 16, 1986; and

(B) all licenses issued before October 16, 1986, which—

(i) did not fix a specific charge for the use of the Government dam or structure involved; and

(ii) did not specify that no charge would be fixed for the use of such dam or structure.

(4) Every 5 years, the Commission shall review the appropriateness of the annual charge limitations provided for in this subsection and report to Congress concerning its recommendations thereon.

**(f) Reimbursement by licensee of other licensees, etc.**

That whenever any licensee hereunder is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable. The proportion of such charges to be paid by any licensee shall be determined by the Commission. The licensees or permittees affected shall pay to the United States the cost of making such determination as fixed by the Commission.

Whenever such reservoir or other improvement is constructed by the United States the Commission shall assess similar charges against any licensee directly benefited thereby, and any amount so assessed shall be paid into the Treasury of the United States, to be reserved and appropriated as a part of the special fund for headwater improvements as provided in section 810 of this title.

Whenever any power project not under license is benefited by the construction work of a licensee or permittee, the United States or any agency thereof, the Commission, after notice to the owner or owners of such unlicensed project, shall determine and fix a reasonable and equitable annual charge to be paid to the licensee or permittee on account of such benefits, or to the United States if it be the owner of such headwater improvement.

**(g) Conditions in discretion of commission**

Such other conditions not inconsistent with the provisions of this chapter as the commission may require.

**(h) Monopolistic combinations; prevention or minimization of anticompetitive conduct; action by Commission regarding license and operation and maintenance of project**

(1) Combinations, agreements, arrangements, or understandings, express or implied, to limit

the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited.

(2) That conduct under the license that: (A) results in the contravention of the policies expressed in the antitrust laws; and (B) is not otherwise justified by the public interest considering regulatory policies expressed in other applicable law (including but not limited to those contained in subchapter II of this chapter) shall be prevented or adequately minimized by means of conditions included in the license prior to its issuance. In the event it is impossible to prevent or adequately minimize the contravention, the Commission shall refuse to issue any license to the applicant for the project and, in the case of an existing project, shall take appropriate action to provide thereafter for the operation and maintenance of the affected project and for the issuing of a new license in accordance with section 808 of this title.

**(i) Waiver of conditions**

In issuing licenses for a minor part only of a complete project, or for a complete project of not more than two thousand horsepower installed capacity, the Commission may in its discretion waive such conditions, provisions, and requirements of this subchapter, except the license period of fifty years, as it may deem to be to the public interest to waive under the circumstances: *Provided*, That the provisions hereof shall not apply to annual charges for use of lands within Indian reservations.

**(j) Fish and wildlife protection, mitigation and enhancement; consideration of recommendations; findings**

(1) That in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning grounds and habitat) affected by the development, operation, and management of the project, each license issued under this subchapter shall include conditions for such protection, mitigation, and enhancement. Subject to paragraph (2), such conditions shall be based on recommendations received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.) from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies.

(2) Whenever the Commission believes that any recommendation referred to in paragraph (1) may be inconsistent with the purposes and requirements of this subchapter or other applicable law, the Commission and the agencies referred to in paragraph (1) shall attempt to resolve any such inconsistency, giving due weight to the recommendations, expertise, and statutory responsibilities of such agencies. If, after such attempt, the Commission does not adopt in whole or in part a recommendation of any such agency, the Commission shall publish each of the following findings (together with a statement of the basis for each of the findings):

(A) A finding that adoption of such recommendation is inconsistent with the purposes and requirements of this subchapter or with other applicable provisions of law.

(B) A finding that the conditions selected by the Commission comply with the requirements of paragraph (1).

Subsection (i) shall not apply to the conditions required under this subsection.

(June 10, 1920, ch. 285, pt. I, § 10, 41 Stat. 1068; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§ 206, 212, 49 Stat. 842, 847; Pub. L. 87–647, Sept. 7, 1962, 76 Stat. 447; Pub. L. 90–451, § 4, Aug. 3, 1968, 82 Stat. 617; Pub. L. 99–495, §§ 3(b), (c), 9(a), 13, Oct. 16, 1986, 100 Stat. 1243, 1244, 1252, 1257; Pub. L. 99–546, title IV, § 401, Oct. 27, 1986, 100 Stat. 3056; Pub. L. 102–486, title XVII, § 1701(a), Oct. 24, 1992, 106 Stat. 3008.)

**Editorial Notes**

REFERENCES IN TEXT

The Fish and Wildlife Coordination Act, referred to in subsec. (j)(1), is act Mar. 10, 1934, ch. 55, 48 Stat. 401, which is classified generally to sections 661 to 666c–1 of this title. For complete classification of this Act to the Code, see section 661(a) of this title, Short Title note set out under section 661 of this title, and Tables.

AMENDMENTS

1992—Subsec. (e)(1). Pub. L. 102–486, in introductory provisions, substituted ''administration of this subchapter, including any reasonable and necessary costs incurred by Federal and State fish and wildlife agencies and other natural and cultural resource agencies in connection with studies or other reviews carried out by such agencies for purposes of administering their responsibilities under this subchapter;'' for ''administration of this subchapter;'' and inserted ''*Provided*, That, subject to annual appropriations Acts, the portion of such annual charges imposed by the Commission under this subsection to cover the reasonable and necessary costs of such agencies shall be available to such agencies (in addition to other funds appropriated for such purposes) solely for carrying out such studies and reviews and shall remain available until expended:'' after ''as conditions may require:''.

1986—Subsec. (a). Pub. L. 99–495, § 3(b), designated existing provisions as par. (1), inserted ''for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat),'' after ''water-power development'', inserted ''irrigation, flood control, water supply, and'' after ''including'', which words were inserted after ''public uses, including'' as the probable intent of Congress, substituted ''and other purposes referred to in section 797(e) of this title'' for ''purposes; and'', and added pars. (2) and (3).

Subsec. (e). Pub. L. 99–546 inserted proviso that no charge be assessed for use of Government dam or structure by licensee if, before Jan. 1, 1985, licensee and Secretary entered into contract which met requirements of date of license, powerplant construction, ownership, and revenue, etc.

Pub. L. 99–495, § 9(a), designated existing provisions as par. (1) and added pars. (2) to (4).

Subsec. (h). Pub. L. 99–495, § 13, designated existing provisions as par. (1) and added par. (2).

Subsec. (j). Pub. L. 99–495, § 3(c), added subsec. (j).

1968—Subsec. (d). Pub. L. 90–451 provided for maintenance of amortization reserves on and after effective date of new licenses.

1962—Subsecs. (b), (e), (i). Pub. L. 87–647 substituted ''two thousand horsepower'' for ''one hundred horsepower''.

1935—Subsec. (a). Act Aug. 26, 1935, § 206, substituted ''plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial uses, in-

cluding recreational purposes'' for ''scheme of improvement and utilization for the purposes of navigation, of water-power development, and of other beneficial public uses,'' and ''such plan'' for ''such scheme''.

Subsec. (b). Act Aug. 26, 1935, §206, inserted ''installed'' before ''capacity''.

Subsec. (d). Act Aug. 26, 1935, §206, substituted ''net investment'' for ''actual, legitimate investment''.

Subsec. (e). Act Aug. 26, 1935, §206, amended subsec. (e) generally.

Subsec. (f). Act Aug. 26, 1935, §206, inserted last sentence to first par., and inserted last par.

Subsec. (i). Act Aug. 26, 1935, §206, inserted ''installed'' before ''capacity'', and ''annual charges for use of'' before ''lands'' in proviso.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1986 Amendment

Amendment by Pub. L. 99–495 effective with respect to each license, permit, or exemption issued under this chapter after Oct. 16, 1986, see section 18 of Pub. L. 99–495, set out as a note under section 797 of this title.

##### Savings Provision

Pub. L. 99–495, §9(b), Oct. 16, 1986, 100 Stat. 1252, provided that: ''Nothing in this Act [see Short Title of 1986 Amendment note set out under section 791a of this title] shall affect any annual charge to be paid pursuant to section 10(e) of the Federal Power Act [16 U.S.C. 803(e)] to Indian tribes for the use of their lands within Indian reservations.''

##### Termination of Reporting Requirements

For termination, effective May 15, 2000, of provisions in subsec. (e)(4) of this section relating to reporting recommendations to Congress every 5 years, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 91 of House Document No. 103–7.

##### Obligation for Payment of Annual Charges

Pub. L. 115–270, title III, §3001(c), Oct. 23, 2018, 132 Stat. 3862, provided that: ''Any obligation of a licensee or exemptee for the payment of annual charges under section 10(e) of the Federal Power Act (16 U.S.C. 803(e)) for a project that has not commenced construction as of the date of enactment of this Act [Oct. 23, 2018] shall commence not earlier than the latest of—

''(1) the date by which the licensee or exemptee is required to commence construction; or

''(2) the date of any extension of the deadline under paragraph (1).''

## §804. Project works affecting navigable waters; requirements insertable in license

If the dam or other project works are to be constructed across, along, or in any of the navigable waters of the United States, the commission may, insofar as it deems the same reasonably necessary to promote the present and future needs of navigation and consistent with a reasonable investment cost to the licensee, include in the license any one or more of the following provisions or requirements:

(a) That such licensee shall, to the extent necessary to preserve and improve navigation facilities, construct, in whole or in part, without expense to the United States, in connection with such dam, a lock or locks, booms, sluices, or other structures for navigation purposes, in accordance with plans and specifications approved by the Chief of Engineers and the Secretary of the Army and made part of such license.

(b) That in case such structures for navigation purposes are not made a part of the original construction at the expense of the licensee, then whenever the United States shall desire to complete such navigation facilities the licensee shall convey to the United States, free of cost, such of its land and its rights-of-way and such right of passage through its dams or other structures, and permit such control of pools as may be required to complete such navigation facilities.

(c) That such licensee shall furnish free of cost to the United States power for the operation of such navigation facilities, whether constructed by the licensee or by the United States.

(June 10, 1920, ch. 285, pt. I, §11, 41 Stat. 1070; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847; July 26, 1947, ch. 343, title II, §205(a), 61 Stat. 501.)

#### Statutory Notes and Related Subsidiaries

##### Change of Name

Department of War designated Department of the Army and title of Secretary of War changed to Secretary of the Army by section 205(a) of act July 26, 1947, ch. 343, title II, 61 Stat. 501. Section 205(a) of act July 26, 1947, was repealed by section 53 of act Aug. 10, 1956, ch. 1041, 70A Stat. 641. Section 1 of act Aug. 10, 1956, enacted ''Title 10, Armed Forces'' which in sections 3010 to 3013 continued military Department of the Army under administrative supervision of Secretary of the Army.

## §805. Participation by Government in costs of locks, etc.

Whenever application is filed for a project hereunder involving navigable waters of the United States, and the commission shall find upon investigation that the needs of navigation require the construction of a lock or locks or other navigation structures, and that such structures cannot, consistent with a reasonable investment cost to the applicant, be provided in the manner specified in subsection (a) of section 804 of this title, the commission may grant the application with the provision to be expressed in the license that the licensee will install the necessary navigation structures if the Government fails to make provision therefor within a time to be fixed in the license and cause a report upon such project to be prepared, with estimates of cost of the power development and of the navigation structures, and shall submit such report to Congress with such recommendations as it deems appropriate concerning the participation of the United States in the cost of construction of such navigation structures.

(June 10, 1920, ch. 285, pt. I, §12, 41 Stat. 1070; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847.)

## §806. Time limit for construction of project works; extension of time; termination or revocation of licenses for delay

The licensee shall commence the construction of the project works within the time fixed in the license, which shall not be more than two years from the date thereof, shall thereafter in good faith and with due diligence prosecute such construction, and shall within the time fixed in the license complete and put into operation such part of the ultimate development as the com-

ing right-of-way granted prior to June 10, 1920, or as confirming or otherwise affecting any claim, or as affecting any authority heretofore given pursuant to law, but any person, association, corporation, State, or municipality holding or possessing such permit, right-of-way or authority may apply for a license under this chapter, and upon such application the Commission may issue to any such applicant a license in accordance with the provisions of this subchapter and in such case the provisions of this chapter shall apply to such applicant as a licensee under this chapter: *Provided*, That when application is made for a license under this section for a project or projects already constructed the fair value of said project or projects determined as provided in this section, shall for the purposes of this subchapter and of said license be deemed to be the amount to be allowed as the net investment of the applicant in such project or projects as of the date of such license, or as of the date of such determination, if license has not been issued. Such fair value shall be determined by the Commission after notice and opportunity for hearing.

(June 10, 1920, ch. 285, pt. I, §23(a), 41 Stat. 1075; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§210, 212, 49 Stat. 846, 847.)

#### EDITORIAL NOTES

##### CODIFICATION

Section consists of subsec. (a) of section 23 of act June 10, 1920, as so designated by act Aug. 26, 1935. Subsec. (b) of section 23 of act June 10, 1920, is set out as section 817 of this title.

##### AMENDMENTS

1935—Act Aug. 26, 1935, §210, amended section generally, substituting ''part'' for ''chapter'' wherever appearing, substituting ''heretofore'' for ''then'', and substituting the last sentence for ''Such fair value may, in the discretion of the commission, be determined by mutual agreement between the commission and the applicant or, in case they cannot agree, jurisdiction is hereby conferred upon the district court of the United States in the district within which such project or projects may be located, upon the application of either party, to hear and determine the amount of such fair value.''

### § 817. Projects not affecting navigable waters; necessity for Federal license, permit or right-of-way; unauthorized activities

(1) It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter. Any person, association, corporation, State, or municipality intending to construct a dam or other project works, across, along, over, or in any stream or part thereof, other than those defined in this

chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State laws.

(2) No person may commence any significant modification of any project licensed under, or exempted from, this chapter unless such modification is authorized in accordance with terms and conditions of such license or exemption and the applicable requirements of this subchapter. As used in this paragraph, the term ''commence'' refers to the beginning of physical onsite activity other than surveys or testing.

(June 10, 1920, ch. 285, pt. I, §23(b), 41 Stat. 1075; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§210, 212, 49 Stat. 846, 847; Pub. L. 99–495, §6, Oct. 16, 1986, 100 Stat. 1248.)

#### EDITORIAL NOTES

##### CODIFICATION

Section consists of subsec. (b) of section 23 of act June 10, 1920, as so designated by act Aug. 26, 1935. Subsec. (a) of section 23 of act June 10, 1920, is set out as section 816 of this title.

##### AMENDMENTS

1986—Pub. L. 99–495 designated existing provisions as par. (1) and added par. (2).

1935—Act Aug. 26, 1935, §210, amended section generally, inserting first sentence, and substituting ''with foreign nations'' for ''between foreign nations'', ''shall before such construction'' for ''may in their discretion'' and ''shall not construct, maintain, or operate such dam or other project works'' for ''shall not proceed with such construction''.

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–495 applicable to licenses, permits, and exemptions without regard to when issued, see section 18 of Pub. L. 99–495, set out as a note under section 797 of this title.

### § 818. Public lands included in project; reservation of lands from entry

Any lands of the United States included in any proposed project under the provisions of this subchapter shall from the date of filing of application therefor be reserved from entry, location, or other disposal under the laws of the United States until otherwise directed by the Commission or by Congress. Notice that such application has been made, together with the date of

able at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

### STATUTORY NOTES AND RELATED SUBSIDIARIES

#### COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

### EXECUTIVE DOCUMENTS

#### EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

#### EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, §102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

### Editorial Notes

#### AMENDMENTS

1975—Par. (2)(D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

### Statutory Notes and Related Subsidiaries

#### CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, §401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

''(1) the Department of the Army has issued a permit for the activity; and

''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

### Executive Documents

#### EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environ-

---

[1] So in original. The period probably should be a semicolon.

ment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

Sec. 2. *Definition.* As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

Sec. 3. *Federal Activities.* To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

Sec. 4. *White House Conference on Cooperative Conservation.* The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

Sec. 5. *General Provision.* This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

## § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

### Statutory Notes and Related Subsidiaries

#### Effective Date of Repeal

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

## § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

## § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

## § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

## SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

## § 4341. Omitted

### Editorial Notes

#### Codification

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

## § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and

(2) The discharge of the hazardous substance results from:

(i) The contamination of noncontact cooling water or storm water, provided that such cooling water or storm water is not contaminated by an on-site spill of a hazardous substance; or

(ii) A continuous or anticipated intermittent discharge of process waste water, and the discharge originates within the manufacturing or treatment systems; or

(iii) An upset or failure of a treatment system or of a process producing a continuous or anticipated intermittent discharge where the upset or failure results from a control problem, an operator error, a system failure or malfunction, an equipment or system startup or shutdown, an equipment wash, or a production schedule change, provided that such upset or failure is not caused by an on-site spill of a hazardous substance.

[44 FR 50776, Aug. 29, 1979, as amended at 44 FR 58910, Oct. 12, 1979]

§ 117.13  Applicability to discharges from publicly owned treatment works and their users.

(a) [Reserved]

(b) These regulations apply to all discharges of reportable quantities to a POTW, where the discharge originates from a mobile source, except where such source has contracted with, or otherwise received written permission from the owners or operators of the POTW to discharge that quantity, and the mobile source can show that prior to accepting the substance from an industrial discharger, the substance had been treated to comply with any effluent limitation under sections 301, 302 or 306 or pretreatment standard under section 307 applicable to that facility.

§ 117.14  Demonstration projects.

Notwithstanding any other provision of this part, the Administrator of the Environmental Protection Agency may, on a case-by-case basis, allow the discharge of designated hazardous substances in connection with research or demonstration projects relating to the prevention, control, or abatement of hazardous substance pollution. The Administrator will allow such a discharge only where he determines that the ex-

pected environmental benefit from such a discharge will outweigh the potential hazard associated with the discharge.

Subpart C—Notice of Discharge of a Reportable Quantity

§ 117.21  Notice.

Any person in charge of a vessel or an onshore or an offshore facility shall, as soon as he has knowledge of any discharge of a designated hazardous substance from such vessel or facility in quantities equal to or exceeding in any 24-hour period the reportable quantity determined by this part, immediately notify the appropriate agency of the United States Government of such discharge. Notice shall be given in accordance with such procedures as the Secretary of Transportation has set forth in 33 CFR 153.203. This provision applies to all discharges not specifically excluded or reserved by another section of these regulations.

§ 117.23  Liabilities for removal.

In any case where a substance designated as hazardous in 40 CFR part 116 is discharged from any vessel or onshore or offshore facility in a quantity equal to or exceeding the reportable quantity determined by this part, the owner, operator or person in charge will be liable, pursuant to section 311 (f) and (g) of the Act, to the United States Government for the actual costs incurred in the removal of such substance, subject only to the defenses and monetary limitations enumerated in section 311 (f) and (g) of the Act.

The Administrator may act to mitigate the damage to the public health or welfare caused by a discharge and the cost of such mitigation shall be considered a cost incurred under section 311(c) for the removal of that substance by the United States Government.

PART 121—STATE CERTIFICATION OF ACTIVITIES REQUIRING A FEDERAL LICENSE OR PERMIT

Subpart A—General

Sec.
121.1   Definitions.
121.2   Contents of certification.

161

A-37

121.3  Contents of application.

### Subpart B—Determination of Effect on Other States

121.11  Copies of documents.
121.12  Supplemental information.
121.13  Review by Regional Administrator and notification.
121.14  Forwarding to affected State.
121.15  Hearings on objection of affected State.
121.16  Waiver.

### Subpart C—Certification by the Administrator

121.21  When Administrator certifies.
121.22  Applications.
121.23  Notice and hearing.
121.24  Certification.
121.25  Adoption of new water quality standards.
121.26  Inspection of facility or activity before operation.
121.27  Notification to licensing or permitting agency.
121.28  Termination of suspension.

### Subpart D—Consultations

121.30  Review and advice.

AUTHORITY: Sec. 21 (b) and (c), 84 Stat. 91 (33 U.S.C. 1171(b) (1970)); Reorganization Plan No. 3 of 1970.

SOURCE: 36 FR 22487, Nov. 25, 1971, unless otherwise noted. Redesignated at 37 FR 21441, Oct. 11, 1972, and further redesignated at 44 FR 32899, June 7, 1979.

## Subpart A—General

### § 121.1  Definitions.

As used in this part, the following terms shall have the meanings indicated below:

(a) *License or permit* means any license or permit granted by an agency of the Federal Government to conduct any activity which may result in any discharge into the navigable waters of the United States.

(b) *Licensing or permitting agency* means any agency of the Federal Government to which application is made for a license or permit.

(c) *Administrator* means the Administrator, Environmental Protection Agency.

(d) *Regional Administrator* means the Regional designee appointed by the Administrator, Environmental Protection Agency.

(e) *Certifying agency* means the person or agency designated by the Governor of a State, by statute, or by other governmental act, to certify compliance with applicable water quality standards. If an interstate agency has sole authority to so certify for the area within its jurisdiction, such interstate agency shall be the certifying agency. Where a State agency and an interstate agency have concurrent authority to certify, the State agency shall be the certifying agency. Where water quality standards have been promulgated by the Administrator pursuant to section 10(c)(2) of the Act, or where no State or interstate agency has authority to certify, the Administrator shall be the certifying agency.

(f) *Act* means the Federal Water Pollution Control Act, 33 U.S.C. 1151 *et seq.*

(g) *Water quality standards* means standards established pursuant to section 10(c) of the Act, and State-adopted water quality standards for navigable waters which are not interstate waters.

### § 121.2  Contents of certification.

(a) A certification made by a certifying agency shall include the following:

(1) The name and address of the applicant;

(2) A statement that the certifying agency has either (i) examined the application made by the applicant to the licensing or permitting agency (specifically identifying the number or code affixed to such application) and bases its certification upon an evaluation of the information contained in such application which is relevant to water quality considerations, or (ii) examined other information furnished by the applicant sufficient to permit the certifying agency to make the statement described in paragraph (a)(3) of this section;

(3) A statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards;

(4) A statement of any conditions which the certifying agency deems necessary or desirable with respect to the discharge of the activity; and

162

**Environmental Protection Agency**                    **§ 121.15**

(5) Such other information as the certifying agency may determine to be appropriate.

(b) The certifying agency may modify the certification in such manner as may be agreed upon by the certifying agency, the licensing or permitting agency, and the Regional Administrator.

### § 121.3  Contents of application.

A licensing or permitting agency shall require an applicant for a license or permit to include in the form of application such information relating to water quality considerations as may be agreed upon by the licensing or permitting agency and the Administrator.

## Subpart B—Determination of Effect on Other States

### § 121.11  Copies of documents.

(a) Upon receipt from an applicant of an application for a license or permit without an accompanying certification, the licensing or permitting agency shall either: (1) Forward one copy of the application to the appropriate certifying agency and two copies to the Regional Administrator, or (2) forward three copies of the application to the Regional Administrator, pursuant to an agreement between the licensing or permitting agency and the Administrator that the Regional Administrator will transmit a copy of the application to the appropriate certifying agency. Upon subsequent receipt from an applicant of a certification, the licensing or permitting agency shall forward a copy of such certification to the Regional Administrator, unless such certification shall have been made by the Regional Administrator pursuant to § 121.24.

(b) Upon receipt from an applicant of an application for a license or permit with an accompanying certification, the licensing or permitting agency shall forward two copies of the application and certification to the Regional Administrator.

(c) Only those portions of the application which relate to water quality considerations shall be forwarded to the Regional Administrator.

### § 121.12  Supplemental information.

If the documents forwarded to the Regional Administrator by the licensing or permitting agency pursuant to § 121.11 do not contain sufficient information for the Regional Administrator to make the determination provided for in § 121.13, the Regional Administrator may request, and the licensing or permitting agency shall obtain from the applicant and forward to the Regional Administrator, any supplemental information as may be required to make such determination.

### § 121.13  Review by Regional Administrator and notification.

The Regional Administrator shall review the application, certification, and any supplemental information provided in accordance with §§ 121.11 and 121.12 and if the Regional Administrator determines there is reason to believe that a discharge may affect the quality of the waters of any State or States other than the State in which the discharge originates, the Regional Administrator shall, no later than 30 days of the date of receipt of the application and certification from the licensing or permitting agency as provided in § 121.11, so notify each affected State, the licensing or permitting agency, and the applicant.

### § 121.14  Forwarding to affected State.

The Regional Administrator shall forward to each affected State a copy of the material provided in accordance with § 121.11.

### § 121.15  Hearings on objection of affected State.

When a licensing or permitting agency holds a public hearing on the objection of an affected State, notice of such objection, including the grounds for such objection, shall be forwarded to the Regional Administrator by the licensing or permitting agency no later than 30 days prior to such hearing. The Regional Administrator shall at such hearing submit his evaluation with respect to such objection and his recommendations as to whether and under what conditions the license or permit should be issued.

163

A-39

## § 121.16  Waiver.

The certification requirement with respect to an application for a license or permit shall be waived upon:

(a) Written notification from the State or interstate agency concerned that it expressly waives its authority to act on a request for certification; or

(b) Written notification from the licensing or permitting agency to the Regional Administrator of the failure of the State or interstate agency concerned to act on such request for certification within a reasonable period of time after receipt of such request, as determined by the licensing or permitting agency (which period shall generally be considered to be 6 months, but in any event shall not exceed 1 year).

In the event of a waiver hereunder, the Regional Administrator shall consider such waiver as a substitute for a certification, and as appropriate, shall conduct the review, provide the notices, and perform the other functions identified in §§ 121.13, 121.14, and 121.15. The notices required by § 121.13 shall be provided not later than 30 days after the date of receipt by the Regional Administrator of either notification referred to herein.

## Subpart C—Certification by the Administrator

## § 121.21  When Administrator certifies.

Certification by the Administrator that the discharge resulting from an activity requiring a license or permit will not violate applicable water quality standards will be required where:

(a) Standards have been promulgated, in whole or in part, by the Administrator pursuant to section 10(c)(2) of the Act: *Provided, however,* That the Administrator will certify compliance only with respect to those water quality standards promulgated by him; or

(b) Water quality standards have been established, but no State or interstate agency has authority to give such a certification.

## § 121.22  Applications.

An applicant for certification from the Administrator shall submit to the Regional Administrator a complete description of the discharge involved in the activity for which certification is sought, with a request for certification signed by the applicant. Such description shall include the following:

(a) The name and address of the applicant;

(b) A description of the facility or activity, and of any discharge into navigable waters which may result from the conduct of any activity including, but not limited to, the construction or operation of the facility, including the biological, chemical, thermal, and other characteristics of the discharge, and the location or locations at which such discharge may enter navigable waters;

(c) A description of the function and operation of equipment or facilities to treat wastes or other effluents which may be discharged, including specification of the degree of treatment expected to be attained;

(d) The date or dates on which the activity will begin and end, if known, and the date or dates on which the discharge will take place;

(e) A description of the methods and means being used or proposed to monitor the quality and characteristics of the discharge and the operation of equipment or facilities employed in the treatment or control of wastes or other effluents.

## § 121.23  Notice and hearing.

The Regional Administrator will provide public notice of each request for certification by mailing to State, County, and municipal authorities, heads of State agencies responsible for water quality improvement, and other parties known to be interested in the matter, including adjacent property owners and conservation organizations, or may provide such notice in a newspaper of general circulation in the area in which the activity is proposed to be conducted if the Regional Administrator deems mailed notice to be impracticable. Interested parties shall be provided an opportunity to comment on such request in such manner as the

164

Regional Administrator deems appropriate. All interested and affected parties will be given reasonable opportunity to present evidence and testimony at a public hearing on the question whether to grant or deny certification if the Regional Administrator determines that such a hearing is necessary or appropriate.

### §121.24 Certification.

If, after considering the complete description, the record of a hearing, if any, held pursuant to §121.23, and such other information and data as the Regional Administrator deems relevant, the Regional Administrator determines that there is reasonable assurance that the proposed activity will not result in a violation of applicable water quality standards, he shall so certify. If the Regional Administrator determines that no water quality standards are applicable to the waters which might be affected by the proposed activity, he shall so notify the applicant and the licensing or permitting agency in writing and shall provide the licensing or permitting agency with advice, suggestions, and recommendations with respect to conditions to be incorporated in any license or permit to achieve compliance with the purpose of this Act. In such case, no certification shall be required.

### §121.25 Adoption of new water quality standards.

(a) In any case where:

(1) A license or permit was issued without certification due to the absence of applicable water quality standards; and

(2) Water quality standards applicable to the waters into which the licensed or permitted activity may discharge are subsequently established; and

(3) The Administrator is the certifying agency because:

(i) No State or interstate agency has authority to certify; or

(ii) Such new standards were promulgated by the Administrator pursuant to section 10(c)(2) of the Act; and

(4) The Regional Administrator determines that such uncertified activity is violating water quality standards;

Then the Regional Administrator shall notify the licensee or permittee of such violation, including his recommendations as to actions necessary for compliance. If the licensee or permittee fails within 6 months of the date of such notice to take action which in the opinion of the Regional Administrator will result in compliance with applicable water quality standards, the Regional Administrator shall notify the licensing or permitting agency that the licensee or permittee has failed, after reasonable notice, to comply with such standards and that suspension of the applicable license or permit is required by section 21(b)(9)(B) of the Act.

(b) Where a license or permit is suspended pursuant to paragraph (a) of this section, and where the licensee or permittee subsequently takes action which in the Regional Administrator's opinion will result in compliance with applicable water quality standards, the Regional Administrator shall then notify the licensing or permitting agency that there is reasonable assurance that the licensed or permitted activity will comply with applicable water quality standards.

### §121.26 Inspection of facility or activity before operation.

Where any facility or activity has received certification pursuant to §121.24 in connection with the issuance of a license or permit for construction, and where such facility or activity is not required to obtain an operating license or permit, the Regional Administrator or his representative, prior to the initial operation of such facility or activity, shall be afforded the opportunity to inspect such facility or activity for the purpose of determining if the manner in which such facility or activity will be operated or conducted will violate applicable water quality standards.

### §121.27 Notification to licensing or permitting agency.

If the Regional Administrator, after an inspection pursuant to §121.26, determines that operation of the proposed facility or activity will violate applicable water quality standards, he

165

A-41

§ 121.28                                                        40 CFR Ch. I (7–1–19 Edition)

shall so notify the applicant and the li-
censing or permitting agency, includ-
ing his recommendations as to reme-
dial measures necessary to bring the
operation of the proposed facility into
compliance with such standards.

§ 121.28   Termination of suspension.

  Where a licensing or permitting
agency, following a public hearing, sus-
pends a license or permit after receiv-
ing the Regional Administrator's no-
tice and recommendation pursuant to
§ 121.27, the applicant may submit evi-
dence to the Regional Administrator
that the facility or activity or the op-
eration or conduct thereof has been
modified so as not to violate water
quality standards. If the Regional Ad-
ministrator determines that water
quality standards will not be violated,
he shall so notify the licensing or per-
mitting agency.

## Subpart D—Consultations

§ 121.30   Review and advice.

  The Regional Administrator may,
and upon request shall, provide licens-
ing and permitting agencies with deter-
minations, definitions and interpreta-
tions with respect to the meaning and
content of water quality standards
where they have been federally ap-
proved under section 10 of the Act, and
findings with respect to the application
of all applicable water quality stand-
ards in particular cases and in specific
circumstances relative to an activity
for which a license or permit is sought.
The Regional Administrator may, and
upon request shall, also advise licens-
ing and permitting agencies as to the
status of compliance by dischargers
with the conditions and requirements
of applicable water quality standards.
In cases where an activity for which a
license or permit is sought will affect
water quality, but for which there are
no applicable water quality standards,
the Regional Administrator may advise
licensing or permitting agencies with
respect to conditions of such license or
permit to achieve compliance with the
purpose of the Act.

## PART 122—EPA ADMINISTERED PER-
MIT PROGRAMS: THE NATIONAL
POLLUTANT DISCHARGE ELIMI-
NATION SYSTEM

### Subpart A—Definitions and General
Program Requirements

Sec.
122.1  Purpose and scope.
122.2  Definitions.
122.3  Exclusions.
122.4  Prohibitions (applicable to State
  NPDES Programs, see § 123.25).
122.5  Effect of a permit.
122.6  Continuation of expiring permits.
122.7  Confidentiality of information.

### Subpart B—Permit Application and Special
NPDES Program Requirements

122.21  Application for a permit (applicable
  to State programs, see § 123.25).
122.22  Signatories to permit applications
  and reports (applicable to State pro-
  grams, see § 123.25).
122.23  Concentrated animal feeding oper-
  ations (applicable to State NPDES pro-
  grams, see § 123.25).
122.24  Concentrated aquatic animal produc-
  tion facilities (applicable to State
  NPDES programs, see § 123.25).
122.25  Aquaculture projects (applicable to
  State NPDES programs, see § 123.25).
122.26  Storm water discharges (applicable to
  State NPDES programs, see § 123.25).
122.27  Silvicultural activities (applicable to
  State NPDES programs, see § 123.25).
122.28  General permits (applicable to State
  NPDES programs, see § 123.25).
122.29  New sources and new dischargers.
122.30  What are the objectives of the storm
  water regulations for small MS4s?
122.31  As a Tribe, what is my role under the
  NPDES storm water program?
122.32  As an operator of a small MS4, am I
  regulated under the NPDES storm water
  program?
122.33  Requirements for obtaining permit
  coverage for regulated small MS4s.
122.34  Permit requirements for regulated
  small MS4 permits.
122.35  May the operator of a regulated small
  MS4 share the responsibility to imple-
  ment the minimum control measures
  with other entities?
122.36  As an operator of a regulated small
  MS4, what happens if I don't comply with
  the application or permit requirements
  in §§ 122.33 through 122.35?
122.37  Will the small MS4 storm water pro-
  gram regulations at §§ 122.32 through
  122.36 and § 123.35 of this chapter change
  in the future?

166

(b) If the project affects lands of the United States, the Commission will notify the appropriate Federal office of the application and the specific lands affected, pursuant to Section 24 of the Federal Power Act.

(c) For an application for a license seeking benefits under Section 210 of the Public Utility Regulatory Polices Act of 1978, as amended, for a project that would be located at a new dam or diversion, the Applicant must serve the public notice issued under paragraph (a)(1) of this Section to interested agencies at the time the applicant is notified that the application is accepted for filing.

[Order 2002, 68 FR 51121, Aug. 25, 2003; 68 FR 61743, Oct. 30, 2003]

### § 5.23 Response to notice.

(a) *Comments and reply comments.* Comments, protests, interventions, recommendations, and preliminary terms and conditions or preliminary fishway prescriptions must be filed no later than 60 days after the notice of acceptance and ready for environmental analysis. All reply comments must be filed within 105 days of that notice.

(b) *Water quality certification.* (1) With regard to certification requirements for a license applicant under Section 401(a)(1) of the Federal Water Pollution Control Act (Clean Water Act), the licensee applicant must file no later than 60 days following the date of issuance of the notice of acceptance and ready for environmental analysis provide for in §5.22:

(i) A copy of the water quality certification;

(ii) A copy of the request for certification, including proof of the date on which the certifying agency received the request; or

(iii) Evidence of waiver of water quality certification as described in paragraph (b)(5)(2) of this Section.

(2) A certifying agency is deemed to have waived the certification requirements of section 401(a)(1) of the Clean Water Act if the certifying agency has not denied or granted certification by one year after the date the certifying agency received a written request for certification. If a certifying agency denies certification, the applicant must

file a copy of the denial within 30 days after the applicant received it.

(3) Notwithstanding any other provision in 18 CFR part 4, subpart B, any application to amend an existing license, and any application to amend a pending application for a license, requires a new request for water quality certification pursuant to §4.34(b)(5) of this chapter if the amendment would have a material adverse impact on the water quality in the discharge from the project or proposed project.

### § 5.24 Applications not requiring a draft NEPA document.

(a) If the Commission determines that a license application will be processed with an environmental assessment rather than an environmental impact statement and that a draft environmental assessment will not be required, the Commission will issue the environmental assessment for comment no later than 120 days from the date responses are due to the notice of acceptance and ready for environmental analysis.

(b) Each environmental assessment issued pursuant to this paragraph must include draft license articles, a preliminary determination of consistency of each fish and wildlife agency recommendation made pursuant to Federal Power Act section 10(j) with the purposes and requirements of the Federal Power Act and other applicable law, as provided for in §5.26, and any preliminary mandatory terms and conditions and fishway prescriptions.

(c) Comments on an environmental assessment issued pursuant to paragraph (a) of this section, including comments in response to the Commission's preliminary determination with respect to fish and wildlife agency recommendations and on preliminary mandatory terms and conditions or fishway prescriptions, must be filed no later than 30 or 45 days after issuance of the environmental assessment, as specified in the notice accompanying issuance of the environmental assessment, as should any revisions to supporting documentation.

(d) Modified mandatory prescriptions or terms and conditions must be filed no later than 60 days following the date for filing of comments provided for in

(2) Identify the proposed categories of activities to be authorized by the general license or permit for which certification is requested;

(3) Include the draft or proposed general license or permit;

(4) Estimate the number of discharges expected to be authorized by the proposed general license or permit each year;

(5) Include documentation that a pre-filing meeting request was submitted to the certifying authority at least 30 days prior to submitting the certification request;

(6) Contain the following statement: '*The project proponent hereby certifies that all information contained herein is true, accurate, and complete to the best of my knowledge and belief*'; and

(7) Contain the following statement: '*The project proponent hereby requests that the certifying authority review and take action on this CWA 401 certification request within the applicable reasonable period of time.*'

### § 121.6 Establishing the reasonable period of time.

(a) The Federal agency shall establish the reasonable period of time either categorically or on a case-by-case basis. In either event, the reasonable period of time shall not exceed one year from receipt.

(b) Within 15 days of receiving notice of the certification request from the project proponent, the Federal agency shall provide, in writing, the following information to the certifying authority:

(1) The date of receipt;

(2) The applicable reasonable period of time to act on the certification request; and

(3) The date upon which waiver will occur if the certifying authority fails or refuses to act on the certification request.

(c) In establishing the reasonable period of time, the Federal agency shall consider:

(1) The complexity of the proposed project;

(2) The nature of any potential discharge; and

(3) The potential need for additional study or evaluation of water quality effects from the discharge.

(d) The Federal agency may extend the reasonable period of time at the request of a certifying authority or a project proponent, but in no case shall the reasonable period of time exceed one year from receipt.

(1) Any request by a certifying authority or project proponent to the Federal agency to extend the reasonable period of time shall be in writing.

(2) If the Federal agency agrees to extend the reasonable period of time, the Federal agency shall notify the certifying authority and project proponent in writing.

(e) The certifying authority is not authorized to request the project proponent to withdraw a certification request and is not authorized to take any action to extend the reasonable period of time other than specified in § 121.6(d).

### § 121.7 Action on a certification request.

(a) Any action by the certifying authority to grant, grant with conditions, or deny a certification request must be within the scope of certification, must be completed within the reasonable period of time, and must otherwise be in accordance with section 401 of the Clean Water Act. Alternatively, a certifying authority may expressly waive certification.

(b) If the certifying authority determines that a discharge from a proposed project will comply with water quality requirements, it may issue or waive certification. If the certifying authority cannot certify that the discharge from a proposed project will comply with water quality requirements, it may deny or waive certification.

(c) Any grant of certification shall be in writing and shall include a statement that the discharge from the proposed project will comply with water quality requirements.

(d) Any grant of certification with conditions shall be in writing and shall for each condition include, at a minimum:

(1) For certification conditions on an individual license or permit,

(i) A statement explaining why the condition is necessary to assure that the discharge from the proposed

project will comply with water quality requirements; and

(ii) A citation to federal, state, or tribal law that authorizes the condition.

(2) For certification conditions on issuance of a general license or permit,

(i) A statement explaining why the condition is necessary to assure that any discharge authorized under the general license or permit will comply with water quality requirements; and

(ii) A citation to federal, state, or tribal law that authorizes the condition.

(e) Any denial of certification shall be in writing and shall include:

(1) For denial of certification for an individual license or permit,

(i) The specific water quality requirements with which the discharge will not comply;

(ii) A statement explaining why the discharge will not comply with the identified water quality requirements; and

(iii) If the denial is due to insufficient information, the denial must describe the specific water quality data or information, if any, that would be needed to assure that the discharge from the proposed project will comply with water quality requirements.

(2) For denial of certification for issuance of a general license or permit,

(i) The specific water quality requirements with which discharges that could be authorized by the general license or permit will not comply;

(ii) A statement explaining why discharges that could be authorized by the general license or permit will not comply with the identified water quality requirements; and

(iii) If the denial is due to insufficient information, the denial must describe the types of water quality data or information, if any, that would be needed to assure that the range of discharges from potential projects will comply with water quality requirements.

(f) If the certifying authority determines that no water quality requirements are applicable to the waters receiving the discharge from the proposed project, the certifying authority shall grant certification.

**§ 121.8  Effect of denial of certification.**

(a) A certification denial shall not preclude a project proponent from submitting a new certification request, in accordance with the substantive and procedural requirements of this part.

(b) Where a Federal agency determines that a certifying authority's denial satisfies the requirements of § 121.7(e), the Federal agency must provide written notice of such determination to the certifying authority and project proponent, and the license or permit shall not be granted.

**§ 121.9  Waiver.**

(a) The certification requirement for a license or permit shall be waived upon:

(1) Written notification from the certifying authority to the project proponent and the Federal agency that the certifying authority expressly waives its authority to act on a certification request; or

(2) The certifying authority's failure or refusal to act on a certification request, including:

(i) Failure or refusal to act on a certification request within the reasonable period of time;

(ii) Failure or refusal to satisfy the requirements of § 121.7(c);

(iii) Failure or refusal to satisfy the requirements of § 121.7(e); or

(iv) Failure or refusal to comply with other procedural requirements of section 401.

(b) A condition for a license or permit shall be waived upon the certifying authority's failure or refusal to satisfy the requirements of § 121.7(d).

(c) If the certifying authority fails or refuses to act, as provided in this section, the Federal agency shall provide written notice to the Administrator, certifying authority, and project proponent that waiver of the certification requirement or condition has occurred. This notice must be in writing and include the notice that the Federal agency provided to the certifying authority pursuant to § 121.6(b).

(d) A written notice of waiver from the Federal agency shall satisfy the project proponent's requirement to obtain certification.

155

A-45

(e) Upon issuance of a written notice of waiver, the Federal agency may issue the license or permit.

### § 121.10 Incorporation of certification conditions into the license or permit.

(a) All certification conditions that satisfy the requirements of § 121.7(d) shall be incorporated into the license or permit.

(b) The license or permit must clearly identify any certification conditions.

### § 121.11 Enforcement of and compliance with certification conditions.

(a) The certifying authority, prior to the initial operation of a certified project, shall be afforded the opportunity to inspect the facility or activity for the purpose of determining whether the discharge from the certified project will violate the certification.

(b) If the certifying authority, after an inspection pursuant to subsection (a), determines that the discharge from the certified project will violate the certification, the certifying authority shall notify the project proponent and the Federal agency in writing, and recommend remedial measures necessary to bring the certified project into compliance with the certification.

(c) The Federal agency shall be responsible for enforcing certification conditions that are incorporated into a federal license or permit.

## Subpart C—Other Jurisdictions

### § 121.12 Determination of effects on neighboring jurisdictions.

(a) A Federal agency shall within 5 days notify the Administrator when it receives a license or permit application and the related certification.

(b) Within 30 days after the Administrator receives notice in accordance with § 121.12(a), the Administrator at his or her discretion may determine that the discharge from the certified project may affect water quality in a neighboring jurisdiction. In making this determination and in accordance with applicable law, the Administrator may request copies of the certification and the federal license or permit application.

(c) If the Administrator determines that the discharge from the certified project may affect water quality in a neighboring jurisdiction, the Administrator, within 30 days after receiving notice in accordance with § 121.12(a), shall notify that neighboring jurisdiction, the certifying authority, the Federal agency, and the project proponent. The federal license or permit may not be issued pending the conclusion of the processes in this paragraph.

(1) Notification from the Administrator shall: Be in writing, be dated, and identify the materials provided by the Federal agency. The notification shall inform the neighboring jurisdiction that it has 60 days to notify the Administrator and the Federal agency, in writing, whether it has determined that the discharge will violate any of its water quality requirements, to object to the issuance of the federal license or permit, and to request a public hearing from the Federal agency.

(2) Notification of objection and request for a hearing from the neighboring jurisdiction shall: Be in writing; identify the receiving waters it determined will be affected by the discharge; and identify the specific water quality requirements it determines will be violated by the certified project.

(3) If the neighboring jurisdiction requests a hearing in accordance with § 121.12(c)(2), the Federal agency shall hold a public hearing on the neighboring jurisdiction's objection to the license or permit.

(i) The Federal agency shall provide the hearing notice to the Administrator at least 30 days before the hearing takes place.

(ii) At the hearing, the Administrator shall submit to the Federal agency his or her evaluation and recommendation(s) concerning the objection.

(iii) The Federal agency shall: Consider recommendations from the neighboring jurisdiction and the Administrator, and any additional evidence presented to the Federal agency at the hearing; and determine whether additional certification conditions are necessary to assure that the discharge

156

A-46

from the certified project will comply with the neighboring jurisdiction's water quality requirements.

(iv) If additional certification conditions cannot assure that the discharge from the certified project will comply with the neighboring jurisdiction's water quality requirements, the Federal agency shall not issue the license or permit.

## Subpart D—Certification by the Administrator

### § 121.13   When the Administrator certifies.

(a) Certification by the Administrator that the discharge from a proposed project will comply with water quality requirements is required where no state, tribe, or interstate agency has authority to give such a certification.

(b) In taking action pursuant to this paragraph, the Administrator shall comply with the requirements of Clean Water Act section 401 and 40 CFR part 121.

### § 121.14   Request for additional information.

(a) If necessary, the Administrator may request additional information from the project proponent, provided that the initial request is made within 30 days of receipt.

(b) The Administrator shall request only additional information that is within the scope of certification and is directly related to the discharge from the proposed project and its potential effect on receiving waters.

(c) The Administrator shall request only information that can be collected or generated within the reasonable period of time.

(d) In any request for additional information, the Administrator shall include a deadline for the project proponent to respond.

(1) The project proponent shall comply with the deadline established by the Administrator.

(2) The deadline must allow sufficient time for the Administrator to review the additional information and to act on the certification request within the reasonable period of time.

(e) Failure of a project proponent to timely provide the Administrator with additional information does not extend the reasonable period of time or prevent the Administrator from taking action on a certification request.

### § 121.15   Notice and hearing.

(a) Within 20 days of receipt, the Administrator shall provide appropriate public notice of receipt, including to parties known to be interested in the proposed project or in the receiving waters into which the discharge may occur.

(b) If the Administrator in his or her discretion determines that a public hearing is appropriate or necessary, the EPA shall: Schedule such hearing at an appropriate time and place; and, to the extent practicable, give all interested and affected parties the opportunity to present evidence or testimony in person or by other means at the hearing.

## Subpart E—Consultations

### § 121.16   Review and advice.

The Administrator may, and upon request shall, provide Federal agencies, certifying authorities, and project proponents with relevant information and assistance regarding the meaning of, content of, application of, and methods to comply with water quality requirements.

## PART 122—EPA ADMINISTERED PERMIT PROGRAMS: THE NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

### Subpart A—Definitions and General Program Requirements

Sec.
122.1   Purpose and scope.
122.2   Definitions.
122.3   Exclusions.
122.4   Prohibitions (applicable to State NPDES Programs, see §123.25).
122.5   Effect of a permit.
122.6   Continuation of expiring permits.
122.7   Confidentiality of information.

157

**42210** **Federal Register** / Vol. 85, No. 134 / Monday, July 13, 2020 / Rules and Regulations

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 121

**[EPA–HQ–OW–2019–0405; FRL–10009–80–OW]**

**RIN 2040–AF86**

### Clean Water Act Section 401 Certification Rule

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is publishing this final rule to update and clarify the substantive and procedural requirements for water quality certification under Clean Water Act (CWA or the Act) section 401. CWA section 401 is a direct grant of authority to States (and Tribes that have been approved for ''treatment as a State'' status) to review for compliance with appropriate federal, State, and Tribal water quality requirements any discharge into a water of the United States that may result from a proposed activity that requires a federal license or permit. This final rule is intended to increase the predictability and timeliness of CWA section 401 certification actions by clarifying timeframes for certification, the scope of certification review and conditions, and related certification requirements and procedures.

**DATES:** This rule is effective on September 11, 2020.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OW–2019–0405, at *https://www.regulations.gov.* All documents in the docket are listed and available at *https://www.regulations.gov.* Although listed in the index, some information is not publicly available, *e.g.* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other materials, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Lauren Kasparek, Oceans, Wetlands, and Communities Division, Office of Water (4504–T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: (202) 564–5700; email address: *cwa401@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. General Information
  A. How can I get copies of this document and related information?
  B. What action is the Agency taking?
  C. Under what legal authority is this final rule issued?
II. Background
  A. Executive Summary
  B. Executive Order 13868: Promoting Energy Infrastructure and Economic Growth
  C. Summary of Stakeholder Engagement
  D. Guidance Document
  E. Effect on Existing Federal, State, and Tribal Laws
  F. Legal Background
    1. The Clean Water Act
    2. The EPA's Role in Implementing Section 401
    3. The EPA's 1971 Certification Regulations
    4. Judicial Interpretations of Section 401
    5. Administrative Law Principles
    6. Response to Comments on the Legal Background
  G. Legal Construct for the Final Rule
    1. Scope of Certification
    2. Timeline for Section 401 Certification Analysis
III. Final Rule
  A. When Section 401 Certification is Required
  B. Pre-filing Meeting Request
  C. Certification Request/Receipt
  D. Certification Actions
  E. Appropriate Scope for Section 401 Certification Review
  F. Timeframe for Certification Analysis and Decision
  G. Contents and Effects of Certification
  H. Certification by the Administrator
  I. Determination of Effect on Neighboring Jurisdictions
  J. The EPA's Role in Review and Advice
  K. Enforcement
  L. Modifications
  M. General Licenses and Permits
IV. Economic Analysis
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review; Executive Order 13563: Improving Regulation and Regulatory Review
  B. Executive Order 13771: Reducing Regulation and Controlling Regulatory Costs
  C. Paperwork Reduction Act
  D. Regulatory Flexibility Act
  E. Unfunded Mandates Reform Act
  F. Executive Order 13132: Federalism
  G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  J. National Technology Transfer and Advancement Act
  K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  L. Congressional Review Act

## I. General Information

*A. How can I get copies of this document and related information?*

1. *Docket.* An official public docket for this action has been established under Docket ID No. EPA–HQ–OW–2019–0405. The official public docket consists of the documents specifically referenced in this action, and other information related to this action. The official public docket is the collection of materials that is available for public viewing at the OW Docket, EPA West, Room 3334, 1301 Constitution Ave. NW, Washington, DC 20004. This Docket Facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The OW Docket telephone number is 202–566–2426. A reasonable fee will be charged for copies.

2. *Electronic Access.* You may access this **Federal Register** document electronically under the ''**Federal Register**'' listings at *https://www.regulations.gov.* An electronic version of the public docket is available through the EPA's electronic public docket and comment system, the EPA Dockets. You may access the EPA Dockets at *https://www.regulations.gov* to view submitted public comments, access the index listing of the contents of the official public docket, and access those documents in the public docket that are available electronically. For additional information about the EPA's public docket, visit the EPA Docket Center homepage at *http://www.epa.gov/epahome/dockets.htm.* Although not all docket materials may be available electronically, you may still access any of the publicly available docket materials through the Docket Facility.

*B. What action is the Agency taking?*

In this notice, the Agency is publishing a final rule updating the water quality certification regulations in 40 CFR 121.

*C. Under what legal authority is this final rule issued?*

The authority for this action is the Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.,* including sections 304(h), 401, and 501(a).

## II. Background

*A. Executive Summary*

Congress enacted section 401 of the CWA to provide States and authorized Tribes with an important tool to help

protect the water quality of federally regulated waters within their borders in collaboration with federal agencies. Under section 401, a federal agency may not issue a license or permit to conduct any activity that may result in any discharge into waters of the United States,[1] unless the State or authorized Tribe where the discharge would originate either issues a section 401 water quality certification finding compliance with applicable water quality requirements or certification is waived. As described in greater detail below, section 401 envisions a robust State and Tribal role in the federal licensing or permitting proceedings, including those in which local authority may otherwise be preempted by federal law. Section 401 also places important limitations on how that role may be implemented to maintain an efficient process, consistent with the overall cooperative federalism construct established by the CWA, as explained below in section II.F.1 of this notice.

Section 401 provides that a State or authorized Tribe must act on a section 401 certification request "within a reasonable period of time (which shall not exceed one year)".[2] Section 401 does not guarantee a State or Tribe a full year to act on a certification request, as the statute only grants as much time as is reasonable. 33 U.S.C. 1341(a)(1). The CWA provides that the timeline for action on a section 401 certification begins "after receipt" of a certification request. *Id.* If a State or Tribe does not grant, grant with conditions, deny, or expressly waive the section 401 certification within a reasonable time period, section 401 states that the "the certification requirements of this subsection shall be waived with respect to such Federal application." *Id.* If the certification requirement has been waived and the federal license or permit is issued, any subsequent action by a State or Tribe to grant, grant with

conditions, or deny section 401 certification has no legal force or effect.

Section 401 authorizes States and Tribes to certify that a discharge into waters of the United States that may result from a proposed activity will comply with certain enumerated sections of the CWA, including the effluent limitations and standards of performance for new and existing discharge sources (sections 301, 302, and 306 of the CWA), water quality standards and implementation plans (section 303), and toxic pretreatment effluent standards (section 307). When granting a section 401 certification, States and Tribes are directed by CWA section 401(d) to include conditions, including "effluent limitations and other limitations, and monitoring requirements" that are necessary to assure that the applicant for a federal license or permit will comply with applicable provisions of CWA sections 301, 302, 306, and 307, and with "any other appropriate requirement of State law."

As the Agency charged with administering the CWA,[3] as well as a certifying authority in certain instances, the EPA is responsible for developing a common regulatory framework for certifying authorities to follow when completing section 401 certifications. *See* 33 U.S.C. 1251(d), 1361(a). In 1971, the EPA promulgated regulations for implementing the certification provisions pursuant to section 21(b) of the Federal Water Pollution Control Act of 1948 (FWPCA), but the EPA has never updated those regulations to reflect the 1972 amendments to the FWPCA (commonly known as the Clean Water Act or CWA), which created section 401, despite the fact that there were changes to the relevant statutory text. Since the 1972 CWA amendments, the EPA issued two guidance documents and participated as amicus curiae in court cases concerning CWA section 401, but the Agency has not updated its regulations to comport with the 1972 amendments and has not, to date, established robust internal procedures for implementing its roles under section 401. Over the last several years, litigation over the section 401 certifications for several high-profile infrastructure projects have highlighted the need for the EPA to update its regulations to provide a common framework for consistency with CWA section 401 and to give project proponents, certifying authorities, and federal licensing and permitting

agencies additional clarity and regulatory certainty.

On April 10, 2019, the President issued Executive Order 13868, entitled *Promoting Energy Infrastructure and Economic Growth* (the Executive Order or Order), which directed the EPA to engage with States, Tribes, and federal agencies and update the Agency's outdated guidance and regulations, including the 1971 certification framework. Pursuant to the Executive Order, on August 8, 2019, the EPA signed the proposed rule "Updating Regulations on Water Quality Certifications," and the proposal was published on August 22, 2019. 84 FR 44080. The 60-day public comment period for the proposal closed on October 21, 2019. Consistent with Executive Order 13868 and the 1972 CWA amendments, this final rule provides an updated common framework that is consistent with the Act and which seeks to increase predictability and timeliness.

The following sections provide an overview of section 401, relevant court cases, outreach, and other actions that inform today's rule, as well as provides responses to salient comments received on these topics.

*B. Executive Order 13868: Promoting Energy Infrastructure and Economic Growth*

The policy objective of the Executive Order is to encourage greater investment in energy infrastructure in the United States by promoting efficient federal licensing and permitting processes and reducing regulatory uncertainty. The Executive Order identified the EPA's outdated section 401 federal guidance and regulations as one source of confusion and uncertainty hindering the development of energy infrastructure.

Several commenters on the proposed rule argued that the EPA failed to demonstrate that the rule would meet the objectives of the Executive Order and the CWA, and they maintained that Presidential policy objectives cannot override the CWA's plain language and Supreme Court jurisprudence. One commenter stated that the EPA's actions under this Executive Order were driven by political considerations and the desire to undertake the rulemaking process as expeditiously as possible to meet the President's purportedly unlawful directions as stated in the Executive Order.

Other commenters asserted that the proposed rule is consistent with the Executive Order. These commenters appreciated the administration's recognition of the importance of energy infrastructure projects; the

---

[1] The CWA, including section 401, uses "navigable waters," defined as "waters of the United States, including territorial seas." 33 U.S.C. 1362(7). This final rule uses "waters of the United States" throughout. In January 2020, the EPA revised the definition of waters of the United States and expects the final definition of the term to control in all CWA contexts. *See* 85 FR 22250 (April 21, 2020).

[2] In some circumstances, the EPA can act as the certifying authority. See section III.H of this notice for further discussion. "If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application." 33 U.S.C. 1341(a)(1); *see also Hoopa Valley Tribe* v. *FERC,* 913 F.3d 1099 (D.C. Cir. 2019).

[3] The EPA co-administers section 404 with the Army Corps of Engineers (the Corps).

the EPA has long recommended that a project proponent requiring a federal license or permit subject to section 401 certification hold early discussions with both the certifying authority and the federal agency, to better understand the certification process and potential data or information needs.

The CWA does not contain provisions for tolling the timeline for any reason, including to request or receive additional information from the project proponent. If the certifying authority has not acted on a request for certification within the reasonable time period, the certification requirement will be waived and the federal agency may proceed to issue the license or permit.

The final rule provides for specific timeframes for certain procedural requirements (*e.g.*, pre-meeting filing requests, discussed in final rule preamble section III.B; and public notice when EPA acts as the certifying authority, discussed in final rule preamble section III.H). Throughout this final rule, EPA intends that the term "days" refers to calendar days as opposed to business days. For further discussion on the Agency's interpretation of the timeline for section 401 certification analysis and related comments, see section III.F of this notice. This final rule is intended to provide greater clarity and certainty and to address some of the delays and confusion associated with the timing elements of the section 401 certification process.

## III. Final Rule

This final rule is intended to make the Agency's regulations consistent with the current text of CWA section 401, increase efficiencies, and clarify aspects of CWA section 401 that have been unclear or subject to differing legal interpretations in the past. The Agency is replacing the entirety of the 1971 certification regulations at 40 CFR part 121 with this final rule. The following sections further explain the Agency's rationale for the final rule, provide a detailed explanation and analysis for the substantive changes that the Agency is finalizing, and respond to significant public comments received on the proposed rule.

The EPA's 1971 certification regulations were issued when the Agency was but a few months old and the CWA had not yet been amended to include the material revisions to section 401.[39] In modernizing 40 CFR part 121,

this final rule recognizes and responds to significant changes to the CWA that occurred after the 1971 regulations were finalized, especially the 1972 and 1977 amendments to the CWA.

Updating the 1971 certification regulations to clarify expectations, timelines, and deliverables also increases efficiencies. Some aspects of the 1971 certification regulations have been implemented differently by different authorities, likely because the scope and timing of review were not clearly addressed in EPA's regulations. While the EPA recognizes that States and Tribes have broad authority to implement State and Tribal law to protect their water quality, *see* 33 U.S.C. 1251(b), section 401 is a federal regulatory program that contains limitations on when and how States and Tribes may exercise this particular authority. This final rule modernizes and clarifies the EPA's regulations and will help States, Tribes, federal agencies, and project proponents know what is required and what to expect during a section 401 certification process, thereby reducing regulatory uncertainty. For further discussion on ways the final rule will reduce regulatory uncertainty, see the Economic Analysis available in the docket for this final rule.

The EPA's 1971 certification regulations did not fully address the public notice requirements called for under CWA section 401(a)(1). The EPA is finalizing public notice requirements applicable to the EPA as the certifying authority but is not extending these requirements to other certifying authorities. The EPA encourages certifying authorities to consider how their public notice requirements can be developed or modified to ensure timely decision-making and to work with federal licensing and permitting agencies to minimize conflicts between State program administration and the federally established reasonable period of time.

Because the EPA has frequently received requests for information regarding certifying authority requirements, the Agency solicited comment on whether it would be appropriate or necessary to require certifying authorities to submit their section 401 procedures and regulations to the EPA for informational purposes. One commenter stated that it would be useful for the EPA to compile procedures of certifying authorities and make these publicly available in one location, while another commenter

stated that it was unnecessary and inappropriate for the EPA to compile procedures of certifying authorities. Some commenters stated that it is not necessary for certifying authorities to submit their section 401 certification procedures and regulations to the EPA. One commenter noted that their procedures are public information available on the state website. Another commenter stated that a regulation that requires submittal of section 401 procedures is unnecessary and duplicative because the State already works with the EPA on section 401 procedures.

The EPA has considered these comments, and the final rule does not include a requirement for certifying authorities to submit their procedures to the EPA. However, to promote transparency and regulatory certainty, the EPA strongly encourages certifying authorities to make their certification regulations and any "water quality requirements" that may be considered during a certification process available online. In the interest of transparency, clarity, and public accessibility, the EPA may consider compiling certifying authorities' procedures and water quality requirements on its website in the future.

In addition to the substantive changes in the final rule described below, the Agency made a number of revisions to streamline and clarify the regulatory text, and to more closely align that text to the language in section 401. These changes include revising the definitions of "Administrator" and "discharge"; replacing the language "proposed discharge location" in section 121.11(a) with "facility or activity" for consistency with section 401; revising certain text in sections 121.7(f), 121.12, and 121.16 for consistency with section 401; and removing redundant language throughout the final rule.

### A. When Section 401 Certification Is Required

#### 1. What is the Agency finalizing?

Under this final rule, the requirement for a section 401 certification is triggered based on the potential for any federally licensed or permitted activity to result in a discharge from a point source into waters of the United States. Consistent with section 401(a)(1), section 121.2 of the final rule provides that:

Certification is required for any license or permit that authorizes an activity that may result in a discharge.

This provision is modified from the proposal to provide greater clarity regarding when a certification is

---

[39] *See* 36 FR 22487, Nov. 25, 1971, redesignated at 37 FR 21441, Oct. 11, 1972, further redesignated at 44 FR 32899, June 7, 1979; Reorganization Plan

No. 3 of 1970 (creating the EPA), 84 Stat. 2086, effective Dec. 2, 1970.

section 121.10 of the final rule for clarity and to reaffirm that if a condition meets the procedural requirements of section 401 and includes the elements listed in 121.7(d) of the final rule, the condition must be incorporated into the federal license or permit in its entirety, as drafted by the certifying authority. Consistent with the proposal, under the final rule, deficient certification conditions do not invalidate the entire certification, nor do they invalidate the remaining conditions in the certification. As discussed below, the Agency has clarified in the final rule that conditions that do not meet these requirements will be deemed waived.

c. Deny

A certifying authority may choose to deny certification if it is unable to certify that the discharge from a proposed project would be consistent with applicable water quality requirements. If a certification is denied, the federal agency may not issue a license or permit for the proposed project. *Id.* at 1341(a). Consistent with the proposal, the final rule requires certification denials to be made in writing and to include three elements to support certification denials. The Agency has made minor editorial changes to these provisions in the final rule to increase clarity, but the final rule provisions retain the same meaning as the proposed rule provisions.

Some commenters agreed with the proposal to require certain information in a certification denial. One commenter asserted that when preparing denials, it would be helpful for certifying authorities to specify water quality requirements with which the proposed project will not comply, as this would assist federal agencies with their duty to determine whether a section 401 certification facially satisfies the requirements of section 401. Another commenter recommended that the final rule also require a statement that there is no certification condition which would prevent noncompliance with water quality requirements.

Other commenters opposed the proposed requirement that certification denials include "the specific water quality data or information, if any, that would be needed to assure that the discharge from the proposed project complies with water quality requirements." These commenters asserted that this requirement was vague, unnecessary, and burdensome and further asserted that it would improperly place a new burden on certifying authorities that should be borne by project proponents to show why their project complies with water

quality requirements. A few of these commenters recommended that insufficient information should be a basis for denial.

As a general matter, the EPA disagrees with the suggestion that including this information in a denial would be overly burdensome for certifying authorities. Indeed, a number of States asserted in public comments that the primary reason why certifications cannot be issued within the reasonable period of time is that project proponents have not provided sufficient information or a "complete" certification request. If this is the case, certifying authorities should be able to identify what information is lacking that precludes a determination that the project will comply with water quality requirements, as the term is defined in the final rule. Clearly establishing a record to support the basis for a denial should already be done as a matter of course to establish a complete defensible administrative record for the certifying authority's action. Further, any denial should be informed by the record before the certifying authority and should be issued with information sufficient to allow the project proponent to understand the basis for denial and have an opportunity to modify the project or to provide new or additional information in a new certification request.

The EPA is finalizing the requirement that a certification denial be in writing and include three elements to support the denial. The required elements will lead to more transparent decision-making and a more complete record of the administrative action. The final rule's requirements may also facilitate discussions between certifying authorities and project proponents about what may be necessary to obtain a certification should the project proponent submit a new certification request in the future. A certifying authority's explanation of why a discharge from a proposed project will not comply with relevant water quality requirements will also assist reviewing courts in understanding whether the denial is appropriately based on the scope of certification discussed in section III.E of this notice.

Some commenters asserted that the proposed rule would prohibit certifying authorities from denying certification based on a lack of information sufficient to grant certification. The EPA disagrees with these commenters. Indeed, by requiring that "if the denial is due to insufficient information, the denial must describe the specific water quality data or information, if any, that would be needed to assure that the discharge

from the proposed project will comply with water quality requirements," the final rule reaffirms and clarifies that insufficient information about the proposed project can be a basis for a certification denial. If the certifying authority determines that there is no specific data or information that would allow the certifying authority to determine that the discharge will comply with water quality requirements, it should indicate as such and provide the basis for the determination in its written decision to deny certification.

As noted in the preamble to the proposed rule, the EPA is aware that some certifying authorities have requested "additional information" in the form of multi-year environmental investigations and studies, including completion of a NEPA review, before the certifying authority would act on a certification request. As discussed in section III.H of this notice, the final rule explicitly prohibits the EPA from requesting additional information that cannot be generated within the reasonable period of time. The rationale for this prohibition applies to all certifying authorities; the Agency believes that such requests for additional information, regardless of which certifying authority generates such requests, would be contrary to the plain language of the statute, which requires certifying authorities to act on a request within a reasonable period of time that does not exceed one year. While additional information requests may be a necessary part of the certification process, such requests may not result in extending the period of time beyond which the CWA requires certifying authorities to act.

d. Waiver

When a certifying authority waives the requirement for a certification, under this final rule the federal agency may proceed to issue the license or permit in accordance with its implementing regulations. A certifying authority may waive expressly by issuing a written statement that it is waiving certification, or implicitly waive by failing or refusing to act. Waiver may occur due to a failure or refusal to act in accordance with the procedural requirements of section 401 or within the reasonable period of time (*see* section III.F of this notice), or by failing or refusing to provide information required to support certifications (section 121.7(c) of the final rule) or denials (section 121.7(e) of the final rule). A condition may also be waived by failing or refusing to provide information required to support

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 121, 122 and 124**

**[EPA–HQ–OW–2022–0128; FRL–6976.1–01–OW]**

**RIN 2040–AG12**

### Clean Water Act Section 401 Water Quality Certification Improvement Rule

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** Following a careful reconsideration of the water quality certification rule promulgated in 2020, the Environmental Protection Agency (EPA or the Agency) is publishing for public comment a proposed rule revising and replacing the Agency's 2020 regulatory requirements for water quality certification under Clean Water Act (CWA) section 401. This proposed rule would update the existing regulations to be more consistent with the statutory text of the 1972 CWA; to clarify, reinforce, and provide a measure of consistency with respect to elements of section 401 certification practice that have evolved over the 50 years since the 1971 Rule was promulgated; and to support an efficient and predictable certification process that is consistent with the water quality protection and cooperative federalism principles central to CWA section 401. This proposal is consistent with the Executive order signed on January 20, 2021, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," which directed the Agency to review the water quality certification rule EPA promulgated in 2020. The Agency is also proposing conforming amendments to the water quality certification regulations for EPA-issued National Pollutant Discharge Elimination System permits.

**DATES:** Comments must be received on or before August 8, 2022. Please refer to the **SUPPLEMENTARY INFORMATION** section for additional information on the public hearing.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OW–2022–0128, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

• *Email: OW-Docket@epa.gov.* Include Docket ID No. EPA–HQ–OW–2022–0128 in the subject line of the message.

• *Hand Delivery/Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. EPA–HQ–OW–2022–0128 for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** Lauren Kasparek, Oceans, Wetlands, and Communities Division, Office of Water (4504–T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: 202–564–3351; email address: *cwa401@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
II. Public Participation
  A. Written Comments
  B. Virtual Public Hearing
III. General Information
  A. What action is the Agency taking?
  B. What is the Agency's authority for taking this action?
  C. What are the incremental costs and benefits of this action?
IV. Background
  A. Development of Section 401
  B. Overview of CWA Section 401 Requirements
  C. Prior Rulemaking Efforts Addressing Section 401
  D. Summary of Stakeholder Outreach
V. Proposed Rule
  A. When Section 401 Certification Is Required
  B. Pre-Filing Meeting Request
  C. Request for Certification
  D. Reasonable Period of Time
  E. Scope of Certification
  F. Certification Decisions
  G. Federal Agency Review
  H. EPA's Roles Under Section 401
  I. Modifications
  J. Enforcement and Inspections
  K. Neighboring Jurisdictions
  L. Treatment in a Similar Manner as a State Under Section 401
  M. Implementation Considerations
VI. Economic Analysis
VII. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review; Executive Order 13563: Improving Regulation and Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

### I. Executive Summary

Clean Water Act (CWA) section 401 provides states [1] and authorized tribes [2] with a powerful tool to protect the quality of their waters from adverse impacts resulting from the construction and operation of federally licensed or permitted projects. Under CWA section 401, a Federal agency may not issue a license or permit to conduct any activity that may result in any discharge into a "water of the United States" [3] unless the state or authorized tribe where the discharge would originate either issues a CWA section 401 water quality certification "that any such discharge will comply with the applicable provisions of Sections 301, 302, 303, 306, and 307" of the CWA, or waives certification. 33 U.S.C. 1341(a)(1). When granting a CWA section 401 certification, states and authorized tribes are directed by CWA section 401(d) to include conditions, including "effluent limitations and other limitations, and monitoring requirements" necessary to assure that the applicant for a Federal license or

---

[1] The CWA defines "state" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands." 33 U.S.C. 1362(3).

[2] The term "authorized tribes" refers to tribes that have been approved for "treatment in a manner similar to a State" status for CWA section 401. *See* 33 U.S.C. 1377(e).

[3] The CWA, including section 401, uses the term "navigable waters," which the statute defines as "the waters of the United States, including the territorial seas." 33 U.S.C. 1362(7). This proposed rule uses the term "waters of the United States" throughout. EPA and the Corps recently published a proposed rule that would define the scope of "waters of the United States." *See* Proposed Revised Definition of "Waters of the United States." 86 FR 69372 (December 7, 2021). The agencies are currently interpreting "waters of the United States" consistent with the pre-2015 regulatory regime. The "pre-2015 regulatory regime" refers to the agencies' pre-2015 definition of "waters of the United States," implemented consistent with relevant case law and longstanding practice, as informed by applicable guidance, training, and experience.

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 121, 122, and 124**

**[EPA–HQ–OW–2022–0128; FRL–6976.1–03–OW]**

**RIN 2040–AG12**

### Clean Water Act Section 401 Water Quality Certification Improvement Rule

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Following careful reconsideration of the water quality certification rule the U.S. Environmental Protection Agency (EPA or the Agency) promulgated in 2020, the Agency is finalizing a rule revising and replacing the 2020 regulatory requirements for water quality certification under Clean Water Act (CWA) section 401. This final rule updates the existing regulations to better align with the statutory text and purpose of the CWA; to clarify, reinforce, and provide a measure of consistency with elements of section 401 certification practice that have evolved over the more than 50 years since EPA first promulgated water quality certification regulations; and to support an efficient and predictable certification process that is consistent with the water quality protection and cooperative federalism principles central to CWA section 401. An Executive order signed on January 20, 2021, entitled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," directed the Agency to review the water quality certification rule EPA promulgated in 2020, and this final rule culminates that review. The Agency is also finalizing conforming amendments to the water quality certification regulations for EPA-issued National Pollutant Discharge Elimination System (NPDES) permits.

**DATES:** This action is effective on November 27, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OW–2022–0128. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Lauren Kasparek, Oceans, Wetlands, and Communities Division, Office of Water (4504–T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: 202–564–3351; email address: *cwa401@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
II. General Information
  A. What action is the Agency taking?
  B. What is the Agency's authority for taking this action?
  C. What are the incremental costs and benefits of this action?
III. Background
  A. Development of Section 401
  B. Overview of Section 401 Requirements
  C. Prior Rulemaking Efforts Addressing Section 401
  D. Summary of Stakeholder Outreach
IV. Final Rule
  A. When Section 401 Certification Is Required
  B. Pre-Filing Meeting Request
  C. Request for Certification
  D. Reasonable Period of Time
  E. Scope of Certification
  F. Certification Decisions
  G. Federal Agency Review
  H. EPA's Roles Under Section 401
  I. Modifications
  J. Enforcement and Inspections
  K. Neighboring Jurisdictions
  L. Treatment in a Similar Manner as a State Under Section 401
  M. Implementation Considerations
  N. Severability
V. Economic Analysis
VI. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All
  K. Congressional Review Act

### I. Executive Summary

Clean Water Act (CWA) section 401 provides states[1] and authorized Tribes[2] with a powerful tool to protect the quality of their waters from adverse impacts resulting from the construction and/or operation of federally licensed or permitted projects. Under CWA section 401, a Federal agency may not issue a license or permit to conduct any activity that may result in any discharge into "waters of the United States"[3] unless the state or authorized Tribe where the discharge would originate either issues a CWA section 401 water quality certification "that any such discharge will comply with the applicable provisions of Sections 301, 302, 303, 306, and 307" of the CWA, or waives certification. 33 U.S.C. 1341(a)(1). When granting a CWA section 401 certification, CWA section 401(d) directs states and authorized Tribes to include conditions, including "effluent limitations and other limitations, and monitoring requirements," necessary to assure that the applicant for a Federal license or permit will comply with CWA sections 301, 302, 306, and 307, and with "any other appropriate requirement of State law." *Id.* at 1341(d).

Congress originally created the water quality certification requirement in section 21(b) of the Water Quality Improvement Act of 1970, which amended the Federal Water Pollution Control Act (FWPCA).[4] Congress granted states this certification authority in response to Federal agencies' failure to achieve Congress's previously stated goal of assuring that federally licensed or permitted activities comply with water quality standards.[5] Two years

---

[1] The CWA defines "state" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands." 33 U.S.C. 1362(3).

[2] The term "authorized Tribes" refers to Tribes that have been approved for "treatment in a manner similar to a State" status for CWA section 401. *See* 33 U.S.C. 1377(e).

[3] The CWA, including section 401, uses the term "navigable waters," which the statute defines as "the waters of the United States, including the territorial seas." 33 U.S.C. 1362(7). This final rule uses the term "waters of the United States" interchangeably with "navigable waters".

[4] Water Quality Improvement Act of 1970, Public Law 91–224, 84 Stat. 91 (April 3, 1970).

[5] S. Rep. 91–351, at 26 (1969) ("Existing law declares it to be the intent of Congress that all Federal departments, agencies, and instrumentalities shall comply with water quality standards. This declaration of intent has proved unsatisfactory. One basic thrust of S. 7 is to require that all activity over which the Federal Government has direct control—. . . federally licensed or permitted activity—be carried out in a manner to assure compliance with applicable water quality standards.")

later, Congress revised the Federal water quality protection framework [6] when it enacted the Federal Water Pollution Control Act Amendments of 1972 (commonly known as the Clean Water Act or CWA).[7] In those Amendments, Congress placed the water quality certification requirement in section 401, using "substantially section 21(b) of existing law," with relevant conforming amendments "to assure consistency with the [ ] changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants." S. Rep. No. 92–414 at 69 (1971); *see also* H.R. Rep. No. 92–911 at 121 (1972) ("Section 401 is substantially section 21(b) of the existing law amended to assure that it conforms and is consistent with the new requirements of the Federal Water Pollution Control Act."). Consistent with the overall cooperative federalism framework of the CWA, section 401 authorizes states and authorized Tribes to play a significant role in the Federal licensing or permitting process.

EPA promulgated implementing regulations for water quality certification in 1971 (1971 Rule) [8] prior to enactment of the 1972 amendments to the CWA. In 1979, the Agency recognized the need to update its water quality certification regulations, in part to be consistent with the 1972 amendments. *See* 44 FR 32854, 32856 (June 7, 1979) (noting the 40 CFR part 121 regulations predated the 1972 amendments). However, the Agency declined to update the regulations at the time because it had not consulted with other Federal agencies impacted by the water quality certification process, and instead developed regulations applicable to water quality certifications on EPA-issued National Pollutant Discharge Elimination System (NPDES) permits. *Id.; see, e.g.,* 40 CFR 124.53 through 124.55. As a result, for a number of years, the 1971 Rule did not fully reflect the amended statutory language. Following the promulgation of the 1971 Rule, several seminal court cases have addressed fundamental aspects of the water quality certification process, including the scope of certification review and the appropriate timeframe for certification decisions. States have also developed and implemented their own water quality certification programs and practices aimed at protecting waters within their borders. During this time, the Agency supported state and Tribal water quality certification practices and the critical role states and Tribes play in protecting their waters under section 401.[9] But the 1971 Rule did not reflect or account for water quality certification practices or judicial interpretations of section 401 that evolved over the 50 years since 1971.

EPA revised the 1971 Rule in 2020.[10] The 2020 Rule did not update the regulations applicable to water quality certifications on EPA-issued NPDES permits but noted that the Agency would "make any necessary conforming regulatory changes in a subsequent rulemaking." 85 FR 42219 (July 13, 2020). The 2020 Rule represented a substantive departure from some of the Agency's and certifying authorities' core prior interpretations and practices with respect to water quality certification. The 2020 Rule also deviated sharply from the cooperative federalism framework central to section 401 and the CWA. While the 2020 Rule reaffirmed some of the Agency's and the courts' prior interpretations, *e.g.,* the need for a potential point source discharge into waters of the United States to trigger the section 401 water quality certification requirement, it rejected nearly 50 years of Agency practice and over 25 years of Supreme Court precedent regarding the appropriate scope of certification review, *i.e.,* rejecting "activity as a whole" for the narrower "discharge-only" approach. Additionally, the 2020 Rule introduced new procedural requirements that disrupted state and Tribal certification programs that evolved over the last half century. In this final rule, the Agency is returning to those important core interpretations and practices, such as an "activity" approach to the scope of certification review and greater deference to the role of states and Tribes in the certification process, while retaining (and adding) elements that provide transparency and predictability for all stakeholders.

On January 20, 2021, President Biden signed Executive Order 13990 directing Federal agencies to review actions taken in the prior four years that are, or may be, inconsistent with the policies stated in the order (including, but not limited to, bolstering resilience to climate change impacts and prioritizing environmental justice).[11] Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Executive Order 13990, 86 FR 7037 (published January 25, 2021, signed January 20, 2021). Pursuant to this Executive order, EPA reviewed the 2020 Rule. EPA identified substantial concerns with several of its provisions that were in tension with section 401's cooperative federalism approach to ensuring that states and Tribes are empowered to protect their water quality. *See* Notice of Intention to Reconsider and Revise the Clean Water Act Section 401 Certification Rule, 86 FR 29541, 29542 (June 2, 2021) (identifying the Agency's concerns with the 2020 Rule). As a result, the Agency announced its intention to revise the 2020 Rule so that it is (1) well-informed by stakeholder input, (2) better aligned with the cooperative federalism principles that have been central to the effective implementation of the CWA, and (3) responsive to the environmental protection and other objectives outlined in Executive Order 13990. *Id.*

Five months after EPA's announcement of its intent to reconsider and revise the 2020 Rule, on October 21, 2021, in a legal challenge to the 2020 Rule, a Federal district court remanded and vacated the 2020 Rule. *In Re Clean Water Act Rulemaking,* 568 F. Supp. 3d 1013 (N.D. Cal. 2021). While EPA had not asked the court to vacate the 2020 Rule,[12] the court found that vacatur was appropriate "in light of the lack of reasoned decision-making and apparent errors in the rule's scope of certification, indications that the rule contravenes the structure and purpose of the Clean Water Act, and that EPA itself has signaled that it could not or would not adopt the same rule upon remand." *Id.* at 1026–27. The effect of the court's vacatur was to reinstate the 1971 Rule, effective October 21, 2021. Defendant-intervenors appealed the vacatur order to the U.S. Court of Appeals for the Ninth Circuit. On April 6, 2022, the U.S. Supreme Court granted the defendant-

---

[6] *City of Milwaukee* v. *Illinois,* 451 U.S. 304, 310, 317 (1981).

[7] Public Law 92–500, 86 Stat. 816, as amended, Public Law 95–217, 91 Stat. 1566, 33 U.S.C. 1251 *et seq.*

[8] 36 FR 8563 (May 8, 1971), redesignated at 36 FR 22369, 22487 (November 25, 1971), further redesignated at 37 FR 21441 (October 11, 1972), further redesignated at 44 FR 32854, 32899 (June 7, 1979).

[9] *See* Wetlands and 401 Certification: Opportunities and Guidelines for States and Eligible Indian Tribes (April 1989) (hereinafter, 1989 Guidance); Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool for States and Tribes (May 2010) (hereinafter, 2010 Handbook) (rescinded in 2019, *see infra*).

[10] Clean Water Act Section 401 Certification Rule, 85 FR 42210 (July 13, 2020) (hereinafter, 2020 Rule). For further discussion on the 2020 Rule, including legal challenges, please see section III of this preamble.

[11] EPA has defined environmental justice as the "fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation and enforcement of environmental laws, regulations and policies." *See https://www.epa.gov/environmentaljustice/learn-about-environmental-justice.*

[12] *See* EPA's Motion for Remand Without Vacatur, No. 3:20–cv–04636–WHA (N.D. Cal. July 1, 2021).

intervenors' application for a stay of the vacatur pending the Ninth Circuit appeal. *Louisiana* v. *Am. Rivers,* 142 S. Ct. 1347 (2022).[13] As a result of the Supreme Court's stay, the 2020 Rule once again applied to section 401 certifications. On February 21, 2023, the U.S. Court of Appeals for the Ninth Circuit reversed the district court's remand with vacatur order and remanded the case back to the U.S. District Court for the Northern District of California for further proceedings.[14] As a result of the Ninth Circuit's decision, the 2020 Rule applies until this final rule goes into effect.

The Agency is finalizing revisions to the 2020 Rule to better reflect the cooperative federalism framework and text of the 1972 and 1977 statutory amendments. The final rule also clarifies issues such as scope of certification and the reasonable period of time for a certifying authority to act. The final rule modifies the regulatory text implementing section 401 to support a more efficient, effective, and predictable certifying authority-driven certification process consistent with the water quality protection and other policy goals of CWA section 401 and Executive Order 13990. The Agency is also finalizing conforming amendments to the water quality certification regulations for EPA-issued NPDES permits.

## II. General Information

### A. What action is the Agency taking?

In this action, the Agency is publishing a final rule to replace its

---

[13] The Court's stay order does not alter EPA's legal conclusions discussed in this final rule. The request for a stay concerned only the appropriateness of the district court's vacatur of a rule before a decision on the merits. The stay request did not raise any issues related to the substance of CWA section 401 certification or the merits of the 2020 Rule. *See* Application for Stay Pending Appeal in *Louisiana* v. *Am. Rivers,* No. 21A539, pp. 1, 4, 16 (March 21, 2022) (identifying "the core issue in this case" to be the appropriateness of the district court's vacatur order) (identifying the Administrative Procedure Act (APA)—not the CWA or section 401—as the statutory provision involved in the application for stay) (starting the application for stay with the question: "Can a single district court vacate a rule that an agency adopted through notice-and-comment rulemaking without first finding that the rule is unlawful?"). Neither the Court's majority—which did not issue an opinion explaining its stay order—nor the dissent discussed any aspect of section 401 certification or the 2020 Rule.

[14] The court found that "the district court lacked the authority to vacate the 2020 Rule without first holding it unlawful." *In Re Clean Water Act Rulemaking,* 60 F.4th 583, 596 (9th Cir. 2023). The court did not address the merits of the 2020 Rule, noting that it could not "engage in the factfinding that might be needed to identify any harms that keeping the 2020 Rule in place during a remand might cause. . . ." *Id.*

currently effective water quality certification regulations at 40 CFR part 121 and to make conforming edits in 40 CFR parts 122 and 124.

### B. What is the Agency's authority for taking this action?

The authority for this action is the Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.,* including but not limited to sections 101(d), 304(h), 401, 402, and 501(a).

### C. What are the incremental costs and benefits of this action?

The Agency prepared the Economic Analysis for the Final "Clean Water Act Section 401 Water Quality Certification Improvement Rule" ("Economic Analysis for the Final Rule"), which evaluates the potential costs and benefits and is available in the rulemaking docket. The analysis is summarized in section V in this preamble. The Economic Analysis for the Final Rule is qualitative due to significant limitations and uncertainties associated with estimating the incremental costs and benefits of the final rule. *See* section V of this preamble for further discussion.

## III. Background

### A. Development of Section 401

In 1965, Congress amended the Federal Water Pollution Control Act (FWPCA) to require states, or, where a state failed to act, the newly created Federal Water Pollution Control Administration, to promulgate water quality standards for interstate waters within each state. Water Quality Act of 1965, Public Law 89–234, 79 Stat. 903 (October 2, 1965). These standards were meant "to protect the public health or welfare, enhance the quality of water and serve the purposes of [the] Act," which included "enhanc[ing] the quality and value of our water resources and [] establish[ing] a national policy for the prevention, control, and abatement of water pollution." *Id.* Yet, only a few years later, while debating potential amendments to the FWPCA, Congress observed that, despite that laudable national policy, states faced obstacles to achieving these newly developed water quality standards because of an unexpected source: Federal agencies. Instead of helping states cooperatively achieve these Federal policy objectives, Federal agencies were "sometimes . . . a culprit with considerable responsibility for the pollution problem which is present." 115 Cong. Rec. 9011, 9030 (April 15, 1969). Federal agencies were issuing licenses and permits "without any assurance that [water

quality] standards [would] be met or even considered." S. Rep. No. 91–351, at 3 (August 7, 1969). As a result, states, industry groups, conservation groups, and the public alike "questioned the justification for requiring compliance with water quality standards" if Federal agencies themselves would not comply with those standards. *Id.* at 7.

In response to such concerns, Congress introduced language that would bolster state authority to protect their waters and ensure federally licensed or permitted projects would not "in fact become a source of pollution" either through "inadequate planning or otherwise." 115 Cong. Rec. 9011, 9030 (April 15, 1969). Under this new provision, instead of relying on the Federal Government to ensure compliance with water quality standards, states would be granted the power to certify that there was reasonable assurance that federally licensed or permitted activities would meet water quality standards before such a Federal license or permit could be issued. Ultimately, Congress added this new provision as section 21(b) of the Water Quality Improvement Act of 1970, Public Law 91–224, 84 Stat. 91 (April 3, 1970).

Under section 21(b)(1), applicants for Federal licenses or permits were required to obtain state certification that there was reasonable assurance that any federally licensed or permitted activity that may result in any discharge into navigable waters would not violate applicable water quality standards. *Id.* Additionally, section 21(b) also provided a role for other potentially affected states, discussed scenarios under which state certification for both Federal construction and operation licenses or permits may be necessary, and provided an opportunity for a Federal license or permit to be suspended for violating applicable water quality standards. Section 21(b) embodied the cooperative federalism principles from the 1965 amendments by providing states with the opportunity to influence, yet not "frustrate," the Federal licensing or permitting process. *See* 115 Cong. Rec. 28875, 28971 (October 7, 1969) (noting the idea of state certification "[arose] out of policy of the 1965 Act that the primary responsibility for controlling water pollution rests with the States"); *see also* H.R. Rep. No. 91–940, at 54–55 (March 24, 1970) (Conf. Rep) (adding a timeline for state certification "[i]n order to insure that sheer inactivity by the State . . . will not frustrate the Federal application").

In 1972, with the enactment of the Clean Water Act, Congress significantly

revised the statutory water quality protection framework.[15] Clean Water Act, Public Law 92–500, 86 Stat. 816, as amended, Public Law 95–217, 91 Stat. 1566, 33 U.S.C. 1251 *et seq.* While doing so, Congress reaffirmed "the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution."[16] To this end, the 1972 amendments included section 401, which Congress considered to be "substantially section 21(b) of the existing law amended to assure that it conforms and is consistent with the new requirements of the Federal Water Pollution Control Act." H.R. Rep. No. 92–911, at 121 (1972). These "new requirements" of the 1972 Act reflected a "changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants." S. Rep. No. 92–414, at 69 (1971). As a result, unlike section 21(b), which focused only on compliance with water quality standards, section 401 required applicants for Federal licenses and permits to obtain state certification of compliance with the newly enacted provisions focused on achieving effluent limitations. 33 U.S.C. 1341(a)(1). A few years later, Congress amended section 401 to correct an omission from the 1972 statute and clarify that it still intended for states to also certify compliance with water quality standards. *See* H.R. Rep. No. 95–830, at 96 (1977) (inserting section 303 in the list of applicable provisions throughout section 401).[17]

Section 401 of the 1972 Act also introduced a new subsection, subsection (d), that explicitly provided states with the ability to include "effluent limitations and other limitations, and monitoring requirements" in their certification to assure that the applicant will comply not only with sections 301, 302, 306, and 307, but also with "any other appropriate requirement of State

law." *Id.* at 1341(d). In subsection (d), Congress also provided that any certification "shall become a condition on any Federal license or permit." *Id.; see also* S. Rep. No. 92–414, at 69 (1971) ("The certification provided by a State in connection with any Federal license or permit must set forth effluent limitations and monitoring requirements necessary to comply with the provisions of this Act or under State law and such a certification becomes an enforceable condition on the Federal license or permit."). Consistent with Congress's intent to empower states to protect their waters from the effects of federally licensed or permitted projects, this provision "assure[d] that Federal licensing or permitting agencies cannot override State water quality requirements." S. Rep. No. 92–414, at 69 (1971).

### B. Overview of Section 401 Requirements

Under CWA section 401, a Federal agency may not issue a license or permit to conduct any activity that may result in any discharge into waters of the United States, unless the certifying authority where the discharge would originate either issues a CWA section 401 water quality certification or waives certification. 33 U.S.C. 1341(a)(1). The applicant for the Federal license or permit that requires section 401 certification is responsible for obtaining certification or a waiver from the certifying authority, which could be a state, territory, authorized Tribe, or EPA, depending on where the discharge originates. To initiate the certification process, Federal license or permit applicants must submit a "request for certification" to the appropriate certifying authority. The certifying authority must act upon the request within a "reasonable period of time (which shall not exceed one year)." *Id.* Additionally, during the reasonable period of time, certifying authorities must comply with public notice procedures established for certification requests, and where appropriate, procedures for public hearings. *Id.*

If a certifying authority determines that the activity will comply with the listed provisions in section 401(a)(1), it may grant or waive certification. *See* section IV.E in this preamble for further discussion on the scope of certification. When granting a CWA section 401 certification, certifying authorities must include conditions (*e.g.,* "effluent limitations and other limitations, and monitoring requirements") pursuant to CWA section 401(d) necessary to assure that the applicant for a Federal license or permit will comply with applicable

provisions of CWA sections 301, 302, 306, and 307, and with "any other appropriate requirement of State law." 33 U.S.C. 1341(d). If a certifying authority grants certification with conditions, those conditions are incorporated into the Federal license or permit. *Id.* Once an applicant provides a Federal agency with a certification, the Federal agency may issue the license or permit. *Id.* at 1341(a)(1).

If a certifying authority is unable to provide such certification, the certifying authority may deny or waive certification. If certification is denied, the Federal agency cannot issue the Federal license or permit. If certification is waived, the Federal agency may issue the Federal license or permit. Certifying authorities may waive certification expressly, or they may waive certification by "fail[ing] or refus[ing] to act on a request for certification within a reasonable period of time." *Id.* Either way, the Federal licensing or permitting agency may issue the Federal license or permit.

Although Congress provided section 401 certification authority to the jurisdiction in which the discharge originates, Congress also recognized that another state or authorized Tribe's water quality may be affected by the discharge, and it created an opportunity for such a state or authorized Tribe to raise objections to, and request a hearing on, the Federal license or permit. *See id.* at 1341(a)(2). Section 401(a)(2) requires the Federal agency to "immediately notify" EPA "upon receipt" of a "[license or permit] application and certification." *Id.* EPA in turn has 30 days from that notification to determine whether the discharge "may affect" the water quality of any other state or authorized Tribe. *Id.* If the Agency makes a "may affect" determination, it must notify the other state or authorized Tribe, the Federal agency, and the applicant. The other state or authorized Tribe then has 60 days to determine whether the discharge will violate its water quality requirements. If the other state or authorized Tribe makes such a determination within those 60 days, it must notify EPA and the Federal agency, in writing, of its objection(s) to the issuance of the Federal license or permit and request a public hearing. *Id.* The Federal licensing or permitting agency is responsible for holding the public hearing. At the hearing, EPA is required to submit its evaluation and recommendations regarding the objection. Based on the recommendations from the objecting state or authorized Tribe and EPA's own evaluation and recommendation, as well as any evidence presented at the

---

[15] *City of Milwaukee* v. *Illinois,* 451 U.S. 304, 310, 317 (1981).

[16] 33 U.S.C. 1251(b).

[17] The conference report noted that "[t]he inserting of section 303 into the series of sections listed in section 401 is intended to mean that a federally licensed or permitted activity, including discharge permits under section 402, must be certified to comply with State water quality standards adopted under section 303. The inclusion of section 303 is intended to clarify the requirements of section 401. It is understood that section 303 is required by the provisions of section 301. Thus, the inclusion of section 303 in section 401 while at the same time not including section 303 in the other sections of the Act where sections 301, 302, 306, and 307 are listed is in no way intended to imply that 303 is not included by reference to 301 in those other places in the Act, such as sections 301, 309, 402, and 509 and any other point where they are listed. Section 303 is always included by reference where section 301 is listed." *Id.*

hearing, the Federal agency is required to condition the license or permit "in such manner as may be necessary to ensure compliance with applicable water quality requirements." *Id.* The Federal license or permit may not be issued "if the imposition of conditions cannot ensure such compliance." *Id.*

Section 401 also addresses when an applicant must provide separate certifications for a facility's Federal construction license or permit and any necessary Federal operating license or permit. Under section 401(a)(3), an applicant may rely on the same certification obtained for the construction of a facility for any Federal operating license or permit for the facility if (1) the Federal agency issuing the operating license or permit notifies the certifying authority, and (2) the certifying authority does not within 60 days thereafter notify the Federal agency that "there is no longer reasonable assurance that there will be compliance with applicable provisions of sections [301, 302, 303, 306, and 307 of the CWA]." *Id.*[18]

Sections 401(a)(4) and (a)(5) describe circumstances where the certified Federal license or permit may be suspended by the Federal agency. First, a Federal agency may suspend a license or permit where a certifying authority determines during a pre-operation inspection of the facility or activity that it will violate applicable water quality requirements. *Id.* at 1341(a)(4). This pre-operation inspection and possible suspension apply only where a facility or activity does not require a separate operating Federal license or permit. Under section 401, the Federal agency may not suspend the license or permit unless it holds a public hearing.[19] *Id.* Once a Federal license or permit is suspended, it must remain suspended until the certifying authority notifies the Federal agency that there is reasonable assurance that the facility or activity will not violate applicable water quality requirements. *Id.* Second, a Federal agency may suspend or revoke a certified license or permit upon the entering of a judgment under the CWA that the facility or activity violated applicable provisions of section 301,

302, 303, 306, or 307 of the CWA. *Id.* at 1341(a)(5).

Section 401 not only identifies the roles and obligations of Federal license or permit applicants, certifying authorities, and Federal agencies, it also provides specific roles for EPA. First, EPA may act as a certifying authority where a state or authorized Tribe "has no authority to give such certification." *Id.* at 1341(a)(1). Second, as discussed above, EPA is responsible for notifying other states or authorized Tribes that may be affected by a discharge from a federally licensed or permitted activity, and where required, for providing an evaluation and recommendations on such other state or authorized Tribe's objections. *Id.* at 1341(a)(2). Lastly, EPA is responsible for providing technical assistance upon request from Federal agencies, certifying authorities, or Federal license or permit applicants. *Id.* at 1341(b).

### C. Prior Rulemaking Efforts Addressing Section 401

In the last 50 plus years, EPA has undertaken two rulemaking efforts focused solely on addressing water quality certification, one of which preceded the 1972 amendments to the CWA. The Agency has also developed several guidance documents on the section 401 process. This section of the preamble discusses EPA's major rulemaking and guidance efforts over the last 50 plus years, including most recently the 2020 Rule and EPA's review of it pursuant to Executive Order 13990.

#### 1. 1971 Rule

In February 1971, EPA proposed regulations implementing section 401's predecessor provision, section 21(b) of the FWPCA. 36 FR 2516 (February 5, 1971). Those proposed regulations were divided into four subparts, one of which provided "definitions of general applicability for the regulations and . . . provide[d] for the uniform content and form of certification." *Id.* The other three subparts focused on EPA's roles. *Id.* In May 1971, after receiving public comments, EPA finalized the water quality certification regulations with the proposed four-part structure at 18 CFR part 615. 36 FR 8563 (May 8, 1971) ("1971 Rule").

The first subpart of the 1971 Rule (subpart A) established requirements that applied generally to all stakeholders in the certification process, including an identification of information that all certifying authorities must include in a certification. According to the 1971 Rule, a certifying authority was required

to include several components in a certification, including the name and address of the project applicant; a statement that the certifying authority either examined the Federal license or permit application or examined other information from the project applicant and, based upon that evaluation, concluded that "there is reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards;" any conditions that the certifying authority deemed "necessary or desirable for the discharge of the activity;" and any other information the certifying authority deemed appropriate. 40 CFR 121.2(a) (2019). Additionally, the 1971 Rule allowed for modifications to certifications upon agreement by the certifying authority, the Federal licensing or permitting agency, and EPA. *Id.* at § 121.2(b) (2019).

The second subpart of the 1971 Rule (subpart B) established a process for EPA to provide notification of potential water quality effects to other potentially affected jurisdictions. Under the 1971 Rule, the Regional Administrator was required to review the Federal license or permit application, the certification or waiver, and, where requested by EPA, any supplemental information provided by the Federal licensing or permitting agency.[20] If the Regional Administrator determined that there was "reason to believe that a discharge may affect the quality of the waters of any State or States other than the State in which the discharge originates," the Regional Administrator would notify each affected state within 30 days of receipt of the application materials and certification. *Id.* at §§ 121.13, 121.16 (2019). In cases where the Federal licensing or permitting agency held a public hearing on the objection raised by an affected jurisdiction, the Federal agency was required to forward notice of such objection to the Regional Administrator no later than 30 days prior to the hearing. *Id.* at § 121.15 (2019). At the hearing, the Regional Administrator was required to submit an evaluation and "recommendations as to whether and under what conditions the license or permit should be issued." *Id.*

Subpart B also provided that certifying authorities may waive the certification requirement under two circumstances: first, when the certifying authority sends written notification expressly waiving its authority to act on

---

[18] Section 401(a)(3) identifies the bases a certifying authority may rely upon for finding that there is no longer reasonable assurance. These are changes after certification was granted in: construction or operation of the facility, characteristics of the water where the discharge occurs, or the applicable water quality criteria or effluent limits or other requirements. *Id.* at 1341(a)(3).

[19] Each Federal licensing or permitting agency may have its own regulations regarding additional processes for suspending a license or permit.

[20] If the documents provided are insufficient to make the determination, the Regional Administrator can request any supplemental information "as may be required to make the determination." 40 CFR 121.12 (2019).

a request for certification; and second, when the Federal licensing or permitting agency sends written notification to the EPA Regional Administrator that the certifying authority failed to act on a certification request within a reasonable period of time after receipt of such a request. *Id.* at § 121.16 (2019). The 1971 Rule provided that the Federal licensing or permitting agency determined what constitutes a ''reasonable period of time,'' and that the period shall generally be six months, but in any event no more than one year. *Id.* at § 121.16(b) (2019).

The third subpart of the 1971 Rule (subpart C) established requirements that only applied when EPA acted as the certifying authority, including identifying specific information that must be included in a certification request. The project applicant was required to submit to the EPA Regional Administrator a signed request for certification that included a ''complete description of the discharge involved in the activity for which certification is sought,'' which included five items: the name and address of the project applicant, a description of the facility or activity and of any related discharge into waters of the United States, a description of the function and operation of wastewater treatment equipment, dates on which the activity and associated discharge would begin and end, and a description of the methods to be used to monitor the quality and characteristics of the discharge. *Id.* at § 121.22 (2019). Once the request was submitted to EPA, the Regional Administrator was required to provide public notice of the request and an opportunity to comment. The 1971 Rule specifically stated that ''[a]ll interested and affected parties will be given reasonable opportunity to present evidence and testimony at a public hearing on the question whether to grant or deny certification if the Regional Administrator determined that such a hearing is necessary or appropriate.'' *Id.* at § 121.23 (2019). If, after consideration of relevant information, the Regional Administrator determined that there was ''reasonable assurance that the proposed activity will not result in a violation of applicable water quality standards,'' the Regional Administrator would issue the certification. *Id.* at § 121.24 (2019).

The fourth and final subpart of the 1971 Rule (subpart D) provided that the Regional Administrator ''may, and upon request shall'' provide Federal licensing and permitting agencies with information regarding water quality standards and advise them as to the status of compliance by dischargers with the conditions and requirements of applicable water quality standards. *Id.* at § 121.30 (2019).

In November 1971, EPA reorganized and transferred several regulations, including the water quality certification regulations, into title 40 of the Code of Federal Regulations. EPA subsequently redesignated the water quality certification regulations twice in the 1970s. *See* 36 FR 22369, 22487 (November 25, 1971), redesignated at 37 FR 21441 (October 11, 1972), further redesignated at 44 FR 32854, 32899 (June 7, 1979). The last redesignation effort was part of a rulemaking that extensively revised the Agency's NPDES regulations. In the revised NPDES regulations, EPA addressed water quality certifications on EPA-issued NPDES permits separately from the 1971 Rule. EPA acknowledged that the 1971 Rule was ''in need of revision'' because the ''substance of these regulations predates the 1972 amendments to the Clean Water Act.'' 44 FR 32880 (June 7, 1979). However, EPA declined to revise the 1971 Rule because it had not consulted the other Federal agencies impacted by the water quality certification process. *Id.* at 32856. Instead, the Agency finalized regulations applicable only to certification on EPA-issued NPDES permits. *Id.* at 32880. EPA developed these regulations, which included a default reasonable period of time of 60 days, limitations on certification modifications, and requirements for certification conditions, in response to practical challenges and issues arising from certification on EPA-issued permits. *Id.* Ultimately, despite the changes Congress made to the statutory text in 1972 and opportunities the Agency had to revisit the regulatory text during redesignation efforts in the 1970s, EPA did not substantively change the 1971 Rule until 2020.

2. EPA Guidance on 1971 Rule

Although EPA did not pursue any additional rulemaking efforts until 2019, the Agency issued three national guidance documents on the water quality certification process set forth in the 1971 Rule. The first and second guidance documents recognized the vital role section 401 certification can play in protecting state and Tribal water quality, sought to inform states and Tribes how to use the certification program to protect their waters, and explained how to leverage available resources to operate or expand their certification programs. These documents provided states and Tribes with background on the certification process, discussed the relevant case law, and identified data sources that could inform the certification review process. Additionally, both documents provided tangible examples of state and Tribal experiences with section 401 that could inform other states and Tribes interested in developing their certification programs.

The first guidance document, issued in 1989, focused on how states and Tribes could use water quality certifications to protect wetlands. Wetlands and 401 Certification: Opportunities and Guidelines for States and Eligible Indian Tribes (April 1989) (''1989 Guidance''). While the 1989 Guidance focused on the use of water quality certifications in lieu of, or in addition to, state or Tribal wetlands regulatory programs, it provided helpful background information on the certification process in general. It also highlighted various state programs and water quality certification practices to demonstrate how other certifying authorities could approach the certification process. For example, the 1989 Guidance highlighted a certification denial issued by the then-Pennsylvania Department of Environmental Resources to illustrate that ''all of the potential effects of a proposed activity on water quality—direct and indirect, short and long term, upstream and downstream, construction and operation—should be part of a State's certification review.'' *Id.* at 22–23. Additionally, the 1989 Guidance discussed considerations states and Tribes could examine when developing their own section 401 implementing regulations, as well as programs and resources states and Tribes could look to for technical support when making certification decisions. *Id.* at 30–37.

The second guidance document, issued in 2010, reflected the development of case law and state and Tribal program experiences over the two decades following the 1989 Guidance. Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool for States and Tribes (May 2010) (''2010 Handbook'') (rescinded in 2019). Instead of focusing on certifications in the context of wetland protection, the 2010 Handbook described more broadly how the certification process could help states and Tribes achieve their water quality goals. Like the 1989 Guidance, the 2010 Handbook discussed the certification process, using state and Tribal programs as examples, and explored methods and means for states and Tribes to leverage available funding, staffing, and data sources to fully implement a water quality certification program. EPA

rescinded the 2010 Handbook on June 7, 2019, concurrent with the publication of the third guidance document.

EPA issued the third guidance document in 2019 pursuant to Executive Order 13868. Clean Water Act Section 401 Guidance for Federal Agencies, States and Authorized Tribes (June 2019) ("2019 Guidance") (rescinded). The 2019 Guidance was meant to "facilitate consistent implementation of section 401 and 1971 certification regulations" based on the view that the 2010 Handbook did not "reflect current case law interpreting CWA section 401." 85 FR 42213. The 2019 Guidance focused on three topics: (1) timeline for certification review and action, (2) the scope of section 401, and (3) the information within the scope of a certifying authority's review. 2019 Guidance at 1. EPA rescinded the 2019 Guidance on July 13, 2020, concurrent with the publication of the final 2020 Rule.

3. Development of the 2020 Rule

In addition to directing EPA to review its 2010 Handbook and issue new section 401 guidance, Executive Order 13868, entitled Promoting Energy Infrastructure and Economic Growth, also directed EPA to propose new regulations governing section 401 consistent with the policy set forth in the order to "promote private investment in the Nation's energy infrastructure." 84 FR 13495, 13496 (April 15, 2019). It is noteworthy that, even in the context of directing EPA to initiate changes to a water quality protection rule, the executive order did not direct the Agency to consider the water quality consequences of any such changes. EPA issued the proposed rule on August 22, 2019.[21] EPA promulgated a final rule on July 13, 2020. Clean Water Act Section 401 Certification Rule, 85 FR 42210 (July 13, 2020) ("2020 Rule").

The 2020 Rule reaffirmed that Federal agencies unilaterally set the reasonable period of time, clarified that the certification requirement was triggered by a point source discharge from a federally licensed or permitted activity into "waters of the United States," and reaffirmed that certifying authorities may explicitly waive certification. The 2020 Rule also introduced several new features, including one that allowed Federal agencies to review certification decisions for compliance with the 2020 Rule's requirements and, if the certification decision did not comply with these requirements, allowed

Federal agencies to deem such non-compliant certifications as waived. The 2020 Rule also prohibited a certifying authority from requesting a project applicant to withdraw and resubmit a certification request and rejected the scope of certification review ("activity as a whole") affirmed by the Supreme Court in *PUD No. 1 of Jefferson County* v. *Washington Department of Ecology,* 511 U.S. 700 (1994), in favor of a more limiting interpretation ("discharge-only" approach) favored by two dissenting Justices in that case.

Following publication, the 2020 Rule was challenged in three Federal district courts by states, Tribes, and non-governmental organizations.[22] Industry stakeholders and eight states intervened on behalf of EPA to defend the 2020 Rule. On October 21, 2021, following briefing and a hearing on EPA's motion for remand without vacatur, the U.S. District Court for the Northern District of California both remanded and vacated the 2020 Rule. *In re Clean Water Act Rulemaking,* 568 F. Supp. 3d 1013 (N.D. Cal. 2021) (*reversed and remanded by* 60 F.4th 583 (9th Cir. 2023)). The court found that vacatur was appropriate "in light of the lack of reasoned decision-making and apparent errors in the rule's scope of certification, indications that the rule contravenes the structure and purpose of the Clean Water Act, and that EPA itself has signaled that it could not or would not adopt the same rule upon remand." *Id.* at 1026–27. The court order required a temporary return to EPA's 1971 Rule until EPA finalized a new rule.[23] After the Ninth Circuit denied intervenors' motion for stay pending appeal on February 24, 2022, intervenors filed an application for a stay of the vacatur pending appeal in the Supreme Court on March 21, 2022. On April 6, 2022, the U.S. Supreme Court granted the application for a stay of the vacatur pending resolution of the appeal of the vacatur in the Ninth Circuit. *Louisiana* v. *Am. Rivers,* No. 21A539 (S. Ct. April 6, 2022). On February 21, 2023, the Ninth Circuit reversed the remand with vacatur and remanded the case back to

the U.S. District Court for the Northern District of California for further proceedings. *In Re Clean Water Act Rulemaking,* No. 21–16958 (9th Cir. February 21, 2023).

4. Executive Order 13990 and Review of the 2020 Rule

On January 20, 2021, President Biden signed Executive Order 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis (Order). 86 FR 7037 (published January 25, 2021, signed January 20, 2021). The Order provides that "[i]t is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals." *Id.* at 7037, Section 1. The Order "directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis." *Id.* "For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions." *Id.,* section 2(a). The Order also revoked Executive Order 13868 of April 10, 2019 (Promoting Energy Infrastructure and Economic Growth), which initiated development of the 2020 Rule, and specifically identified the 2020 Rule for review. *See* Fact Sheet: List of Agency Actions for Review, available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/* (last visited on January 27, 2022).

EPA reviewed the 2020 Rule in accordance with Executive Order 13990 and, in the spring of 2021, determined that it would propose revisions to the 2020 Rule through a new rulemaking effort. *See* Notice of Intention to Reconsider and Revise the Clean Water Act Section 401 Certification Rule, 86

---

[21] Updating Regulations on Water Quality Certifications, 84 FR 44080 (August 22, 2019).

[22] *In re Clean Water Act Rulemaking,* No. 3:20–cv–04636–WHA (N.D. Cal.); *Delaware Riverkeeper et al.* v. *EPA,* No. 2:20–cv–03412 (E.D. Pa.); *S.C. Coastal Conservation League* v. *EPA,* No. 2:20–cv–03062 (D.S.C.).

[23] The two other courts also remanded the 2020 Rule to EPA, but without vacatur. Order, *Delaware Riverkeeper* v. *EPA,* No. 2:20–cv–03412 (E.D. Pa. August 6, 2021) (determining that vacatur was not appropriate because the court "has not yet, and will not, make a finding on the substantive validity of the Certification Rule"); Order, *S.C. Coastal Conservation League* v. *EPA,* No. 2:20–cv–03062 (D.S.C. August 2, 2021) (remanding without vacating).

FR 29541 (June 2, 2021). EPA considered several factors in making this determination, including but not limited to the text of CWA section 401; congressional intent and the cooperative federalism framework of CWA section 401; concerns raised by stakeholders about the 2020 Rule, including implementation-related feedback; the principles outlined in the Executive Order; and issues raised in litigation challenging the 2020 Rule. *Id.* In particular, the Agency identified substantial concerns about whether portions of the 2020 Rule impinged on the cooperative federalism principles central to CWA section 401. The Agency identified this and other concerns as they related to different provisions of the 2020 Rule, including certification requests, the reasonable period of time, scope of certification, certification actions and Federal agency review, enforcement, and modifications. *See id.* at 29543–44.

Agencies have inherent authority to reconsider past decisions and to revise, replace, or repeal a decision to the extent permitted by law and supported by a reasoned explanation. *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (''*Fox*''); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42 (1983); *see also Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.''). Such a decision need not be based upon a change of facts or circumstances. A revised rulemaking based ''on a reevaluation of which policy would be better in light of the facts'' is ''well within an agency's discretion.'' *Nat'l Ass'n of Home Builders* v. *EPA,* 682 F.3d 1032, 1038 & 1043 (D.C. Cir. 2012) (*citing Fox,* 556 U.S. at 514–15). The Agency reviewed the 2020 Rule, determined that the rule should be replaced, and proposed a replacement rule. Some commenters on the proposed rule opposed reconsideration of the 2020 Rule and asserted that EPA did not provide a basis for reconsideration of the 2020 Rule. EPA disagrees. EPA proposed the replacement rule only after reviewing the statutory text, legislative history, case law, and public comments. EPA found, and continues to find, it appropriate to revise the 2020 Rule for several reasons. First, the 2020 Rule does not represent the best statutory interpretation of fundamental concepts, such as the scope of certification. *See* section IV.E in this preamble for further discussion on why the 2020 Rule's

interpretation of the scope of certification is inconsistent with the statutory text of section 401 and authoritative Supreme Court precedent interpreting that text. Further, the 2020 Rule did not align with the broader water quality protection goals of the Act or congressional intent behind development and passage of section 401. The 2020 Rule also failed to appropriately address adverse impacts to state and Tribal water quality, as evidenced in public comment.[24] *See e.g.,* section IV.F of this preamble for further discussion on the potential adverse water quality-related impacts of the 2020 Rule's interpretation of the scope of certification.

Accordingly, EPA is now finalizing revisions to the 2020 Rule to be fully consistent with the 1972 and 1977 CWA amendments, the Agency's legal authority, and the principles outlined in Executive Order 13990. This final rule revises the 2020 Rule to better reflect the CWA's statutory text, the legislative history regarding section 401, and the broad water quality protection goals of the Act. In addition, the final rule clarifies certain aspects of section 401 implementation that have evolved in response to over 50 years of judicial interpretation and certifying authority practice, and it supports an efficient and predictable water quality certification process that is consistent with the cooperative federalism principles central to the CWA and section 401.

### D. Summary of Stakeholder Outreach

Following the publication of EPA's notice of intent to revise the 2020 Rule, the Agency opened a public docket to receive written pre-proposal recommendations for a 60-day period beginning on June 2, 2021 and concluding on August 2, 2021. The Agency received nearly 3,000 recommendations from members of the public, which can be found in the pre-proposal docket. *See* Docket ID No. EPA–HQ–OW–2021–0302. The **Federal Register** publication requested feedback related to key issues identified during implementation of the 2020 Rule, including but not limited to issues regarding pre-filing meeting requests,

certification requests, reasonable period of time, scope of certification, certification actions and Federal agency review, enforcement, modifications, neighboring jurisdictions, data and other information, and implementation coordination. *See* 86 FR 29543–44 (June 2, 2021).

EPA also held a series of virtual listening sessions for certifying authorities (June 14, June 23, and June 24, 2021), project applicants (June 15, 2021), and the public (June 15, June 23, 2021) to gain further pre-proposal input. *See id.* at 29544 (announcing EPA's intention to hold multiple webinar-based listening sessions). EPA also met with stakeholders upon request during development of the proposed rule. More information about the outreach and engagement conducted by EPA during the pre-proposal input period can be found in Docket ID No. EPA–HQ–OW–2022–0128. Additionally, EPA also met with other Federal licensing and permitting agencies to solicit feedback on the **Federal Register** publication. At the virtual listening sessions, the Agency gave a presentation that provided background on section 401 and prior Agency actions and sought input on the Agency's intent to revise the 2020 Rule and the specific issues included in the **Federal Register** publication described above.

The Agency heard from stakeholders representing a diverse range of interests and positions and received a wide variety of recommendations during this pre-proposal outreach process. Some certifying authorities expressed concern about the limited role of states and Tribes under the 2020 Rule, and they called for increased flexibility in implementing section 401 to fully protect their water resources. During the project proponent listening session, project proponents shared feedback about the need to streamline the certification process and recommended that the new rule prevent delays in determining certification decisions. In the public listening sessions, speakers from non-governmental environmental and water conservation organizations reinforced the idea that states and Tribes should be accorded greater deference in the certification process. An overarching theme articulated by many speakers from various stakeholder groups was the need for EPA's new rule to provide increased guidance and clarity.

The Agency also initiated a Tribal consultation and coordination process on June 7, 2021. The Agency engaged with Tribes over a 90-day consultation period during development of the

---

[24] For example, commenters noted that use of the 2020 Rule's procedural requirements on certifications for the Army Corps of Engineers' (Corps) Nationwide General Permits resulted in certifications with conditions or denials being treated as constructive waivers. As discussed in section IV.F in this preamble, the Agency recognizes that a constructive waiver is a severe consequence; a waiver means that a Federal license or permit that could adversely impact the certifying authority's water quality (*i.e.,* cause noncompliance with water quality requirements) may proceed *without* any input from the certifying authority.

The Agency finds that defining "to act on a request for certification" as making one of the four above-described certification decisions is reasonable, consistent with congressional intent, is consistent with longstanding Agency position and case law, and allows for greater certainty and transparency in the certification process. First, while Congress did not use the words "grant or deny" or "decide" in place of "act on a request for certification," in context it seems evident that these are the actions Congress had in mind. After all, section 401(a)(1) is about the effects of granting or denying certification. Moreover, while Congress did not use the words "grant or deny," it likewise did not use a term that clearly indicated that Congress had in mind something short of a final "action" on a request for certification. Congress clearly intended to balance state water quality concerns with the need to guard against unreasonable delays in the Federal licensing or permitting process. *See, e.g.,* 115 Cong. Rec. 9257, 9264 (April 16, 1969) ("The failure by the State to act in one way or the other within the prescribed time would constitute a waiver of the certification required as to that State."); H.R. Rep. No. 91–940, at 54–55 (March 24, 1970) (Conf. Rep.) ("In order to insure that sheer inactivity by the State . . . will not frustrate the Federal application, a requirement, similar to that contained in the House bill is contained in the conference substitute that if within a reasonable period, which cannot exceed one year, after it has received a request to certify, the State . . . fails or refuses to act on the request for certification, then the certification requirement is waived."). If a certifying authority could merely act in a "significant and meaningful" way to avoid waiver at the expiration of the reasonable period of time, it could delay the Federal licensing or permitting process well beyond the statutory one-year timeframe and have the same practical effect as denying certification without going on the record to do so. While Congress provided states and Tribes with a powerful tool to prevent federally licensed or permitted activities that will not comply with water quality requirements, Congress clearly intended states and Tribes to take an affirmative action to prevent such activities. 33 U.S.C. 1341(a)(1) ("No license or permit shall be granted if certification *has been denied* . . .") (emphasis added). The Agency finds that defining "to act" as taking one of the four decisions contemplated in section 401 best effectuates congressional intent and respects the cooperative federalism balance central to section 401.

Further, although the Agency has never explicitly defined "to act on a request for certification," the interpretation taken in this final rule is consistent with prior Agency guidance and the 2020 Rule preamble. In the 2020 Rule, the Agency noted that "[i]f a certifying authority fails or refuses to [grant certification, grant certification with conditions, deny certification, or expressly waive certification] within the reasonable period of time, the CWA provides that the certifying authority will be deemed to have waived the certification requirement." 85 FR 42262 (July 13, 2020). One implication of this language is that the Agency thought that "to act on a request for certification" means to make a final decision on the request (*i.e.,* grant, grant with conditions, deny, or expressly waive certification). Courts appear to agree. *See, e.g., Alcoa Power Generating, Inc.* v. *FERC,* 643 F.3d 963, 972 (D.C. Cir. 2011) (noting that "[i]n imposing a one-year time limit on States to 'act,' Congress plainly intended to limit the amount of time that a State could delay a federal licensing proceeding without making a decision on the certification request"); *NYSDEC,* 884 F.3d at 455–56 (noting that a state must act after receiving a certification request and that denial "would constitute 'acting' on the request under the language of Section 401"); *New York State Dep't of Environmental Cons.* v. *FERC,* 991 F.3d 439, 443, 450 (2d Cir. 2021) (State agency could not "extend[ ] the deadline . . . to issue or deny water quality certification" beyond "one year of the actual receipt of the application" for certification); *Millennium Pipeline Co.* v. *Seggos,* 860 F.3d 696, (D.C. Cir. 2017) ("To prevent state agencies from indefinitely delaying issuance of a federal permit, . . . . a State [must] grant or deny the certificate" within one year from the receipt of a request for certification).

Lastly, the Agency finds that the final rule's approach best supports a clear, consistent, and transparent certification process. As noted at proposal, EPA shared similar concerns as stakeholders with the *NCDEQ* approach, noting that it may make the section 401 certification process less predictable and transparent. 87 FR 35350 (June 9, 2022). The Agency remains concerned that interpreting "to act on a request for certification" as any "significant and meaningful action" might inject significant uncertainty and subjectivity into the certification process (*e.g.,* what is a "significant and meaningful action?") causing significant confusion for stakeholders. *Id.* EPA

finds that the final rule approach will provide stakeholders with a clear and predictable endpoint for knowing when the certifying authority has failed or refused to act, resulting in a waiver. *See* 33 U.S.C. 1341(a)(1).

### c. Failing or Refusing To Act on a Request for Certification

Similar to the proposed rule, the Agency is finalizing at § 121.9(a) that "the certification requirement shall be waived only if a certifying authority fails or refuses to act on a request for certification within the reasonable period of time." 40 CFR 121.9(a). EPA proposed at § 121.8 that "the certification requirement shall be waived if a certifying authority fails or refuses to act on a request for certification in accordance with § 121.7(a) within the reasonable period of time, as defined at § 121.6." EPA has reorganized the regulatory text by moving the text proposed at § 121.8 ("Failure or refusal to act") to § 121.9 and made several revisions. First, EPA made minor non-substantive revisions at § 121.9(a) to remove unnecessary and redundant internal references to §§ 121.6 (reasonable period of time) and 121.7(a) (possible actions on a request for certification). Second, the Agency has moved proposed § 121.9(c), which described the process that occurred once a certifying authority failed or refused to act, to § 121.9(b) to pair the process that occurs once a certifying authority fails or refuses to act with the final rule's express statement on constructive waiver. The Agency intends such restructuring to clearly convey that a constructive waiver of certification may only occur where a certifying authority fails or refuses to act, as defined in this final rule, within the reasonable period of time. *See* section IV.G in this preamble for further discussion on Federal agency review for failure or refusal to act within the reasonable period of time.

The plain language of section 401(a)(1) provides that the certification requirement is waived if a certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year)." *Id.* As discussed in section IV.D of this preamble, a certifying authority and Federal agency may jointly agree to set the reasonable period of time up to one year. 40 CFR 121.6(b). However, if they are unable to reach agreement, it will default to six months. 40 CFR 121.6(c). Accordingly, if the certifying authority fails or refuses to act in the agreed-upon or default reasonable period of time, the certifying authority will constructively waive.

Section 401(a)(1) clearly indicates Congress's intent to limit constructive waivers to situations where a certifying authority did not act within the reasonable period of time. *See id.* ("No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence.").

The legislative history of this provision also suggests that constructive waivers were intended to prevent delays in the Federal licensing or permitting process due to the certifying authority's failure to grant or deny certification. *See* H. Rep. No 92–911, at 122 (1972) ("In order to insure that sheer inactivity by the State, interstate agency or Administrator as the case may be, will not frustrate the Federal application, a requirement, that if within a reasonable period, which cannot exceed 1 year, after it has received a request to certify the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on the request for certification, then the certification requirement is waived."). Similarly, the 1971 Rule and subsequent Agency guidance recognized that constructive waivers could occur due to certifying authority inaction. 40 CFR 121.16(b) (2019) (providing that constructive waiver occurred upon the "failure of the State . . . concerned to act on such a request for certification within a reasonable period of time after receipt of such request"); 2010 Handbook at 11 (rescinded in 2019, *see supra*) ("State and tribes are authorized to waive [section] 401 certification . . . by the certification agency not taking action.").

The 2020 Rule's interpretation of what it means for a certifying authority to fail or refuse to act departed from the longstanding Agency position on constructive waivers. The 2020 Rule allowed a Federal agency to determine that a certifying authority had failed or refused to act, and thereby waived certification—even when the certifying authority *did* in fact act on a request for certification within the reasonable period of time—if the Federal agency found that the action was somehow procedurally deficient (*e.g.,* did not follow the 2020 Rule's procedural requirements for a denial of certification). 40 CFR 121.9(a)(2) (2020); 85 FR 42266. Similarly, a Federal agency could determine that a certification condition was waived if the condition did not comply with procedural requirements of the 2020 Rule. *Id.* at 42250. This aspect of the 2020 Rule drew considerable pre-proposal input and public comment to the effect that this interpretation could

result in a Federal agency "veto" of a section 401 certification, and that it was contrary to the statute, the legislative history, and case law. EPA similarly expressed concern in its **Federal Register** document announcing its intent to revise the 2020 Rule, noting that "a federal agency's review may result in a state or tribe's certification or conditions being permanently waived as a result of non-substantive and easily fixed procedural concerns identified by the federal agency." 86 FR 29543 (June 2, 2021).

The 2020 Rule's interpretation of waiver of a certification decision is not consistent with the plain language of the statute and its legislative history. The mere failure of a certifying authority to include certain regulatorily defined elements in its certification decision or comply with other procedural requirements of section 401, such as following public notice procedures on a request for certification, do not qualify as the kind of "sheer inactivity" that Congress contemplated would result in a constructive waiver. This interpretation also resulted in Federal agencies rejecting certification decisions intended to prevent adverse water quality impacts because of fixable procedural concerns. For example, some commenters noted that use of the 2020 Rule's procedural requirements on certifications for the Corps' Nationwide General Permits resulted in certifications with conditions or denials being treated as constructive waivers. As discussed in section IV.G.2 of this preamble, a constructive waiver is a severe consequence because a waiver means that a Federal license or permit which could adversely impact the certifying authority's water quality (*i.e.,* cause noncompliance with water quality requirements) may proceed without any input from the certifying authority. Accordingly, consistent with the statutory language, legislative history, and prior Agency interpretation, EPA is finalizing regulatory text to clarify that constructive waivers may occur only if a certifying authority fails or refuses to take one of the four actions described in this section within the reasonable period of time.

Consistent with this approach, EPA is also finalizing targeted conforming revisions to its part 124 and part 122 regulations, where these regulations previously allowed EPA to find that a certifying authority waived its right to certify or waived a certification condition for reasons other than those specified in final rule § 121.9 (failure to act on a request for certification within the reasonable period of time). EPA is deleting the majority of the language in

40 CFR 124.53(e)(2) and (3), which allowed EPA to waive certification conditions that did not meet certain requirements.[75] *See* discussion *infra* for further discussion on the revisions to § 124.53.

EPA is also finalizing revisions to 40 CFR 124.55(c), which allowed EPA to waive certification conditions or denials that were based on state law allowing a less stringent permit condition. Specifically, EPA is deleting the second sentence of § 124.55(c), which allowed EPA to waive a certification denial or condition. The first sentence of § 124.55(c) will remain because it is not affected by this final rule. Finally, EPA is finalizing revisions to 40 CFR 122.44(d)(3), which allowed EPA to waive certifications that were stayed by a court or state board under certain circumstances. EPA is deleting the second and third sentences, which concerned certification waiver. As a result of these deletions and revisions in EPA's part 124 and part 122 regulations, certification waivers for EPA-issued NPDES permits will be governed solely by the certification waiver requirements in § 121.9 of the final rule.

d. Contents of a Certification Decision

To further clarify how a certifying authority may "act on a request for certification," EPA is finalizing recommended contents of a certification decision at § 121.7(c) through (f) and finalizing a requirement that all certification decisions be in writing. In a change from proposal and in support of the cooperative federalism balance central to section 401, the Agency is not mandating the contents that certifying authorities must include in their certification decisions. Instead, the final rule includes recommended contents for a grant of certification (§ 121.7(c)), a grant of certification with conditions (§ 121.7(d)), a denial of certification (§ 121.7(e)), and an express waiver of certification (§ 121.7(f)). As discussed in more detail below, these recommended contents are similar to those proposed (as requirements) with modifications in light of commenter input. The Agency is also finalizing revisions to the regulatory text located at § 121.7(a) of the 2020 Rule with minor, non-substantive revisions to clarify that all certification decisions should be within the scope of certification and taken within the reasonable period of time. 40 CFR 121.7(b).

---

[75] EPA is also deleting provisions in § 124.53(e) because its approach to the contents of a certification decision differed from final rule § 121.7, as explained in preamble section IV.F.2.d of this preamble.

EPA is finalizing removal of the regulatory text located at § 121.7(b) of the 2020 Rule, which characterized what actions a certifying authority may take based on its evaluation of the request for certification. EPA believes it is redundant to retain separate regulatory text restating the ideas as final rule § 121.7(a) and (c) through (f).

While the statute provides that certifying authorities may make one of four decisions when processing a request for certification, the CWA does not explicitly describe the contents or elements of a certification decision. EPA's 1971 Rule defined the contents of a certification and express waiver decision for all certifying authorities. The 1971 Rule's enumeration of the contents of a certification decision was simple but effective and included the name and address of the applicant, a statement that the certifying authority examined the application, a statement that "there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards," and other information deemed appropriate by the certifying authority. 40 CFR 121.2(a) (2019). In addition, the 1971 Rule provided that a certification could be waived upon either (1) written notification from the certifying authority that it expressly waived its authority to act on a request, or (2) written notification from the Federal licensing or permitting agency regarding the failure of the certifying authority to act on a request for certification within the reasonable period of time. 40 CFR 121.16 (2019). The 1971 Rule did not define the contents of a certification denial or provide specific requirements for how to articulate and incorporate a certification condition.

In the 2020 Rule, EPA updated those requirements for each type of certification decision and more fully addressed the effects of those decisions. First, it provided that, when a certifying authority granted certification under the 2020 Rule, the certification must be in writing and include a written statement that the discharge from the proposed project would comply with water quality requirements. 40 CFR 121.7(c) (2020); 85 FR 42286.

Second, when a certifying authority granted certification with conditions, the 2020 Rule required that the certifying authority explain the necessity of each condition and provide a citation to an applicable Federal, state, or Tribal law. 40 CFR 121.7(d) (2020); 85 FR 42286. This was a change from the 1971 Rule, which broadly provided for certifying authorities to include

conditions as they "deem[ed] necessary or desirable." 40 CFR 121.2(a)(4) (2019). The 2020 Rule preamble stated that the requirements were "intended to increase transparency and ensure that any limitation or requirement added to a certification . . . is within the scope of certification." 85 FR 42256. EPA observes that this provision was similar to EPA's current NPDES program-specific section 401 regulations. *See* 40 CFR 124.53(e)(2) (2023) (requiring a citation for any conditions more stringent than those in the draft permit).[76]

Third, unlike the 1971 Rule, under which certification denials were undefined, the 2020 Rule defined the contents of a denial decision. Specifically, the 2020 Rule required certification denials to be made in writing and to identify any water quality requirements with which the discharge will not comply, include a statement explaining why the discharge would not comply with those requirements, and provide any specific water quality data or information that would help explain a denial based on insufficient information. 40 CFR 121.7(e) (2020); 85 FR 42286.

Fourth, the 2020 Rule included similar language to the 1971 Rule for express waivers and required written notification from the certifying authority indicating an express waiver of its authority to act on a request for certification. 40 CFR 121.9(a)(1) (2020); 85 FR 42286. Lastly, under the 2020 Rule, EPA defined constructive waiver as a certifying authority's "failure or refusal to act on a certification request" which included failing or refusing to (1) act within the reasonable period of time, (2) satisfy the procedural requirements for a grant or denial of certification imposed by the 2020 Rule, or (3) comply with other procedural requirements of section 401 (*e.g.,* provide public notice on a certification request). 40 CFR 121.9(a)(2) (2020); 85 FR 42286. The 2020 Rule also provided that condition-specific waivers could occur if the certifying authority failed to satisfy the procedural requirements imposed by the 2020 Rule for certification conditions. 40 CFR 121.9(b) (2020); 85 FR 42286. *See* section IV.G in this preamble for further discussion on constructive waivers and the role of Federal agencies.

The stated purpose of the 2020 Rule requirements was to promote transparency and consistency in certification decisions and to help

streamline the Federal licensing and permitting processes. 85 FR 42220. However, in pre-proposal input, several certifying authorities said that the 2020 Rule's requirements for the contents of certification decisions delayed rather than streamlined the certification process. Conversely, in pre-proposal outreach, project proponents expressed interest in keeping the 2020 Rule requirements for the added transparency and argued that it is helpful when certifying authorities explain their final certification decisions (especially denials). In response to this mixed input, the Agency proposed to include some requirements for each of the four types of certification decisions. The Agency intended for this approach to address both the workload concerns expressed by certifying authorities, and the desire of project proponents for increased transparency and consistency in the certification process.

Some commenters supported the proposed rule's approach, including the removal of the 2020 Rule requirements to include specific statutory or regulatory citations for each certification condition and denial, and retaining the inclusion of a statement explaining why each of the included conditions is necessary to assure that the activity as a whole will comply with water quality requirements. Commenters argued that the explanation requirement would provide transparency and regulatory certainty. However, some commenters asserted that any content requirements imposed by EPA would place an undue burden on the certifying authority and recommended that the Agency remove all content requirements. Conversely, some other commenters expressed interest in keeping the 2020 Rule requirements, including a few commenters who argued that citations are necessary for legally defensible certification decisions, to provide transparency, and to enable the project proponent and the public to understand the rationale for a condition.

After reviewing public comments, the Agency is not finalizing any requirements for certification decisions. Before the 2020 Rule, EPA did not impose requirements on certifying authorities regarding what information they must include in a denial or what information they must include to support a certification condition. EPA is not aware of any major issues regarding clarity or information in certification denials or conditions. Instead of mandating detailed requirements for certifying authorities, the final rule identifies recommended contents for a grant of certification, a grant of certification with conditions, a denial of

---

[76] The Agency is finalizing revisions to the part 124 regulations where such provisions are inconsistent with this final rule, including deleting 40 CFR 124.53(e)(2). *See* discussion *infra.*

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

EPA believes that it is not practicable to assess whether the human health or environmental conditions that exist prior to this action result in disproportionate and adverse effects on communities with environmental justice concerns. The Economic Analysis for the Final Rule includes information about the data limitations and uncertainties that exist regarding both baseline environmental conditions and how stakeholders, including certifying authorities, may respond to this final rule.

The Agency recognizes that the burdens of environmental pollution disproportionately fall on certain communities with environmental justice concerns, and EPA is responsive to environmental justice concerns through multiple provisions in this rule.

One of the ways the Agency addresses environmental justice concerns through the final rule is through the pre-filing meeting request requirement, which provides a mechanism to ensure certifying authorities can request and receive information needed to protect their water resources and ensure the activity will comply with applicable water quality requirements, including through consideration of information and input from potentially affected communities with environmental justice concerns during early engagement. In addition to informing the certification process, this also advances the goals of Executive Order 14096, including "meaningful involvement."

Additionally, the final rule empowers certifying authorities to make a well-informed decision that may affect communities with environmental justice concerns because under the final rule, the certifying authority can determine the additional contents of requests for certification (as long as those contents are relevant to the water quality-related impacts from the activity and are identified prior to when a project proponent submits a request). Starting the certifying authority's review of a request for certification with the necessary information about water quality-related impacts from the activity promotes environmental justice and transparency in the certification process. This also enables certifying authorities to share a greater level of detail with the public (including any communities that may be impacted by a proposed project), so that participants in the public notice and comment process can provide better informed input.[121]

Under the final rule's collaborative approach for determining the reasonable period of time, certifying authorities can take the needs of potentially affected communities into account when determining the amount of time they need to review and evaluate the potential impacts of a proposed project on the communities' water resources (*e.g.,* a certifying authority may suggest a longer reasonable period of time to facilitate outreach to communities or to conduct studies on a proposed project's impact on local communities). Additionally, the "activity" approach for scope of review has the potential to benefit communities with environmental justice concerns by ensuring that the certifying authority can broadly review the potential water quality impacts on affected communities.

Furthermore, the TAS provisions for section 401 as a whole or only for section 401(a)(2) give Tribes additional options to obtain TAS, as well as more opportunities to provide input and voice any water quality concerns during the section 401 process. Lastly, when EPA is acting as the certifying authority, the Agency is finalizing the proposed updates to the public notice provision to facilitate participation by the broadest number of potentially interested stakeholders, including communities with environmental justice concerns.

The information supporting this Executive order review, including a description of data limitations and uncertainties, is contained in the Economic Analysis for the Final Rule, which can be found in the docket for this action and is briefly summarized in section V in this preamble.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and EPA will submit a rule report to each House of Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## List of Subjects

*40 CFR Part 121*

Environmental protection, Administrative practice and procedure, Intergovernmental relations, Water pollution control.

---

[121] Under CWA section 401(a)(1), certifying authorities are required to establish procedures for public notice and, to the extent it deems appropriate, procedures for public hearings. 33 U.S.C. 1341(a)(1).

*40 CFR Part 122*

Environmental protection, Administrative practice and procedure, Confidential business information, Hazardous substances, Reporting and recordkeeping requirements, Water pollution control.

*40 CFR Part 124*

Environmental protection, Administrative practice and procedure, Air pollution control, Hazardous waste, Indians—lands, Reporting and recordkeeping requirements, Water pollution control, Water supply.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, EPA amends 40 CFR parts 121, 122, and 124 as follows:

■ 1. Revise part 121 to read as follows:

## PART 121—STATE CERTIFICATION OF ACTIVITIES REQUIRING A FEDERAL LICENSE OR PERMIT

Sec.

**Subpart A—General**

121.1  Definitions.
121.2  When certification is required.
121.3  Scope of certification.
121.4  Pre-filing meeting requests.
121.5  Request for certification.
121.6  Reasonable period of time.
121.7  Certification decisions.
121.8  Extent of Federal agency review.
121.9  Failure or refusal to act.
121.10  Modification to a grant of certification.
121.11  Requirements for Indian Tribes to administer a water quality certification program.

**Subpart B—Neighboring Jurisdictions**

121.12  Notification to the Regional Administrator.
121.13  Determination of effects on neighboring jurisdictions.
121.14  Objection from notified neighboring jurisdiction and request for a public hearing.
121.15  Public hearing and Federal agency evaluation of objection.

**Subpart C—Certification by the Administrator**

121.16  When the Administrator certifies.
121.17  Public notice and hearing.

**Subpart D—Review and Advice**

121.18  Review and advice.

**Subpart E—Severability**

121.19  Severability

**Authority:** 33 U.S.C. 1251 *et seq.*

**Subpart A—General**

**§ 121.1  Definitions.**

As used in this part, the following terms shall have the meanings indicated:

(a) *Administrator* means the Administrator, Environmental Protection Agency (EPA).

(b) *Certifying authority* means the entity responsible for certifying compliance with applicable water quality requirements in accordance with Clean Water Act section 401.

(c) *Federal agency* means any agency of the Federal Government to which application is made for a Federal license or permit that is subject to Clean Water Act section 401.

(d) *Federal Indian Reservation, Indian reservation,* or *reservation* means all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation.

(e) *Indian Tribe* or *Tribe* means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian Reservation.

(f) *License* or *permit* means any license or permit issued or granted by an agency of the Federal Government to conduct any activity which may result in any discharge into waters of the United States.

(g) *Neighboring jurisdiction* means any state, or Tribe with treatment in a similar manner as a state for Clean Water Act section 401 in its entirety or only for Clean Water Act section 401(a)(2), other than the jurisdiction in which the discharge originates or will originate.

(h) *Project proponent* means the applicant for a Federal license or permit, or the entity seeking certification.

(i) *Regional Administrator* means the Regional designee appointed by the Administrator, Environmental Protection Agency.

(j) *Water quality requirements* means any limitation, standard, or other requirement under sections 301, 302, 303, 306, and 307 of the Clean Water Act, any Federal and state or Tribal laws or regulations implementing those sections, and any other water quality-related requirement of state or Tribal law.

### § 121.2   When certification is required.

Certification or waiver is required for any Federal license or permit that authorizes any activity which may result in any discharge from a point source into waters of the United States.

### § 121.3   Scope of certification.

(a) When a certifying authority reviews a request for certification, the certifying authority shall evaluate whether the activity will comply with applicable water quality requirements. The certifying authority's evaluation is limited to the water quality-related impacts from the activity subject to the Federal license or permit, including the activity's construction and operation.

(b) Consistent with the scope of review identified in paragraph (a) of this section, a certifying authority shall include any conditions in a grant of certification necessary to assure that the activity will comply with applicable water quality requirements.

### § 121.4   Pre-filing meeting requests.

The project proponent shall request a pre-filing meeting with the certifying authority at least 30 days prior to submitting a request for certification in accordance with the certifying authority's applicable submission procedures, unless the certifying authority waives or shortens the requirement for a pre-filing meeting request.

### § 121.5   Request for certification.

(a) Where a project proponent is seeking certification from any certifying authority, the request for certification shall include the following minimum contents:

(1) If the request for certification is for an individual Federal license or permit, it shall be in writing, signed, and dated and shall include the following:

(i) A copy of the Federal license or permit application submitted to the Federal agency; and

(ii) Any readily available water quality-related materials that informed the development of the application.

(2) If the request for certification is for the issuance of a general Federal license or permit, it shall be in writing, signed, and dated and shall include the following:

(i) A copy of the draft Federal license or permit; and

(ii) Any readily available water quality-related materials that informed the development of the draft Federal license or permit.

(b) Where a project proponent is seeking certification from the Regional Administrator, if not already included in the request for certification in accordance with paragraph (a) of this section, a request for certification shall also include the following, as applicable:

(1) A description of the proposed activity, including the purpose of the proposed activity and the type(s) of discharge(s) that may result from the proposed activity;

(2) The specific location of any discharge(s) that may result from the proposed activity;

(3) A map or diagram of the proposed activity site, including the proposed activity boundaries in relation to local streets, roads, and highways;

(4) A description of current activity site conditions, including but not limited to relevant site data, photographs that represent current site conditions, or other relevant documentation;

(5) The date(s) on which the proposed activity is planned to begin and end and, if known, the approximate date(s) when any discharge(s) may commence;

(6) A list of all other Federal, interstate, Tribal, state, territorial, or local agency authorizations required for the proposed activity and the current status of each authorization; and

(7) Documentation that a pre-filing meeting request was submitted to the certifying authority in accordance with applicable submission procedures, unless the pre-filing meeting request requirement was waived.

(c) Where a project proponent is seeking certification from a certifying authority other than the Regional Administrator, and that certifying authority has identified contents of a request for certification in addition to those identified in paragraph (a) of this section that are relevant to the water quality-related impacts from the activity, the project proponent shall include in the request for certification those additional contents identified prior to when the request for certification is made.

(d) Where a project proponent is seeking certification from a certifying authority other than the Regional Administrator, and that certifying authority has not identified contents of a request for certification in addition to those identified in paragraph (a) of this section that are relevant to the water quality-related impacts from the activity, the project proponent shall include in the request for certification those additional contents identified in paragraph (b) of this section.

### § 121.6   Reasonable period of time.

(a) The reasonable period of time begins on the date that the certifying authority receives a request for certification, as defined in § 121.5, in accordance with the certifying authority's applicable submission procedures. The certifying authority shall send written confirmation to the project proponent and Federal agency of the date that the request for certification was received.

(b) The Federal agency and the certifying authority may jointly agree in writing to the reasonable period of time for the certifying authority to act on the request for certification, provided the reasonable period of time does not exceed one year from the date that the request for certification was received. Such written agreements may establish categorical reasonable periods of time.

(c) If the Federal agency and the certifying authority do not agree in writing on the length of the reasonable period of time, the reasonable period of time shall be six months.

(d) If a longer period of time is necessary to accommodate the certifying authority's public notice procedures or force majeure events (including, but not limited to, government closure or natural disasters), upon written notification by the certifying authority to the Federal agency prior to the end of the reasonable period of time, the reasonable period of time shall be extended by the period of time necessitated by public notice procedures or the force majeure event. In such written notification to the Federal agency, the certifying authority shall identify how much additional time is required and provide a justification for such extension. Such an extension shall not cause the reasonable period of time to exceed one year from the date that the request for certification was received.

(e) The Federal agency and certifying authority may agree in writing to extend the reasonable period of time for any reason, provided that the extension shall not cause the reasonable period of time to exceed one year from the date that the request for certification was received.

### § 121.7    Certification decisions.

(a) A certifying authority may act on a request for certification in one of four ways: grant certification, grant certification with conditions, deny certification, or expressly waive certification.

(b) A certifying authority shall act on a request for certification within the scope of certification and within the reasonable period of time.

(c) A grant of certification shall be in writing and should include the following:

(1) Identification of the decision as a grant of certification;

(2) Identification of the applicable Federal license or permit;

(3) A statement that the activity will comply with water quality requirements; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(d) A grant of certification with conditions shall be in writing and should include the following:

(1) Identification of the decision as a grant of certification with conditions;

(2) Identification of the applicable Federal license or permit;

(3) A statement explaining why each of the included conditions is necessary to assure that the activity will comply with water quality requirements; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(e) A denial of certification shall be in writing and should include the following:

(1) Identification of the decision as a denial of certification;

(2) Identification of the applicable Federal license or permit;

(3) A statement explaining why the certifying authority cannot certify that the activity will comply with water quality requirements, including but not limited to a description of any missing water quality-related information if the denial is based on insufficient information; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(f) An express waiver shall be in writing and should include the following:

(1) Identification of the decision as an express waiver of certification;

(2) Identification of the applicable Federal license or permit;

(3) A statement that the certifying authority expressly waives its authority to act on the request for certification; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(g) If the certifying authority determines that no water quality requirements are applicable to the activity, the certifying authority shall grant certification.

### § 121.8    Extent of Federal agency review.

To the extent a Federal agency verifies compliance with the requirements of Clean Water Act section 401, its review is limited to whether: the appropriate certifying authority issued the certification decision; the certifying authority confirmed it complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1); and the certifying authority acted on the request for certification within the reasonable period of time.

### § 121.9    Failure or refusal to act.

(a) The certification requirement shall be waived only if a certifying authority fails or refuses to act on a request for certification within the reasonable period of time.

(b) If the Federal agency determines that the certifying authority did not act on a request for certification within the reasonable period of time, the Federal agency shall promptly notify the certifying authority and project proponent in writing that the certification requirement has been waived in accordance with § 121.8. Such notice shall satisfy the project proponent's requirement to obtain certification.

### § 121.10    Modification to a grant of certification.

(a) Provided that the Federal agency and the certifying authority agree in writing that the certifying authority may modify a grant of certification (with or without conditions), the certifying authority may modify only the agreed-upon portions of the certification. The certifying authority is not required to obtain the Federal agency's agreement on the language of the modification.

(b) The certifying authority shall not, through a modification pursuant to paragraph (a) of this section:

(1) Revoke a grant of certification (with or without conditions); or

(2) Change a grant of certification (with or without conditions) into a denial or waiver of certification.

### § 121.11    Requirements for Indian Tribes to administer a water quality certification program.

(a) The Regional Administrator may accept and approve a Tribal application for purposes of administering a water quality certification program if the Tribe meets the following criteria:

(1) The Indian Tribe is recognized by the Secretary of the Interior and meets the definitions in § 121.1(d) and (e);

(2) The Indian Tribe has a governing body carrying out substantial governmental duties and powers;

(3) The water quality certification program to be administered by the Indian Tribe pertains to the management and protection of water resources that are within the borders of the Indian reservation and held by the Indian Tribe, within the borders of the Indian reservation and held by the United States in trust for Indians, within the borders of the Indian reservation and held by a member of the Indian Tribe if such property interest is subject to a trust restriction on alienation, or otherwise within the borders of the Indian reservation; and

(4) The Indian Tribe is reasonably expected to be capable, in the Regional Administrator's judgment, of carrying out the functions of an effective water quality certification program in a manner consistent with the terms and purposes of the Clean Water Act and applicable regulations in this chapter.

(b) Requests by an Indian Tribe for administration of a water quality certification program should be submitted to the appropriate EPA Regional Administrator. The application shall include the following information, provided that where the Tribe has previously qualified for eligibility or ''treatment as a state'' under another EPA-administered program, the Tribe need only provide the required information that has not been submitted in a previous application:

(1) A statement that the Tribe is recognized by the Secretary of the Interior.

(2) A descriptive statement demonstrating that the Tribal governing body is currently carrying out substantial governmental duties and powers over a defined area. The statement should:

(i) Describe the form of Tribal government;

(ii) Describe the types of governmental functions currently performed by the Tribal governing body such as, but not limited to, the exercise of police powers affecting (or relating to) the health, safety, and welfare of the affected population, taxation, and the exercise of the power of eminent domain; and

(iii) Identify the source of the Tribal government's authority to carry out the governmental functions currently being performed.

(3) A descriptive statement of the Tribe's authority to regulate water quality. The statement should include:

(i) A map or legal description of the area over which the Tribe asserts authority to regulate surface water quality; and

(ii) A statement by the Tribe's legal counsel or equivalent official that describes the basis for the Tribe's assertion of authority and may include copies of documents such as Tribal constitutions, by-laws, charters, executive orders, codes, ordinances, and/or resolutions that support the Tribe's assertion of authority.

(4) A narrative statement describing the capability of the Indian Tribe to administer an effective water quality certification program. The narrative statement should include:

(i) A description of the Indian Tribe's previous management experience that may include the administration of programs and services authorized by the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450, *et seq.*), the Indian Mineral Development Act (25 U.S.C. 2101, *et seq.*), or the Indian Sanitation Facility Construction Activity Act (42 U.S.C. 2004a);

(ii) A list of existing environmental or public health programs administered by the Tribal governing body and copies of related Tribal laws, policies, and regulations;

(iii) A description of the entity (or entities) which exercise the executive, legislative, and judicial functions of the Tribal government;

(iv) A description of the existing, or proposed, agency of the Indian Tribe which will assume primary responsibility for establishing and implementing a water quality certification program; and

(v) A description of the technical and administrative capabilities of the staff to administer and manage an effective water quality certification program or a plan which proposes how the Tribe will acquire additional administrative and technical expertise. The plan must address how the Tribe will obtain the funds to acquire the administrative and technical expertise.

(5) Additional documentation required by the Regional Administrator which, in the judgment of the Regional Administrator, is necessary to support a Tribal application.

(c) The procedure for processing a Tribe's application is as follows:

(1) The Regional Administrator shall process an application of an Indian Tribe submitted pursuant to paragraph (b) of this section in a timely manner. The Regional Administrator shall promptly notify the Indian Tribe of receipt of the application.

(2) Except as provided in paragraph (c)(4) of this section, within 30 days after receipt of the Tribe's application, the Regional Administrator shall provide appropriate notice. The notice shall:

(i) Include information on the substance and basis of the Tribe's assertion of authority to regulate the quality of reservation waters;

(ii) Be provided to all appropriate governmental entities; and

(iii) Provide 30 days for comments to be submitted on the Tribal application. Comments shall be limited to the Tribe's assertion of authority.

(3) If a Tribe's asserted authority is subject to a competing or conflicting claim, the Regional Administrator, after due consideration, and in consideration of other comments received, shall determine whether the Tribe has adequately demonstrated that it meets the requirements of paragraph (a)(3) of this section.

(4) Where, after November 27, 2023, EPA has determined that a Tribe qualifies for treatment in a similar manner as a state for the Clean Water Act section 303(c) Water Quality Standards Program, Clean Water Act section 303(d) Impaired Water Listing and Total Maximum Daily Loads Program, Clean Water Act section 402 National Pollutant Discharge Elimination System Program, or Clean Water Act section 404 Dredge and Fill Permit Program, and has provided notice and an opportunity to comment on the Tribe's assertion of authority to appropriate governmental entities as part of its review of the Tribe's prior application, no further notice to governmental entities, as described in paragraph (c)(2) of this section, shall be provided with regard to the same Tribe's application for the water quality certification program, unless the application presents to the EPA Regional Administrator different jurisdictional issues or significant new factual or legal information relevant to jurisdiction.

(5) Where the Regional Administrator determines that a Tribe meets the requirements of this section, they shall promptly provide written notification to the Indian Tribe that the Tribe is authorized to administer the water quality certification program.

(d) An Indian Tribe may submit a Tribal application for purposes of administering only the Clean Water Act section 401(a)(2) portion of a water quality certification program.

## Subpart B—Neighboring Jurisdictions

### § 121.12  Notification to the Regional Administrator.

(a) Within five days of the date that it has received both the application and either a certification or waiver for a Federal license or permit, the Federal agency shall provide written notification to the appropriate Regional Administrator.

(1) The notification shall include a copy of the certification or waiver and the application for the Federal license or permit.

(2) The notification shall also contain a general description of the proposed project, including but not limited to the Federal license or permit identifier, project location (*e.g.*, latitude and longitude), a project summary including the nature of any discharge and size or scope of activity, and whether the Federal agency is aware of any neighboring jurisdiction providing

comment about the project. If the Federal agency is aware that a neighboring jurisdiction provided comment about the project, it shall include a copy of those comments in the notification.

(b) If the Regional Administrator determines there is a need for supplemental information to make a determination about potential neighboring jurisdiction effects pursuant to Clean Water Act section 401(a)(2), the Regional Administrator may make a written request to the Federal agency that such information be provided in a timely manner for EPA's determination, and the Federal agency shall obtain that information from the project proponent and forward the additional information to the Administrator within such timeframe.

(c) The Regional Administrator may enter into an agreement with a Federal agency regarding the manner of this notification process and the provision of supplemental information.

### § 121.13   Determination of effects on neighboring jurisdictions.

(a) Within 30 days after the Regional Administrator receives notice in accordance with § 121.12(a), the Regional Administrator shall determine whether a discharge from the project may affect water quality in a neighboring jurisdiction.

(b) If the Regional Administrator determines that the discharge from the project may affect water quality in a neighboring jurisdiction, within 30 days after receiving notice in accordance with § 121.12(a), the Regional Administrator shall notify the neighboring jurisdiction, the Federal agency, and the project proponent in accordance with paragraph (c) of this section.

(c) Notification from the Regional Administrator shall be in writing and shall include:

(1) A statement that the Regional Administrator has determined that a discharge from the project may affect the neighboring jurisdiction's water quality;

(2) A copy of the Federal license or permit application and related certification or waiver; and

(3) A statement that the neighboring jurisdiction has 60 days after such notification to notify the Regional Administrator and the Federal agency, in writing, if it has determined that the discharge will violate any of its water quality requirements, to object to the issuance of the Federal license or permit, and to request a public hearing from the Federal agency.

(d) A Federal license or permit shall not be issued pending the conclusion of the process described in this section, and §§ 121.14 and 121.15.

### § 121.14   Objection from notified neighboring jurisdiction and request for a public hearing.

(a) If a neighboring jurisdiction notified by the Regional Administrator pursuant to § 121.13(b) determines that a discharge from the project will violate any of its water quality requirements, it shall notify the Regional Administrator and the Federal agency in accordance with paragraph (b) of this section within 60 days after receiving such notice from the Regional Administrator.

(b) Notification from the notified neighboring jurisdiction shall be in writing and shall include:

(1) A statement that the notified neighboring jurisdiction objects to the issuance of the Federal license or permit;

(2) An explanation of the reasons supporting the notified neighboring jurisdiction's determination that the discharge from the project will violate its water quality requirements, including but not limited to, an identification of those water quality requirements that will be violated; and

(3) A request for a public hearing from the Federal agency on the notified neighboring jurisdiction's objection.

(c) The notified neighboring jurisdiction may withdraw its objection prior to the public hearing. If the notified neighboring jurisdiction withdraws its objection, it shall notify the Regional Administrator and the Federal agency, in writing, of such withdrawal.

### § 121.15   Public hearing and Federal agency evaluation of objection.

(a) Upon a request for hearing from a notified neighboring jurisdiction in accordance with § 121.14(b), the Federal agency shall hold a public hearing on the notified neighboring jurisdiction's objection to the Federal license or permit, unless the objection is withdrawn in accordance with § 121.14(c).

(b) The Federal agency shall provide public notice at least 30 days in advance of the hearing to interested parties, including but not limited to the notified neighboring jurisdiction, the certifying authority, the project proponent, and the Regional Administrator.

(c) At the hearing, the Regional Administrator shall submit to the Federal agency its evaluation and recommendation(s) concerning the objection.

(d) The Federal agency shall consider recommendations from the notified

neighboring jurisdiction and the Regional Administrator, and any additional evidence presented to the Federal agency at the hearing, and determine whether additional Federal license or permit conditions may be necessary to ensure that any discharge from the project will comply with the neighboring jurisdiction's water quality requirements. If such conditions may be necessary, the Federal agency shall include them in the Federal license or permit.

(e) If additional Federal license or permit conditions cannot ensure that the discharge from the project will comply with the notified neighboring jurisdiction's water quality requirements, the Federal agency shall not issue the Federal license or permit.

## Subpart C—Certification by the Administrator

### § 121.16   When the Administrator certifies.

(a) Certification or waiver by the Administrator is required where no state, Tribe, or interstate agency has authority to give such a certification.

(b) When acting pursuant to this section, the Administrator shall comply with the requirements of Clean Water Act section 401 and this part.

### § 121.17   Public notice and hearing.

(a) Within 20 days of the date that the request for certification was received, the Administrator shall provide public notice of the request for certification. Following such public notice, the Administrator shall provide an opportunity for public comment.

(b) If the Administrator determines that a public hearing on a request for certification is appropriate, the Administrator shall schedule such hearing at an appropriate time and place and, to the extent practicable, give all interested and potentially affected parties the opportunity to present evidence or testimony in person or by other means.

## Subpart D—Review and Advice

### § 121.18   Review and advice.

Upon the request of any Federal agency, certifying authority, or project proponent, the Administrator shall provide any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any Federal agency, certifying authority, or project proponent, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

## Subpart E—Severability

### § 121.19  Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

## PART 122—EPA ADMINISTERED PERMIT PROGRAMS: THE NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

■ 2. The authority citation for part 122 continues to read as follows:

**Authority:** The Clean Water Act, 33 U.S.C. 1251 *et seq.*

■ 3. Amend § 122.4 by revising paragraph (b) to read as follows:

### § 122.4  Prohibitions (applicable to State NPDES programs, see § 123.25).

\*      \*      \*      \*      \*

(b) When the applicant is required to obtain a State or other appropriate certification under section 401 of the CWA and that certification has not been obtained or waived;

\*      \*      \*      \*      \*

■ 4. Amend § 122.44 by revising paragraph (d)(3) to read as follows:

### § 122.44  Establishing limitations, standards, and other permit conditions (applicable to State NPDES programs, see § 123.25).

\*      \*      \*      \*      \*

(d) \*      \*      \*

(3) Conform to the conditions in a State certification under section 401 of the CWA when EPA is the permitting authority;

\*      \*      \*      \*      \*

■ 5. Amend § 122.62 by revising paragraph (a)(3)(iii) to read as follows:

### § 122.62  Modification or revocation and reissuance of permits (applicable to State programs, see § 123.25).

\*      \*      \*      \*      \*

(a) \*      \*      \*

(3) \*      \*      \*

(iii) For changes based upon modified State certifications of NPDES permits, see § 121.10 of this chapter.

\*      \*      \*      \*      \*

## PART 124—PROCEDURES FOR DECISIONMAKING

■ 6. The authority citation for part 124 continues to read as follows:

**Authority:** Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq.*; Safe Drinking Water Act, 42 U.S.C. 300f *et seq.*; Clean Water Act, 33 U.S.C. 1251 *et seq.*; Clean Air Act, 42 U.S.C. 7401 *et seq.*

■ 7. Amend § 124.53 by revising paragraphs (b) through (e) to read as follows:

### § 124.53  State certification.

\*      \*      \*      \*      \*

(b) Consistent with the requirements set forth in §§ 121.4 and 121.5 of this chapter, applications for individual permits may be forwarded by the Regional Administrator to the certifying State agency with a request to act on the request for certification consistent with § 121.7 of this chapter.

(c) If State certification has not been requested by the time the draft permit is prepared, the Regional Administrator shall send the certifying State agency a request for certification consistent with § 121.5 of this chapter and include a copy of the draft permit.

(d) State certification shall be granted or denied within the reasonable period of time as required under CWA section 401(a)(1). The State shall send a notice of its action, including a copy of any certification, to the applicant and the Regional Administrator.

(e) State certification on a draft permit may include a statement of the extent to which each condition of the draft permit can be made less stringent without violating the requirements of State law, including water quality standards.

■ 8. Amend § 124.54 by revising paragraphs (a) and (b) to read as follows:

### § 124.54  Special provisions for State certification and concurrence on applications for section 301(h) variances.

(a) When an application for a permit incorporating a variance request under CWA section 301(h) is submitted to a State, the appropriate State official shall either:

(1) Deny the request for the CWA section 301(h) variance (and so notify

the applicant and EPA) and, if the State is an approved NPDES State and the permit is due for reissuance, process the permit application under normal procedures; or

(2) Forward a copy of the certification required under CWA section 401(a)(1) to the Regional Administrator.

(b) When EPA issues a tentative decision on the request for a variance under CWA section 301(h), and no certification has been received under paragraph (a) of this section, the Regional Administrator shall forward the tentative decision to the State. If the State fails to deny or grant certification and concurrence under paragraph (a) of this section within the reasonable period of time provided in CWA section 401(a)(1), certification will be waived and the State shall be deemed to have concurred in the issuance of a CWA section 301(h) variance.

\*      \*      \*      \*      \*

■ 9. Amend § 124.55 by:
■ a. Revising paragraph (a);
■ b. Removing paragraph (b);
■ c. Redesignating paragraphs (c) through (f) as paragraphs (b) through (e), respectively; and
■ d. Revising newly redesignated paragraphs (b) and (c).

The revisions read as follows:

### § 124.55  Effect of State certification.

(a) When certification is required under CWA section 401(a)(1), no final permit shall be issued:

(1) If certification is denied; or

(2) Unless the final permit incorporates the conditions specified in the certification.

(b) A State may not condition or deny a certification on the grounds that State law allows a less stringent permit condition.

(c) A condition in a draft permit may be changed during agency review in any manner consistent with a corresponding certification. No such changes shall require EPA to submit the permit to the State for recertification.

\*      \*      \*      \*      \*

[FR Doc. 2023–20219 Filed 9–26–23; 8:45 am]

**BILLING CODE 6560–50–P**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on November 2, 2023.  Participants in the case will be served by the appellate CM/ECF system.

_/s/ Angela X. Gao_
Angela X. Gao
Attorney